UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

PARKS, LLC,                                  :
                                             :
                    Plaintiff,               :
            v.                               :        No. 5:15-cv-00946
                                             :
TYSON FOODS, INC.; HILLSHIRE                 :
BRANDS COMPANY,                              :
                                             :
                    Defendants.              :
_____

<u>**MEMORANDUM OPINION**</u>

**Plaintiff's Motion for Preliminary Injunction, ECF No. 5 - Denied**

**Joseph F. Leeson, Jr.**                                    **July 28, 2015**
**United States District Judge**

**I.      Background and Procedural History**

Plaintiff is Parks, LLC, a seller of sausages and other processed meat products, which traces its origins to the H.G. Parks Sausage Company. Am. Compl. ¶¶ 2, 15, ECF No. 4. The Parks Sausage Company, founded in Maryland in 1950, sold its products under the name "Parks." <u>Id.</u> ¶ 16. Taken public in 1969, Parks Sausage Company became known as the first African-American-owned company to be publicly traded on a U.S. stock exchange and for its radio and television advertisements that contained "a distinctive plea in the voice of a child for 'more Parks' sausages Mom.'" <u>Id.</u> ¶ 15.

However, fame does not assure commercial success, and by 1995 the Parks Sausage Company had declared bankruptcy. <u>Id.</u> ¶ 17. Plaintiff is Parks Sausage Company's successor, having acquired the defunct company's assets in 1996. <u>Id.</u> ¶ 18. Initially, Plaintiff attempted to carry on with the manufacture and sale of processed meat products, but later contracted the tasks

of producing, marketing, and selling the products through a license agreement with Dietz & Watson, Inc., another producer of processed meat products. Id. ¶¶ 19-20.

Plaintiff has also licensed the use of the "Parks" name to Super Bakery Inc., which "specializes in nutrition-oriented foods for schoolchildren and sells food products to the armed services." Id. ¶¶ 18, 20. Super Bakery markets and sells processed meat products under the Parks name, primarily to the "United States military and other institutions for distribution throughout the United States." Id. ¶ 20.[1] Super Bakery is related to Plaintiff by more than a licensing agreement: the two entities are owned by the same individuals who formed the Plaintiff entity in 1996 to purchase the assets of the bankrupt Parks Sausage Company, and they continue to own both companies to this day. Id. ¶ 18.

Defendants are Tyson Foods, Inc. and its wholly-owned subsidiary, Hillshire Brands Company, both sellers of processed meat products. Id. ¶¶ 9-10, 22-29. Tyson is a large presence in this market—an "overwhelmingly larger business entity" than Plaintiff. Id. ¶¶ 43-46. Through Tyson's acquisition of Hillshire, Tyson came to possess the "Ball Park" trademark, which has been used to sell frankfurters[2] for over fifty years. Id. ¶¶ 27, 30-31, 33.

In 2014, Hillshire launched a new line of frankfurters[3] under the name "Park's Finest," and it is this new product that brings the parties before the Court. Id. ¶ 33. According to Plaintiff, the "Parks" name and the "Ball Park" trademark were able to peacefully coexist for over fifty

---

[1] While Plaintiff has produced evidence that it licenses the use of the "Parks" name to Dietz & Watson and Super Bakery, the name is not currently registered as a trademark with the U.S. Patent and Trademark Office. At some time during the company's history, the Office cancelled the registration of the trademark. See Pl.'s Reply Supp. Mot. Prelim. Inj. 6, ECF No. 23.

[2] The term "frankfurter" is generally synonymous with the term "hot dog", although there is some evidence that the term frankfurter may carry a premium connotation. See Tr. Prelim. Inj. Hr'g 48:12-13, 172:16-173:2, ECF No. 44 ("Consumers see franks as a bit more premium that a hot dog. Frank is something you're going to put on a grill. A hot dog is something you're going to boil . . . ."). Plaintiff has expressed a clear preference for the term frankfurter, see Pl.'s Reply 1, and for consistency the Court will generally refer to these products as such, except when referring to evidence in the record that uses the alternative term.

[3] The front of the packaging for the product states that the product consists of "uncured beef frankfurters." See Prelim. Inj. Hr'g Exs. 23A-23C. Plaintiff asserts that Defendants are selling not frankfurters but sausages, a distinction whose importance will be further explored later in this Memorandum.

years, but Hillshire's choice to name its new product "Park's Finest" constitutes, among other things, false advertising. Id. ¶¶ 30-31. Plaintiff, Parks, claims that by Hillshire's use of this name for the new Hillshire frankfurters, Defendants are representing "that they are selling Parks' finest products," and thereby engaging in various forms of false advertising and trademark infringement in violation of federal and state law. Id. ¶¶ 37-38, 50-81.

The new frankfurters appear in a package that features the name "Park's Finest" prominently displayed in a capitalized, sans-serif typeface, with the word "Park's" located on a separate line directly above the word "Finest." Id. ¶ 33. The two words are set in a justified alignment, and together they form a large, rectangular-shaped word mark. Id. Superimposed on the center of, and partially obscuring, the "Park's Finest" text is Defendants' "Ball Park" trademark—the mark that appears on Defendants' Ball Park-branded frankfurters. Id. The new Park's Finest name and the Ball Park brand are also used together in the radio and television advertisements Defendants created, which describe the product as "Park's Finest from Ball Park." Id. ¶¶ 34-36.

Plaintiff claims that Defendants' misleading presentation of the Park's Finest frankfurters cuts deeper than the product's name. Plaintiff also points to an image that appears on the front of the package of the product, which appears to depict a cross-sectional view of the inside of a single Park's Finest frankfurter that has been sliced diagonally. See id. ¶ 33; Pl.'s Mem. Supp. Mot. Prelim. Inj. 4, ECF No. 5-1. According to Plaintiff, this image shows "what appears to be a sausage link," rather than a frankfurter. Am. Compl. ¶ 33; see Caputo Decl. ¶ 8, ECF No. 5-3. Because Plaintiff (and its predecessor, the Parks Sausage Company) is primarily associated with sausage products, this image—combined with the name Hillshire chose for its new

3

frankfurters—leads to an inescapable conclusion: Defendants "are marketing and selling their product as PARK'S FINEST sausages." See id. ¶¶ 15-16, 39, 42; Pl.'s Mem. 6, 13.

Plaintiff initiated this action on February 24, 2015.[4] Plaintiff claims that Defendants: (1) made false or misleading statements of fact in violation of the Lanham Act, specifically in violation of 15 U.S.C. § 1125; (2) made false or misleading statements related to the origin of the Park's Finest product, also in violation of 15 U.S.C. § 1125(a); (3) used Plaintiff's mark in a manner likely to cause dilution of Plaintiff's mark, entitling Plaintiff to injunctive relief pursuant to 15 U.S.C. § 1125(c); (4) engaged in violations of unspecified sections of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. § 201-1 to 201-9.3; (5) engaged in trademark dilution in violation of 54 Pa. Cons. Stat. § 1124; and (6) engaged in unfair competition in violation of state law. See id. ¶¶ 50-81. Approximately one month later, Plaintiff filed the present Motion, seeking a preliminary injunction that would enjoin Defendants from "identifying products as PARK'S FINEST on labels or in other advertising" pending the final resolution of this action. Pl.'s Mot. Prelim. Inj. 2, ECF No. 5. For the purpose of this Motion, Plaintiff relies solely on its claim that Defendants are engaging in false advertising in violation of the Lanham Act. See id. ¶ 6; Pl.'s Mem. 8-9; Pl.'s Reply 4.

## II.    Legal Standard – Motions for Preliminary Injunctions

To prevail on a motion for a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without the injunction; (3) the "balance of equities" weighs in the moving party's favor; and (4) the public interest favors the injunction. See Groupe SEB USA, Inc. v. Euro-Pro Operating LLC, 774 F.3d 192, 197 (3d Cir. 2014) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20

---

[4]      Prior to initiating this action, Plaintiff opposed Hillshire's attempt to register the "Park's Finest" name with the U.S. Patent and Trademark Office in a proceeding before the Trademark Trial and Appeal Board. That proceeding remained ongoing when Plaintiff filed this action. See Springer Decl. ¶¶ 6-20, ECF No. 22-2.

(2008)). The moving party bears the burden of showing that each of these four factors tips in its favor. <u>Ferring Pharm., Inc. v. Watson Pharm., Inc.</u>, 765 F.3d 205, 210 (3d Cir. 2014) ("The 'failure to establish any element . . . renders a preliminary injunction inappropriate.'" (quoting <u>NutraSweet Co. v. Vit-Mar Enters., Inc.</u>, 176 F.3d 151, 153 (3d Cir. 1999))). A preliminary injunction is an "extraordinary remedy never awarded as a matter of right" that is reserved for "limited circumstances." <u>See</u> <u>Group SEB</u>, 774 F.3d at 197 (quoting <u>Winter</u>, 555 U.S. at 24); <u>Kos Pharm., Inc. v. Andrx Corp</u>. 369 F.3d 700, 708 (3d Cir. 2004) (quoting <u>Am. Tel. & Tel. Co. v. Windback & Conserve Program, Inc.</u>, 42 F.3d 1421, 1427 (3d Cir. 1994)) (internal quotation mark omitted).

## III.    Findings of Fact

"In granting or refusing an interlocutory injunction, the court must . . . state the findings and conclusions that support its action," Fed. R. Civ. P. 52(a)(2), which requires the court to "find the facts specially and state its conclusions of law separately," Fed. R. Civ. P. 52(a)(1). While "Rule 52 does not require hyper-literal adherence," findings of fact and conclusions of law must be delineated in such a manner that does not leave an appellate court "unable to discern what were [the court's] intended factual findings." <u>See</u> <u>In re Frescati Shipping</u>, 718 F.3d at 197; <u>see also</u> 9C Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2579 (3d ed. 2008) ("The district court should state separately its findings of fact and conclusions of law without commingling them . . . ."). Accordingly, this Court's findings of facts pertinent to the disposition of Plaintiff's Motion follow.

## A.    The Parties

1.    Plaintiff is the present-day successor of the "Parks Sausage Company," which was founded by Henry G. Parks. <u>See</u> Caputo Decl. ¶ 7. Plaintiff's current involvement in the

processed meat products market is based on agreements Plaintiff has made to license the use of the name "Parks" to third parties, who use the name in connection with the production, marketing, and sale of such products. <u>See</u> Caputo Decl. ¶¶ 1, 3; Harris Decl. ¶¶ 1-2, 11-12, ECF No. 5-4. Dietz & Watson, Inc., conducting business under the "Parks Sausage Company" name, uses the Parks name to market and sell processed meat products that include "pork sausage rolls, little link sausages, pork, beef and turkey brown and serve links, mild smoked beef and turkey sausage, hot smoked beef and turkey sausage, scrapple, cracklins and pork chitterlings," which the company primarily sells in the eastern half of the country. Caputo Decl. ¶¶ 1, 3-4. Super Bakery Inc. uses the Parks name to market and sell "meat and cheese sandwiches and meal kits containing beef, beef barbeque, ham, meat balls, chicken, chicken barbeque, tuna, tuna salad and a variety of other products." Harris Decl. ¶¶ 1-2.

2.      Defendant Hillshire is a subsidiary of Defendant Tyson. <u>See</u> Smith Decl. ¶ 5, ECF No. 22-1; Tr. 171:19-21. Like Plaintiff, Tyson and its subsidiaries are also involved in the processed meat products market through their production, marketing, and sale of a variety of processed meat products under various brands, including the "Ball Park" brand of hot dogs. <u>See</u> Smith Decl. ¶¶ 4; Tr. 23:9-10. The origins of the Ball Park brand can be traced to hot dogs originally sold in Tiger Stadium, former home of the Detroit Tigers, in the late 1950s, and the brand is currently the top-selling brand of hot dogs in the country, accounting for approximately 23% of the revenue of all hot dogs sold in the United States. <u>See</u> Smith Decl. ¶¶ 5-6; Tr. 23:9-24:2. The Ball Park brand generates over $500 million in sales, primarily from sales of Ball Park-branded hot dogs but also in part from the sale of frozen, pre-cooked hamburger patties sold under the Ball Park brand. <u>See</u> Tr. 48:3-11. Ball Park-branded products are available for sale in every state of the country and can be found in a variety of grocery stores. <u>See</u> Smith Decl. ¶ 6.

The Ball Park brand is well-known in this country: research conducted between 2012 and 2014 found that over 90% of adults over the age of eighteen were familiar with the brand. <u>See</u> Smith Decl. ¶ 6; Tr. 24:5-17.

**B.    Defendants' Park's Finest Product**

1.    The market for hot dogs in this country can be divided into three categories based on the meat composition of the product. <u>See</u> Tr. 25:11-14. At the bottom of the food chain are "meat hot dogs," which are primarily consumed by children and represent a "value play" within the hot dog market. Tr. 25:14-16. The intermediate level is occupied by "beef hot dogs," a category that includes Defendants' Ball Park-branded hot dogs. Tr. 25:16-18. Standing atop the market are "super premium" hot dogs, which "tend[] to be beef hot dogs with additional benefits, whether that be flavor, or simpler ingredient statements, those kind of things." Tr. 25:18-21. This latter category is "the fastest growing space" in the hot dog market and includes brands such as Nathan's Famous and Hebrew National. <u>See</u> Tr. 25:1-3, 21-24.

2.    In late 2012, Hillshire commenced development of a hot dog product targeted at the super-premium category. Smith Decl. ¶ 7; Tr. 24:18-24. Hillshire brought this product to market in February 2014, under the name "Park's Finest." <u>See</u> Smith Decl. ¶ 7; Tr. 25:18-24.

3.    Defendants' Park's Finest product is a "hot dog" or "frankfurter." <u>See</u> Smith Decl. ¶¶ 7-8; Elliott Decl. ¶ 5; Tr. 24:18-24, 25:25-26:15, 30:18-31:19, 35:2-19; 39:6-21; 52:3-21; 60:5-63:5; Prelim. Inj. Hr'g Exs. 23A-23C. To differentiate the product from Defendants' existing Ball Park line of hot dogs, Hillshire provided the Park's Finest hot dogs with various distinguishing attributes. <u>See</u> Tr. 60:11-63:5. Compared to a Ball Park-branded hot dog, a Park's Finest hot dog has "more seasoning, a coarser grind, [and] a bit more snap to the exterior" as well as "a cleaner ingredient label" and "no added preservatives" or nitrates. Tr. 60:12-18.

7

4.      Hillshire's choice of the "Park's Finest" name for these new hot dogs was the product of a number of considerations. Hillshire desired for the name to convey an association with Defendants' existing Ball Park brand but to also "communicate[] to consumers that [Hillshire was] producing something different and better." Tr. 25:25-26:4. To that end, Hillshire sought a name that "was kind of a step away, still very clearly a hot dog, but a step away" from the Ball Park brand to communicate that the product "is a better hot dog" than the existing Ball Park-branded hot dogs. Tr. 26:4-12. These criteria led Hillshire to select the name "Park's Finest", which Hillshire viewed as a "clear shorthand version of Ball Park" that "convey[s] that this is Ball Park's finest hot dog." Tr. 26:12-15, 81:15-17. Hillshire considered a variety of other names for the new product, but rejected each in favor of "Park's Finest." See Tr. 67:10-68:9.

5.      Prior to introducing a new product, Defendants' practice is to test the proposed name with consumers. See Tr. 205:19-21, 210:5-14. Hillshire tested the Park's Finest name with consumers to determine whether consumers would associate the name with the Ball Park brand, and Hillshire found that the name "evoked thoughts among consumers of going to the ball park and that consumers linked PARK'S FINEST to [Defendants'] BALL PARK brand." See Smith Decl. ¶ 7; Tr. 26:16-25. Hillshire found that the majority of consumers who took part in Hillshire's research understood the name "to be shorthand for Ball Park's Finest" and "were very comfortable with the short, crisp communication of Park's Finest." Tr. 66:16-20.

6.      Hillshire approached the design of the packaging for the new product with similar goals in mind. Hillshire intended for "consumers to clearly understand that [the product] was an offering from Ball Park" but also "wanted consumers to recognize that it was different than [their] traditional beef hot dogs." Tr. 49:22-50:3. Hillshire also sought to call attention to the distinguishing features of the Park's Finest hot dogs—namely, the product's seasoning, flavors,

and lack of artificial preservatives. Tr. 50:3-7. The design of the Park's Finest word mark that appears on the front of the packaging was driven by two of these same objectives: differentiate the product from the Ball Park-branded hot dogs while still communicating to consumers that the product was associated with the Ball Park brand. Tr. 51:6-8; 53:13-16. Hillshire thus decided to embed the Ball Park-brand trademark on top and in the center of—and thus partially obscuring—the words "Park's Finest" but in a size that renders the Ball Park trademark substantially smaller than the words "Park's Finest." See id.

7.      Appearing to the right of the word mark on the package is an image of the particular variety of Park's Finest frankfurter contained within,[5] which shows a cross-sectional view of the inside of a single hot dog that has been sliced diagonally. See Tr. 81:18-82:12. When compared to cross-sectional views of the inside of one of Defendants' Ball Park-brand hot dogs and one of Defendants' Hillshire smoked sausages, the Park's Finest hot dog bears closer resemblance to a Hillshire smoked sausage than to a Ball Park hot dog. See Pl.'s Mem. App. The difference between the appearance of a Ball Park hot dog and a Park's Finest hot dog is attributable to the coarser grind of meat and additional seasonings used in the Park's Finest product. See Pl.'s Mem. App.; Tr. 60:11-63:5.[6] Defendants, however, do not intend for the Park's Finest product to be perceived as a sausage, because the market for hot dogs is significantly larger than the market for sausages. Tr. 30:18-31:17. To that end, the front of the Park's Finest packaging contains the words "uncured beef frankfurters" adjacent to, and in approximately the same size font as, claims that the product has no artificial preservatives and

---

[5]      Defendants offer the Park's Finest product in multiple varieties, such as seasoned beef, slow-smoked hickory, smokehouse barbeque, and cracked Dijon mustard. See Smith Decl. ¶ 8.
[6]      The resemblance is also due to the fact that the difference in size between the products—a Park's Finest frankfurter has a notably smaller diameter than a Hillshire smoked sausage—is not discernible from cross-sectional images of the products, which lack any indication of scale. See Pl.'s Mem. App.; Tr. 60:11-63:5. This size difference would, however, be apparent to a consumer who encountered the products in person. See Tr. 61:11-18.

that no nitrates or nitrites were added to the product. <u>See</u> Prelim. Inj. Hr'g Exs. 23A, 23B, 23C; Tr. 31:4-9.

8.     Hillshire commenced an advertising campaign contemporaneously with the launch of the Park's Finest product, which included airing television commercials. <u>See</u> Smith Decl. ¶ 9; Tr. 31:24-32:4. The commercials feature a spokesperson Hillshire had previously featured in a commercial for its Ball Park-brand Angus beef frankfurters, as well as "patriotic imagery," which Hillshire hoped would evoke the summer season, the associated seasonal holidays, and the connection of Defendants' Ball Park brand to "Americana" and the sport of baseball. <u>See</u> Smith Decl. ¶ 9; Tr. 35:2-19. The spokesperson introduces the Park's Finest product as "new Park's Finest from Ball Park." <u>See</u> Prelim. Inj. Hr'g Exs. 21, 22.

9.     Defendants consider the Park's Finest frankfurters to be a successful product. <u>See</u> Smith Decl. ¶ 11; Tr. 39:12-21. The product generated sales exceeding $30 million in 2014, and an annual study conducted by Information Resources, Inc. found that the debut of the Park's Finest product was the "biggest launch in the last four years within the hot dog category." <u>See</u> <u>id.</u>

## C.     The Reaction of Plaintiff's Licensees to the Park's Finest Product

1.     Upon his first encounter with Defendants' Park's Finest product, Patrick Caputo, an employee of Dietz & Watson—one of Plaintiff's licensees—and Account Manager for the Parks Sausage Company, believed that the product consisted of link sausages. <u>See</u> Caputo Decl. ¶¶ 1, 9. From his experience in this industry, he believes that the packaging of the Park's Finest product will lead consumers to "think that BALL PARK is selling Parks sausages and/or that BALL PARK is related to Parks." <u>See</u> <u>id.</u> ¶¶ 16-17. Giuseppe Harris, an employee of Super Bakery—Plaintiff's other licensee—and Marketing Manager for Parks products, had a similar first impression of Hillshire's new frankfurters. <u>See</u> Harris Decl. ¶¶ 1, 13. He believed at first

sight that "the Parks Sausage Company was offering a new product," which appeared to him to be "a kielbasa sausage." Id. ¶ 13. Mr. Caputo subsequently learned of three possible instances of consumers mistakenly believing that the product was associated with Plaintiff. See Caputo Decl. ¶ 18. One consumer contacted the Parks Sausage Company's consumer telephone number "to complain about 'Parks from Ball Park brand.'" Id. Two others complained to Mr. Caputo about the nitrate content of sausage products sold under the Parks name. Id. These consumers stated that they had been under the impression that Parks sausage products do not contain nitrates, which they said they had learned from television commercials. Id. Mr. Caputo attributes these two incidents of confusion about the nitrate content of Parks sausage products to the Park's Finest television commercials, which advertise that Defendants' Park's Finest product does not contain nitrates. See id.

2.     Tyson's Vice President and General Manager of the company's Rapid Growth Business Unit, who was Vice President and General Manager of the Ball Park brand from the time Hillshire launched the Park's Finest product until May 2014, did not learn of any instances of consumers confusing the Park's Finest product with any Parks sausage products, despite being in a position to learn of any customer complaints that were voiced through Defendants' consumer hotline during his tenure with the Ball Park brand. See Tr. 21:18-22:4, 45:24-46:22. Nor has Tyson's current senior brand manager for Ball Park-branded hot dogs, who has held that position since August 2014, learned of any such incidents. See Tr. 171:22-172:3, 198:2-9.

## IV.     Conclusions of Law

Plaintiff seeks to preliminarily restrain Defendants from making false statements of fact in violation of the Lanham Act, 15 U.S.C. § 1125(a). Section 1125(a)(1)(B) prohibits using "in commerce any word, term, name, symbol, or device, or any combination thereof, or any false

designation of origin, false or misleading description of fact, or false or misleading

representation of fact" either "on or in connection with any goods or services, or any container

for goods," which "in commercial advertising or promotion, misrepresents the nature,

characteristics, qualities, or geographic origin of his or her or another person's goods, services,

or commercial activities." 15 U.S.C. § 1125(a)(1)(B); see Groupe SEB, 774 F.3d at 198. To

establish a violation of § 1125(a)(1)(B), the moving party must show that a claim meets the

following five requirements:

> 1) that the defendant has made false or misleading statements as to his own
> product [or another's]; 2) that there is actual deception or at least a tendency to
> deceive a substantial portion of the intended audience; 3) that the deception is
> material in that it is likely to influence purchasing decisions; 4) that the advertised
> goods traveled in interstate commerce; and 5) that there is a likelihood of injury to
> the plaintiff in terms of declining sales, loss of good will, etc.

Group SEB, 774 F.3d at 198 (quoting Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc., 653

F.3d 241, 248 (3d Cir. 2011)).

 With respect to the first requirement, a statement may be "false or misleading" in one of

two ways: the statement may be either "literally false" or "literally true or ambiguous, but

ha[ving] the tendency to deceive customers." Id. (quoting Novartis Consumer Health, Inc. v.

Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002)). The

categorization of the statement affects the second requirement: if the statement is literally false,

the moving party need not prove that the false statement actually deceived or tended to deceive

consumers. Id. In other words, upon a showing of literal falsity, the second requirement of

"actual deception or a tendency to deceive is presumed." Pernod Ricard, 653 F.3d at 248 (citing

Novartis, 290 F.3d at 586). But if the statement is not literally false, the moving party cannot

prevail without proving actual deception or a tendency to deceive. Id. (citing Novartis, 290 F.3d

at 586, 588-90; Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer

Pharms., Inc., 19 F.3d 125, 129-31 (3d Cir. 1994)). The categorization of the statement is thus a

critical phase in the process of assessing a claim of false advertising. See Jean Wegman Burns,

Confused Jurisprudence: False Advertising under the Lanham Act, 79 B.U. L. Rev. 807, 866

(Oct. 1999).

**A.      Plaintiff has failed to Show that Defendants Have Made a Literally False Statement**

To determine whether Defendants have made a literally false statement, the Court must

conduct a two-step inquiry. Groupe SEB, 774 F.3d at 198. First, the Court must determine

whether the statement is unambiguous, for only an unambiguous statement can be literally false.

Id. (citing Novartis, 290 F.3d at 587). If the message the statement conveys is unambiguous, the

Court then proceeds to the second step: determining whether that unambiguous message is false.

Id. The assessment of whether a statement is "literally false" should not be conducted in the

abstract; instead, the message must be analyzed in the context in which the message is presented.

See id. (quoting Rhone-Poulenc Rorer, 19 F.3d at 129); see also Pernod Ricard, 653 F.3d at 252-

53 (observing that the falsity of two words on a product label must be considered "in the context

of the entire accused advertisement"—in that case, the entire product label—and not in

isolation).

A number of observations guide this inquiry. A statement may be ambiguous if "its

meaning [is] 'balanced between several plausible meanings'" rather than having "only one

plausible meaning." Id. at 199-200 (quoting Clorox Co. P.R. v. Proctor & Gamble Commercial

Co., 228 F.3d 24, 35 (1st Cir. 2000)). By contrast, the label of "literally false" should be reserved

for "the patently false statement that means what it says to any linguistically competent person,"

which explains why the moving party—when confronted with such a "bald-faced, egregious,

undeniable, over the top" statement—is relieved from having to come forward with proof that

the statement deceived, or tends to deceive, the seller's audience. See Schering-Plough

Healthcare Prods., Inc. v. Schwarz Pharma., Inc., 586 F.3d 500, 512-13 (7th Cir. 2009)

(Posner, J.). Thus, "[t]he greater the degree to which a message relies upon the viewer or

consumer to integrate its components and draw the apparent conclusion . . . the less likely it is

that a finding of literal falsity will be supported." See Groupe SEB, 774 F.3d at 198 (quoting

Novartis, 290 F.3d at 587) (internal quotation marks omitted).

A claim need not be made explicitly to be literally false; a claim conveyed by implication

can be deemed literally false if, "based on a facial analysis of the product name or advertising,

. . . the consumer will unavoidably receive a false message." Id. (quoting Novartis, 290 F.3d at

587); see Novartis, 290 F.3d at 587-90 (concluding that the term "Night Time Strength," as

applied to a liquid heartburn medication, necessarily implied "the unambiguous message that the

product is specially formulated to relieve nighttime heartburn").

Both sides assert that the Park's Finest name and the phrase "Park's Finest from Ball

Park" convey only one, unambiguous message, but proceed to offer two competing messages

that they have each derived from these statements. To Plaintiff, "the only plausible meaning of

PARKS is the Plaintiff, Parks." Pl.'s Mem. 13. Thus, the Park's Finest name and the use of the

phrase "Park's Finest from Ball Park" in Defendants' advertising campaigns conveys "an explicit

unambiguous message to the consumer that Ball Park is now offering PARKS 'finest'

products."[7] Id. at 11, 13. To Defendants, "the word PARK'S in the phrase PARK'S FINEST

---

[7]     In Plaintiff's reply to Defendants' opposition to the present Motion, Plaintiff shifts the emphasis of its
argument. Instead of focusing on the relationship between the Park's Finest name and Plaintiff's "Parks" name,
Plaintiff argues that Defendants' statements are false because "the PARK'S FINEST in Defendants' advertising
does not mean BALL PARK but someone else," which, according to Plaintiff, means that the use of the Park's
Finest name and the phrase "Park's Finest from Ball Park" conveys a message that "is literally false whether the
someone else is Plaintiff or not." See Pl.'s Reply 1. This alternative argument is the weaker of the two. That the
word "Park's" could refer not only to Plaintiff but to other, unidentified third parties as well suggests that
Defendants' statements are not susceptible to only one meaning but rather are "balanced between several plausible
meanings," which would preclude this Court from concluding that Defendants' statements are literally false. See

unambiguously refers to Defendants' famous BALL PARK brand, with the BALL PARK brand placed in the center and on top of [the words] PARK'S FINEST" on the packaging of the product. Defs.' Mem. Opp. Mot. Prelim. Inj. 12, ECF No. 22. As to the "Park's Finest from Ball Park" phrase that Defendants have featured in their advertising campaigns, Defendants assert that, "in the context of the commercial, consumers will immediately understand that the word 'Park's' in the statement 'Park's Finest from Ball Park' refers to Defendants' BALL PARK brand." Id. at 15.

The Court does not agree with Plaintiff that the word "Park's" in the Park's Finest name can be understood only as a reference to Plaintiff or to Plaintiff's Park's Sausage Company-predecessor. "Park's" may also be understood, as Defendants insist, simply "as a shorthand reference to [Defendants'] famous BALL PARK brand." See Smith Decl. ¶ 3. While the connection between the phrase "Park's Finest" and Defendants' Ball Park brand might not have been readily apparent if Defendants had chosen to present the Park's Finest name in isolation, the "determination of literal falsity rests on an analysis of the message in context." Groupe SEB, 774 F.3d at 198 (quoting Rhone-Poulenc Rorer, 19 F.3d at 129); see also Pernod Ricard, 653 F.3d at 252-53 ("As we have already emphasized, we are not dealing with [the allegedly false] words in isolation. This is not a trademark case . . . no matter how much [plaintiff] may wish it were. We are obligated in this false advertising case . . . to look at the [challenged statement] in the context of the entire accused advertisement . . . .").

This Court finds that Hillshire intended for both the design of the product's packaging and the commercials to communicate to consumers that the Park's Finest product and Defendants' Ball Park-branded frankfurters are related. Both on the cover of the Park's Finest

---

Groupe SEB, 774 F.3d at 199-200 (quoting Clorox, 228 F.3d at 35). For "[u]nless the claim is unambiguous, . . . it cannot be literally false." Id. at 198 (citing Novartis, 290 F.3d at 587).

packaging and in the Park's Finest advertisements, Hillshire chose to intertwine the Park's Finest name with the Ball Park brand. On the product's packaging, Hillshire integrated its Ball Park trademark into the Park's Finest word mark, and in the television commercials, Hillshire chose to verbally juxtapose the two names by using the phrase, "Park's Finest from Ball Park." This relationship Hillshire created between the two names provides the context in which Defendants' messages must be analyzed. In that context, the name "Park's Finest" and the phrase "Park's Finest from Ball Park" plausibly convey to consumers that the Park's Finest frankfurters "are the highest-end product line under the BALL PARK brand." See Smith Decl. ¶ 7.

Plaintiff rejects this interpretation. To Plaintiff, it is implausible for the word "Park's" in the Park's Finest name to be understood as a reference to Defendants' Ball Park brand. Plaintiff's reasoning is that: first, Defendants' existing Ball Park trademark is associated with frankfurters, not sausages. Second, Defendants are marketing the Park's Finest product as a sausage, not a frankfurter. Therefore, the Park's Finest name cannot plausibly refer to Defendants' Ball Park brand, "because there is no association whatever between BALL PARK and sausages." See Pl.'s Reply 1-2. But as this Court finds, Defendants are marketing the Park's Finest product as a frankfurter, not a sausage. Even if a consumer mistakenly believed that the Park's Finest product was a sausage—or had Hillshire decided to launch a sausage product called "Park's Finest"—a consumer could still understand that the "Park's Finest" name, in the context Hillshire has created, was intended to be a reference to Defendants' Ball Park brand. Plaintiff's observation that there is currently "no association whatever between BALL PARK and sausages" is of no moment, for Hillshire would effectively create that association by integrating the Ball Park trademark into the Park's Finest word mark. Thus, even a sausage named "Park's Finest" could be understood by a consumer as a reference to Defendant's Ball Park name; such an

interpretation would at least be among the "several plausible meanings" a consumer could derive. See Groupe SEB, 774 F.3d at 199 (quoting Clorox, 228 F.3d at 35).[8]

Plaintiff's insistence that the Park's Finest name cannot plausibly be understood as a reference to Defendants' Ball Park brand fails to account for the context in which the name is presented to consumers.[9] Because the Park's Finest name can be interpreted as a reference to the Ball Park brand, this Court cannot say that a consumer would "unavoidably receive a false message" from Defendants' statements. See Groupe SEB, 774 F.3d at 202 (quoting Novartis, 290 F.3d at 587). Therefore, only if Plaintiff can show that the message these statements convey tends to deceive consumers can Plaintiff demonstrate a likelihood of succeeding on the merits of its false advertising claim.

## B.    Plaintiff has failed to Show that Defendants' Statements Tend to Deceive

"If the message conveyed by an advertisement is literally true or ambiguous, . . . the plaintiff must prove actual deception or a tendency to deceive . . . ." Pernod Ricard, 653 F.3d at 248 (citing Novartis, 290 F.3d at 586; Rhone-Poulenc Rorer, 19 F.3d at 129-31). Whether a message is deceptive is a question of fact, see id. at 251, but "there may be cases . . . in which a

---

[8]    Of course, using the name "Park's Finest" for a sausage product may not have the same ready association with Defendants' Ball Park-branded frankfurters as a frankfurter product under that name, but because Hillshire chose the name "Park's Finest" rather than "Park's Finest Franks", the name is sufficiently malleable such that a sausage product sold under that name could be understood by a consumer as meaning "Ball Park's finest sausages." A hypothetical Park's Finest sausage would also not be the first non-frankfurter product to appear under Defendants' Ball Park brand: Timothy Smith, Tyson's Vice President and General Manager of the company's Rapid Growth Business Unit, testified that Defendants are currently selling products other than frankfurters, such as beef patties, under the Ball Park name, which generate approximately $100 million per year in sales. See Tr. 48:5-11.

[9]    Plaintiff's arguments also fail to give due regard to the common usage of the word "park" as a reference to a ballpark. Whether used to recount one player's athletic feat, see Ben Shpigel, Jeter's Inside-the-Park Homer Brings Back Memories, N.Y. Times, July 23, 2010, http://bats.blogs.nytimes.com/2010/07/23/jeters-inside-the-park-homer-brings-back-memories, or to tell the story of another's final chapter, see John Updike, Hub Fans Bid Kid Adieu, The New Yorker, Oct. 22, 1960, available at http://www.newyorker.com/magazine/1960/10/22/hub-fans-bid-kid-adieu ("In the fifth, we thought he had it; he smacked the ball hard and high into the heart of his power zone, but the deep right field in Fenway and the heavy air and a causal east wind defeated him. . . . On another day, in another park, it would have been gone."), or simply as part of the name of one team's venerable home (which, of course, is not known as "Fenway Ballpark"), this particular shorthand is ubiquitous—so ubiquitous that its usage transcends sport, see James Estrin, At National Geographic, 125 Years of Showing Beauty and Tragedy, N.Y. Times, Aug. 29, 2013, http://lens.blogs.nytimes.com/2013/08/29/for-125-years-showing-the-beauty-and-the-tragedy ("I want the photographers to come in here, especially the newer photographers, and really hit it out of the park . . . .").

court can properly say that no reasonable person could be misled by the advertisement in question," id. at 252 & n.12 (instructing that, in proper cases, courts "should . . . be prepared to use common sense to conclude that an advertisement, when taken as a whole, could not mislead a rational consumer"); see Group SEB, 774 F.3d at 201. These cases, however, are rare, and courts should engage in "[t]houghtful reflection on potential ambiguities in an advertisement," aided by the evidence produced by the challenging party, before concluding as a matter of law that a message could not mislead a reasonable person. Pernod Ricard, 653 F.3d at 254-55.

Introducing a consumer survey into evidence is the prevailing method of proving that a statement is deceptive or has a tendency to deceive. See id. at 248; Novartis, 290 F.3d at 587; Rhone-Poulenc Rorer, 19 F.3d at 129-30 (observing that, in the absence of a showing of literal falsity, the success of a claim of false advertising "usually turns on the persuasiveness of a consumer survey"). To be deceptive, the message must be capable of deceiving a "substantial portion" or "significant number" of consumers, though these proportions have not been assigned precise numerical values. See Novartis, 290 F.3d at 591, 594 (concluding that survey evidence showing that 15% of consumers were misled was sufficient to constitute a substantial portion, and observing that some courts have found actionable deception even where the percentage of the audience deceived is in single digits). The primacy of the consumer survey as the method of proving deception is diminished when the plaintiff is seeking only a preliminary injunction, but the plaintiff still must come forward with sufficient, alternative evidence of deception. See United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1183 (8th Cir. 1998) ("At the preliminary injunction stage, . . . full-blown consumer surveys or market research are not an absolute prerequisite, and expert testimony or other evidence may at times be sufficient to obtain preliminary injunctive relief . . . .") (citing Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 15

(7th Cir. 1992)); accord Scotts Co. v. United Indus. Corp., 315 F.3d 264, 276 (4th Cir. 2002); Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002); QVC, Inc. v. Your Vitamins, Inc., 714 F. Supp. 2d 291, 299 (D. Del. 2010), aff'd, 439 F. App'x 165 (3d Cir. 2011).

Ultimately, the moving party "must persuade the court that the persons 'to whom the advertisement is addressed' would find that the message received left a false impression about the product." See U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 922 (3d Cir. 1990) (quoting Toro Co. v. Textron, Inc., 499 F. Supp. 241, 251 (D. Del. 1980)) (internal quotation marks omitted).

Defendants contend that the Park's Finest name and advertising "unambiguously" refer to Defendants' Ball Park brand, suggesting that Plaintiff's claim belongs to that rare category of false advertising claims that permits the Court to declare, as a matter of law, that Defendants have not engaged in false advertising.[10] See Pernod Ricard, 653 F.3d at 252, 255 n.18 (concluding that "a district court can properly disregard survey evidence as immaterial" when confronted with a factually accurate, unambiguous statement, "because, by definition, § [1125](a)(1) does not forbid language that reasonable people would have to acknowledge is not false or misleading"). But as with Plaintiff's attempt to banish all ambiguity from Defendants' statements, the Court rejects Defendants' attempt to do the same. For a consumer to receive Defendants' intended message—that the Park's Finest frankfurters are the "finest" Ball Park product—the consumer must take notice of both the Park's Finest name and the Ball Park trademark, identify the words "Ball Park" as a reference to Defendants' existing brand of frankfurters, and interpret the Park's Finest name as a reference to the Ball Park brand. Not every

---

[10]    See Defs.' Mem. 1 ("Defendants' advertising does not convey a false message."); Defs.' Mem. 12 ("[T]he word PARK'S in the phrase PARK'S FINEST unambiguously refers to Defendants' famous BALL PARK brand . . . .").

consumer may notice or recognize the Ball Park trademark on the product's packaging, and not every consumer may understand that Defendants intend for this product to be understood as "the highest-end product line under the BALL PARK brand." See Smith Decl. ¶ 7.

"The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion," the greater the potential ambiguity in the message. See Groupe SEB, 774 F.3d at 198-99 (quoting Novartis, 290 F.3d at 587). The need for a consumer to notice, identify, and integrate the Park's Finest name with Defendants' Ball Park brand leaves room for a measure of ambiguity in Defendants' statements.[11] A reasonable consumer could observe Defendants' packaging and receive only the message that the frankfurters are called "Park's Finest."

A consumer survey that Defendants produced in connection with their opposition to Plaintiff's present Motion, which will be examined in further detail later in this Memorandum, appears to confirm this conclusion. When 200 survey respondents were presented with an image of the packaging for Defendants' Park's Finest product, 26 of them (13%) identified "Parks" or "Park's" as the company responsible for making the product. See Am. Mazis Decl. 8-9, ECF No. 39-1. Another 41 respondents (21%) responded that they "did not know" which company made the product, and 23 respondents (12%) responded that the product was made by a company other than "Ball Park", "Parks", or "Park's". Id. 116 respondents (58%) identified "Ball Park" as the responsible party. Id.

---

[11]     Had Hillshire chosen to name the new frankfurters "Ball Park's Finest," a name that Plaintiff appears to favor, see Pl.'s Mem. 16, this measure of ambiguity would likely not exist. But as this Court discussed in its findings of fact, Hillshire approached the selection of a name for the product with the goal of differentiating the product from its existing Ball Park line of frankfurters. While Hillshire intended for consumers to understand that the two products are associated with each other, Hillshire's intent to separate the two product lines appears to have been responsible for creating some level of ambiguity in the Park's Finest name. See Tr. 83:15-17.

In total, 90 respondents, or 45% of the sample, failed to identify "Ball Park" as the source of the Park's Finest product. The respondents were allowed to name more than one company in response to this question, and eight did so. Id. at 8. The summary of the survey results contained in Mr. Mazis's declaration, however, does not indicate which companies were named by those respondents who provided more than one answer, and so it is possible that up to eight of the 90 respondents who named an entity other than "Ball Park" as a maker of the product also named "Ball Park" as a second maker of the product. Conservatively subtracting those eight respondents from the total number of respondents who named an entity other than "Ball Park" still leaves at least 81 respondents, or 40.5% of the sample, who apparently did not identify "Ball Park" as the maker of the Park's Finest product. The respondents were also asked whether the company they believed to have made the product was "sponsored or approved" by another company or had "a business affiliation or connection" with another company, but Mr. Mazis's declaration does not indicate whether any of these 81 respondents managed to later identify the connection to the Ball Park brand in response to one of those questions. See id. at 10-11. The number of respondents who failed to identify a relationship between the Park's Finest product and Defendants' Ball Park brand thus cannot be precisely determined from the evidence before the Court, but it appears likely that a substantial percentage of consumers who view the packaging for the Park's Finest product may fail to receive the message that Defendants intend to communicate, receiving instead only the message that the name of the product is "Park's Finest."

But whether that message misrepresents the nature, quality, or characteristics of Defendants' product necessarily depends upon whether that consumer—who failed to grasp the connection to Defendants' Ball Park brand—would be deceived into believing that the product was "Plaintiff's Finest." While Plaintiff argues that Defendants' statements are false or

misleading regardless of whether those statements refer to Plaintiff or to some third party other

than Plaintiff,[12] Plaintiff has not suggested any person or entity other than itself to which the

statements could refer. For Defendants' statements to misrepresent the Park's Finest product, the

message would necessarily have to be understood by consumers as referring to a particular,

identifiable person or entity that is not Tyson or Hillshire. See Fernandez v. Jones, 653 F. Supp.

2d 22, 32 (D.D.C. 2009) (dismissing a false advertising claim by plaintiffs, owners of the

company "MCM Parking Co, Inc.", over defendants' use of the name "MCM Parking" because

plaintiffs lacked protectable rights in the name of its company, compelling a conclusion that

defendants' use of the name was not misleading); Philbrick v. eNom, Inc., 593 F. Supp. 2d 352,

381 (D.N.H. 2009) (granting summary judgment to defendant on a claim of false advertising

brought by plaintiff, owner of a business called "Philbrick's Sports", over defendant's use of the

phrase "Welcome to Philbricksports.com" on various internet sites, because the record was

"devoid of proof that anyone who encountered [defendant's] sites believed they had anything to

do with the plaintiffs"). The mere fact that a consumer may fail to understand the association

between the Park's Finest name and the Ball Park brand does not mean that Defendants'

statements are false or misleading.[13] For a consumer who receives from Defendants' packaging

or advertisements only the message that the product is called "Park's Finest"—neither believing

the product to relate to Plaintiff nor understanding Defendants' play on the "Ball Park" name—

---

[12]      See supra note 7.

[13]      Plaintiff contends that "PARK'S FINEST in Defendant's advertising does not mean BALL PARK but
someone else so that the statement that Defendants are selling PARK'S FINEST is literally false." However, an
entity is free to select a trade name that has no inherent connection to itself, provided that the chosen name does not
infringe on another's trademark rights or otherwise deceive consumers. See 815 Tonawanda St. Corp. v. Fay's Drug
Co., Inc., 842 F.2d 643, 646-49 (2d Cir. 1988) (observing that plaintiff could obtain trademark rights in the name
"Fay's Leader" as a name for plaintiff's pharmacy if the name has attained secondary meaning, despite the fact that
"no one named Fay was ever associated with Fay's Leader"); see generally 2 J. Thomas McCarthy, McCarthy on
Trademarks and Unfair Competition § 13:14 (4th ed. database updated June 2015) (discussing the impact of an
organization's decision to use a personal name as a trademark that does not have any connection to anyone in the
organization on a claim of trademark infringement). Thus, Defendants' potential liability under the Lanham Act
hinges on the question of whether that "someone else" is a specific third party, such that Defendants' choice of name
tends to deceive consumers.

the name would contain little to no meaning at all, other than the meaning the name derives from its association with the product.[14]

Thus, as Defendants observe, Plaintiff's false advertising claim effectively collapses into an inquiry into whether consumer surveys or other evidence show that a substantial number of consumers would associate the Park's Finest name with Plaintiff's "Parks" name.[15] The Court

---

[14]     It is also questionable whether a consumer's mere failure to appreciate the relationship between the Park's Finest name and the Ball Park brand—if determined to be in some way deceptive—would relate to the "the nature, characteristics, qualities, or geographic origin" of the frankfurters. See 15 U.S.C. § 1125(a)(1)(B); infra note 15.

[15]     See Defs.' Mem. 12. There appears to be substantial overlap between Plaintiff's false advertising claim under 15 U.S.C. § 1125(a)(1)(B) and a claim of false association under § 1125(a)(1)(A), raising some question as to whether Plaintiff's challenge to Defendants' use of the Park's Finest name relates to the "nature, characteristics, [or] qualities" of the Park's Finest product, see 15 U.S.C. § 1125(a)(1)(B), or is instead properly characterized as an assertion that the Park's Finest name "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" between Plaintiff and Defendants "or as to the origin, sponsorship, or approval of [Defendants'] goods . . . by another person," see 15 U.S.C. § 1125(a)(1)(A). See Forschner Grp., Inc. v. Arrow Trading Co., 30 F.3d 348, 353-57 (2d Cir. 1994) (concluding that the phrase "Swiss Army knife" did not relate to the geographic origin or quality of a multifunction pocketknife, thereby precluding a claim for false advertising based on the use of that phrase to market "an inexpensive and shoddy multifunction pocketknife manufactured in China"); see also Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1384 (2014) (citing Waits v. Frito-Lay, 978 F.2d 1093, 1108 (9th Cir. 1992)) ("Section 1125(a) thus creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."); Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462, 478 (2d Cir. 2005) ("[Section] 43(a) gradually developed through judicial construction into the foremost federal vehicle for the assertion of two major and distinct types of 'unfair competition': (1) infringement of even unregistered marks, names and trade dress, and (2) 'false advertising.'" (alteration in original) (quoting 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.9 (4th ed. 2002)) (internal quotation mark omitted)).

        Plaintiff's arguments in connection with this Motion appear to suggest the latter. See, e.g., Pl.'s Mem. 7 ("Fearing that it would be irreparably harmed by the threatened expansion of Defendants' use of the PARKS trademark in their marketing and sale of PARK'S FINEST . . . , Parks filed the present civil action and the present motion for preliminary injunctive relief."); Pl.'s Mem. 8 ("Defendants have falsely represented that they are the source of Parks' finest products."); Pl.'s Mem. 9 ("The essence of Parks' contention is that Defendants are falsely advertising their goods as Parks' finest product."); Pl.'s Mem. 11 ("Defendants are claiming that they, Ball PARK, are now selling the "finest" product of another party, specifically their competition PARKS."); Pl.'s Mem. 14-15 ("Defendants' false advertising . . . harms Parks in a number of ways. It suggests a connection between Parks and Defendants in which Defendants, not Parks, are in control of the marketing of Parks' products . . . . It suggests that PARKS is one of Tyson's collection of trademarks."); Tr. 5:22-6:19 ("[Defendants' statement is] false because the company that it identifies is Parks, and Parks is a long-time established manufacturer and seller of competitive products . . . .").

        It thus "appear[s]" that this false advertising dispute is a proxy for the real fight" Plaintiff wants to have over the rights to the use of the name "Parks" in the market for processed meat products. See Pernod Ricard, 653 F.3d at 247 & n.8. Plaintiff, however, elected to proceed with this Motion only on the basis of its false advertising claim, see Pl.'s Reply 4, which, unlike a claim of trademark infringement under § 1125(a)(1)(A), did not—as Plaintiff readily observes—require Plaintiff to come forward at this time with evidence that the "Parks" name has secondary meaning, see id. Defendants have not questioned the propriety of Plaintiff proceeding on a theory of false advertising, and because there is some reason to believe that Plaintiff's claim could relate to the "nature, characteristics, or qualities" of either the Park's Finest product or Plaintiff's sausage products, the Court is proceeding to assess the merits of Plaintiff's claim within the Lanham Act's false-advertising framework. See Pl.'s Mem. 11-12 ("Defendants are claiming that they . . . are now selling the 'finest' product of another party . . . . That

23

turns, therefore, to the question of whether Plaintiff has produced sufficient evidence at this stage of the proceedings to suggest that Defendants' statements tend to deceive consumers.

Plaintiff has not produced the results of a consumer survey to support its Motion. Instead, the only evidence Plaintiff has produced to suggest that consumers may be deceived by Defendants' advertising is contained in two declarations accompanying Plaintiff's Motion.[16]

The first declaration contains the statements of Patrick Caputo, an employee of Dietz & Watson—the entity that manufactures and sells products under the Parks name pursuant to a license agreement with Plaintiff—who has "oversee[n] the marketing and sales of Parks products" for the previous seven years. Caputo Decl. ¶ 1. He first opines that, "[f]rom the perspective of a typical shopper, passing a display case with the PARK'S FINEST packages on display, those packages offer PARKS FINEST sausages." Id. ¶ 16. He then expresses his belief that, "[i]f [a] shopper . . . examines the PARK'S FINEST package and sees the BALL PARK logo, . . . it is most likely that she would think that BALL PARK is selling Parks sausages and/or that BALL PARK is related to Parks." Id. ¶ 17. As the Court observed in its findings of fact, he recounts three instances of consumers expressing confusion between Plaintiff's Parks name and Defendants' Park's Finest product. One contacted the Parks Sausage Company by telephone to complain about a product identified as "Parks from Ball Park brand," while the other two complained to Mr. Caputo that they "had been told on television" that Parks sausages do not contain nitrates, when in fact Plaintiff's products do contain nitrates. Id. ¶ 18. Mr. Caputo assigns the source of this confusion over the nitrate content of Plaintiff's sausage products to the

---

is not boasting, it is a comparative claim that the PARKS product they are offering is better than PARKS' other products."); Pl.'s Mem. 15 ("By claiming to be selling Parks' "finest" products, Defendants suggest that Parks is not selling its own 'finest' products.").

[16]    Plaintiff elected not to produce any evidence at the hearing this Court held on Plaintiff's Motion on June 15, 2015, and is instead relying solely on the declarations and exhibits Plaintiff filed with its Motion. See Tr. 5:6-21, 16:5-25.

packaging and television advertisements for the Park's Finest product, which touts the product's lack of nitrates.[17] See id.

The second declaration contains the statements of Giuseppe Harris, an employee of Super Bakery—Plaintiff's other licensee—who has served as marketing manager for Parks products since 2000. In his declaration, he described his first encounter with Defendants' Park's Finest product: "[w]hen I first saw [the Park's Finest] package in a market, I understood it to mean that Parks Sausage Company was offering a new product which appeared to me to be a kielbasa sausage. That is what the label says." Harris Decl. ¶ 13.

The evidence contained in these two declarations is not sufficient to show that Defendants' packaging and advertisements have a tendency to deceive a substantial portion of consumers, and the Court therefore cannot conclude that there is a reasonable likelihood that Plaintiff will succeed on the merits of its false advertising claim. While Plaintiff need not produce a consumer survey at this stage of the proceedings to satisfy its burden, consumer reaction to an allegedly false statement is the crux of a false advertising claim that does not rest on literal falsity. See Rhone-Poulenc Rorer, 19 F.3d at 129 ("Public reaction is the measure of a commercial's impact."); Sandoz, 902 F.2d 222, 228-29 (3d Cir. 1990) ("[A plaintiff] cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react."). The reaction of three consumers—to the extent those reactions support Plaintiff's claim that Defendants' statements tend to deceive[18]—cannot be extrapolated to reach the conclusion that Defendants' statements would tend to deceive a "substantial number" of consumers. See Your Vitamins, 439 F. App'x at 168 & n.2 (affirming a district court's refusal to enter a

---

[17]     Mr. Caputo's declaration does not indicate whether these latter two consumers identified the advertising for Defendants' Park's Finest product as the source of their beliefs about the nitrate content of Plaintiff's products; his declaration appears to suggest that he inferred that Defendants' advertisements were responsible for their confusion.
[18]     See supra note 17.

preliminary injunction where evidence showed only that "a handful" of consumers may have been misled).

Nor do Mr. Caputo's and Mr. Harris's opinions add meaningful evidentiary support to Plaintiff's claim. Under the law governing trademarks, when a question arises as to whether a trademark has attained secondary meaning, courts give little weight to the testimony of individuals who are affiliated with the trademark's user. See 815 Tonawanda St., 842 F.2d at 648 (recognizing that "'opinion' testimony by a proprietor is considered self-serving and of little probative value" (citing 1 J. Thomas McCarthy, McCarty on Trademarks and Unfair Competition § 15.13 at 688-89 (2d ed. 1984))); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:40 (4th ed. database updated June 2015) ("The testimony of the trademark user's employees as to secondary meaning is often given little weight as a mere conclusion colored by possible bias."). The reasons for discounting such evidence in the context of a trademark infringement claim apply with equal force here given that the deceptive tendency of Defendants' statements hinges on the question of whether consumers would identify some relation between the Park's Finest product and Plaintiff. These reasons are not based solely on the possibility that Mr. Caputo's and Mr. Harris's statements may be "colored by possible bias" from their business relationship with Plaintiff: as persons who are intimately familiar with Plaintiff's business,[19] their perspectives are not representative of the perspectives of consumers who may encounter the Park's Finest product. Where, as here, the deceptive tendency of Defendants' statements depends upon the possibility that consumers will

---

[19]     Mr. Caputo, "Account Manager for Parks Sausage Company", stated that he is "constantly in and out of food markets, assessing the brand presence of Parks and competing products," Caputo Decl. ¶¶ 1,11, while Mr. Harris, "Marketing Manager for PARKS products," stated that his duties include "meeting with military and civilian personnel at all levels and marketing PARKS products" and "attending and participating in dozens of food shows around the country at which suppliers engage one-on-one with military personnel who eat PARKS products and are the end consumers," Harris Decl. ¶¶ 6, 8.

interpret Defendants' statements as references to Plaintiff, Mr. Caputo and Mr. Harris may readily interpret a connection to Plaintiff that many consumers may not. See Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 59 F.3d 902, 910 (9th Cir. 1995) ("Attestations from [a] person in close association and intimate contact with [a trademark user's] business do not reflect the views of the purchasing public." (quoting Norm Thompson Outfitters, Inc. v. Gen. Motors Corp., 448 F.2d 1293, 1297 (9th Cir. 1971)) (internal quotation marks omitted)).

Defendants, for their part, did conduct a consumer survey. As explored previously in this Memorandum, Defendants found that when 200 consumers were shown the packaging of the Park's Finest frankfurters and asked to identify the company that made them, 116 respondents, or 58% of the sample, responded with Defendants' brand "Ball Park." Mazis Decl. 9. Of interest to Plaintiff are the 26 respondents, or 13% of the sample, who responded with "Parks" or some variant thereof.[20] Id. Plaintiff concludes from these responses that "[t]hirteen percent of the respondents actually identified Parks as the source of the product." See Pl.'s Reply 4. But, as this Court previously explained, a consumer's identification of the name "Parks" is different from a consumer's identification of Plaintiff, and Defendants' survey proceeded to assess whether the identification of "Parks" by those 26 respondents indicated the latter. When these respondents were subsequently asked whether they had previously heard of the company they identified as the source of the product (namely, "Parks" or a variant of Parks), only eight respondents, or 4% of the sample, responded in the affirmative (an additional three were unsure). Mazis Decl. 9. When those eight respondents were then asked to name other products made by the company they had named, only one, according to Mr. Mazis, was able to identify any of Plaintiff's

---

[20]     Among those 26 participants, one responded with "Parks Ball Park" and another responded with "Parker." Mazis Decl. 8.

products.[21] Id. at 10. From these results, Mr. Mazis concluded that this one participant "is the only case of confusion found in the survey, for an incidence of 0.5%."[22] Id. at 11.

Plaintiff claims, however, that survey's ultimate conclusion is "useless" because the participants chosen for the survey were not limited to Plaintiff's customers. See Pl.'s Reply 3-4. Plaintiff quotes from Citizens Financial Group, Inc. v. Citizens National Bank of Evans City, a case involving a claim of trademark infringement based on "reverse confusion"—a type of infringement that occurs when "a larger, more powerful company . . . uses the trademark of a smaller, less powerful senior owner . . . and thereby causes likely confusion as to the source of the senior user's goods or services." 383 F.3d 110, 119 (3d Cir. 2004) (quoting Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 474 (3d Cir. 1994)). The Citizens court wrote that "[w]here, as here, the relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user, it is appropriate to survey the senior user's customers." Id. at 121-22 (quoting Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 741 (2d Cir. 1994)).

In the context of a claim of trademark infringement based on reverse confusion, it is appropriate to limit the universe of a survey to the senior user's customers, because the "relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user." Id. But, as this Court has observed, Plaintiff is not proceeding with this

---

[21]     Specifically, this participant responded by naming the following products: dinner sausage, breakfast sausage, patties, and links. See id. at 10.

[22]     This incidence rate would be slightly higher if the 41 survey participants who responded that they "did not know" the identity of the maker of the Park's Finest product were removed from the results prior to calculating the incidence rate. The Court of Appeals for the Third Circuit has suggested that a consumer survey should "filter" the responses to a survey to remove those participants who received "no message from the advertisement" in question. See Novartis, 290 F.3d at 592 ("The evidentiary value of a survey depends upon its underlying objectivity as determined through many factors, such as 'whether [the survey] is properly "filtered" to screen out those who got no message from the advertisement . . . .'" (alternation in original) (quoting Johnson & Johnson-Merck Consumer Pharm. Co. v. Smithkline Beecham Corp., 960 F.2d 294, 300 (2d Cir. 1992))); see also Rhone-Poulenc Rorer, 19 F.3d at 134. This alteration to the survey's results is of little importance; removing those 41 participants increases the incidence rate only from 0.50% to 0.63%.

Motion on a theory of trademark infringement.[23] The issue presented by a claim of false

advertising, by contrast, is whether "the persons 'to whom [an] advertisement is addressed'

would find that the message received left a false impression about the product." See U.S.

Healthcare, 898 F.3d at 922 (quoting Toro, 499 F. Supp. at 253); see also Pernod Ricard, 653

F.3d at 248 ("To establish a false advertising claim under the Lanham Act, a plaintiff must prove

. . . 'that there is actual deception or at least a tendency to deceive a substantial portion of the

intended audience . . . .'" (quoting Warner-Lambert v. Breathasure, 204 F.3d 87, 91-92 (3d Cir.

2000))). Thus, Mr. Mazis's decision to limit the survey's universe to persons who "had

purchased hot dogs at a grocery or convenience store in the past six months and expected to do

so again in the next six months" and who were also required to have "purchased 100% beef hot

dogs in the past six months," appears to have been a proper attempt to limit participation in the

survey to the persons to whom Defendants' statements are addressed. See Mazis Decl. 4; Tr.

110:8-111:25; see also 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair

Competition § 27.55 (4th ed. database updated June 2015) ("[T]he most direct way to prove the

message conveyed by the accused ad is to conduct a survey: ask a sample of the target group of

customers.").

     Plaintiff takes issue with two other aspects of Defendants' survey, but the alleged flaws

that Plaintiff identifies in the survey's methodology do not significantly undermine the survey's

evidentiary value.[24] Questions about the validity of Defendants' survey are ultimately of little

---

[23]     See supra note 15.

[24]     Plaintiff criticizes the language of the survey questions for repeatedly referring to the Park's Finest product as "hot dogs." See Mazis Decl. Ex. C, at 2-5, ECF No. 39-1. For example, after being shown an image of the Park's Finest packaging, the participants were asked, "What company do you think makes the hot dogs in the package that you just saw?" Id. at 3. Plaintiff appears to contend that the questions were leading: by telling the participants that the Park's Finest product was a hot dog, a participant who may have otherwise believed that the product was actually a sausage—and who would associate a sausage product with the sausage products historically sold under the Parks name—may then be less likely to draw a connection between the two brands. Plaintiff thus attributes the

matter, because Plaintiff has not produced sufficient evidence to show that is has a reasonable

likelihood of succeeding on the merits of its false advertising claim. Plaintiff cannot manufacture

evidence of deception by calling into question this survey's conclusion that little potential for

extremely low rate of confusion the survey found to the fact that the survey's questions dispelled any confusion about the product's identity as a frankfurter.

    Plaintiff's argument encounters two problems. The first is that, as the Court has previously discussed, the Park's Finest product is a frankfurter, not a sausage. Plaintiff's evidence that consumers may mistakenly believe that the product is a sausage comes primarily from the declarations of Mr. Caputo and Mr. Harris, who stated that they believed, at first sight, that the product was a "link sausage" or a "kielbasa," respectively. See Caputo Decl. ¶ 9; Harris Decl. ¶ 13. But for the reasons the Court has already discussed, their impressions of the nature of the Park's Finest product are not representative of the average consumer of Defendants' Park's Finest product. Plaintiff produces little other evidence that Defendants' consumers would mistake the Park's Finest product for a sausage, other than to point to the fact that the image of the Park's Finest product on the front of the product's packaging bears some similarity to a Hillshire smoked sausage. But not once in the briefing Plaintiff filed in support of this Motion does Plaintiff acknowledge that the front of the Park's Finest package contains the statement "Uncured Beef Frankfurters" in a font size that is significantly larger than much of the other text that appears on the package.

    The second is Plaintiff's questionable assumption that survey respondents who did not associate a "hot dog" product with Plaintiff would associate the same product with Plaintiff if they believed it to be a sausage. In other words, Plaintiff believes that the potential for deception depends overwhelmingly upon the type of processed meat product the consumer believes the product to be. Thus, the argument goes, telling the survey participants that the product contained "hot dogs" was the reason the rate of deception was so low. But Plaintiff hasn't produced any evidence to suggest that consumers draw such neat distinctions between different types of processed meat products, such that a consumer who did not identify any connection between Plaintiff and a "Park's Finest" hot dog would readily identify an association between Plaintiff and a "Park's Finest" sausage. Additionally, Plaintiff's evidence indicates that Plaintiff's Parks name is not solely associated with sausage products: Mr. Harris stated his employer, Super Bakery, is currently using the Parks name to sell "meat and cheese sandwiches and meal kits containing beef, beef barbeque, ham, meat balls, chicken, chicken barbeque, tuna, tuna salad and a variety of other products." See Harris Decl. ¶ 2. If Plaintiff's licensees currently associate the Parks name with a variety of food products, there is little reason to believe that the tendency of the Park's Finest product to deceive consumers turns upon whether the consumers believe the product to be a sausage instead of a "hot dog."

    But Plaintiff's contention is not devoid of merit—the Court cannot say that telling the participants that the Park's Finest product is a "hot dog" had no impact on the incidence of deception the survey detected, and the Court has taken this possibility into account in weighing the evidentiary value of Defendants' survey. Of course, Mr. Mazis could have easily avoided this problem by simply referring to the Park's Finest product as "the product."

    Plaintiff also contends that the survey did not accurately recreate the retail environment in which consumers would encounter the Park's Finest product. Specifically, Plaintiff claims that by directing the survey participants to "study the package by scrolling its image on a computer screen," the survey "ignore[d] the normal supermarket shopping conditions . . . such as impulse purchasing at a distance of five feet from the package." See Pl.'s Reply 4. For support, Plaintiff turns to the declaration of Mr. Caputo, who opined that, from his experience, a "shopper generally views the products from a distance of five feet or more" while "moving through the market glancing at the products on display." See Caputo Decl. ¶¶ 13, 15. But Mr. Smith, Tyson's Vice President and General Manager of the company's Rapid Growth Business Unit, testified that consumers do not shop for Defendants' products at a great distance; rather, they tend to observe the product at "arm's reach" when they pick up the package. See Tr. 56:18-24. Similarly, Ms. Elliott, Tyson's Senior Brand Manager for the Ball Park brand, testified that consumers "first notice the brands" at a distance of approximately five to six feet but do not take note of a specific product until closing to a distance of "about two feet." See Tr. 181:7-25. Mr. Mazis testified that he designed the survey "to simulate how people might respond as if they would have seen this package in the grocery store." See Tr. 97:10-12. The survey participants were shown images of the front and back of the packaging of the Park's Finest product and were instructed to "look at these images . . . for as long as you would if you were at the grocery store and considering whether to purchase this product." See Mazis Decl. Ex. C, at 2; Tr. 97:12-17. Based on this testimony, the Court cannot say that the simulated retail environment created in the survey differed materially from the manner in which consumers would encounter Defendants' Park's Finest product.

deception exists. Plaintiff, of course, was free to conduct its own consumer survey using its preferred methodology, but Plaintiff elected to not present any survey evidence at this time to aid in carrying its burden of proof.

Therefore, Plaintiff has failed to demonstrate a reasonable likelihood of succeeding on the merits of its false advertising claim.

## V.     Conclusion

Since Plaintiff has failed to demonstrate a reasonable likelihood of succeeding on the merits of its false advertising claim, the Court need not address the question of whether Plaintiff could satisfy the other requirements necessary to support the entry of a preliminary injunction to conclude that this is not an appropriate circumstance for such relief. See Your Vitamins, 439 F. App'x at 169 ("[T]he District Court correctly concluded that [plaintiff] had not shown on the record at the time that it was reasonably likely to prevail on the merits of this action and therefore that it was not entitled to a preliminary injunction."); Ferring, 765 F.3d at 210 ("The 'failure to establish any element . . . renders a preliminary injunction inappropriate.'" (quoting NutraSweet, 176 F.3d at 153)); Sandoz, 902 F.2d at 232 n.13. Plaintiff's Motion for a Preliminary Injunction is denied. An appropriate order follows.

**BY THE COURT:**

_/s/ Joseph F. Leeson, Jr._____
**JOSEPH F. LEESON, JR.**
**United States District Judge**