UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

PARKS, LLC,                                          :
                                                     :
                          Plaintiff,                 :
                  v.                                 :          No. 5:15-cv-00946
                                                     :
TYSON FOODS, INC.; HILLSHIRE                         :
BRANDS COMPANY,                                      :
                                                     :
                          Defendants.                :
_____

**<u>MEMORANDUM OPINION AND ORDER</u>**

**Defendants' Motion for Protective Order, ECF No. 100 – Granted in Part**
**Defendants' Motion to Compel, ECF No. 86 – Granted in Part**

**Joseph F. Leeson, Jr.**                                    **December 23, 2015**
**United States District Judge**

**I.      Introduction**

         Before the Court are two motions, both brought by Defendants: first, a Motion for

Protective Order Regarding Plaintiff's Notice of Rule 30(b)(6) to Defendant Hillshire Brands

Company, and second, a Motion to Compel Plaintiff's Responses to Certain Discovery Requests.

For the following reasons, both motions are granted in part.

         The facts of this case, which involve claims by Plaintiff, the successor of the Parks

Sausage Company, against Defendants based on Defendants' use of the name "Park's Finest" for

a line of frankfurters, are set forth in detail in a previous opinion. See Parks, LLC v. Tyson

Foods, Inc., No. 5:15-cv-00946, 2015 WL 4545408, at *1-6 (E.D. Pa. July 28, 2015). The Court

is now presented with various discovery disputes between the parties, which arose out of

Plaintiff's request to depose a designee of Defendant Hillshire Brands Company and Defendants'
requests for written discovery and the production of documents.

First, Defendants seek a protective order in response to Plaintiff's request to depose a
designee of Defendant Hillshire. The parties dispute the proper location for the deposition as
well as the propriety of the topics that Plaintiff intends to cover. Second, Defendants seek an
order compelling Plaintiff to respond to certain discovery requests that it refused to answer and
directing Plaintiff to correct various purported deficiencies in Plaintiff's responses to others.

**I.      Defendants' motion for a protective order is granted in part.**

Initially, the Court addresses Defendants' contention that Plaintiff should be barred from
deposing a designee of Hillshire. Defendants argue that Plaintiff should effectively be estopped
from participating in further discovery because Plaintiff opposed their request for an extension of
the fact discovery deadline and represented to the Court that it did not wish to have additional
time to conduct further discovery. The fact that Plaintiff opposed the extension of the fact
discovery deadline does not mean that it could not seek additional discovery once the Court ruled
in Defendants' favor and extended the deadline. The Court did not attach any conditions to the
extension of the discovery period, and will not do so now.

**A.      The deposition of Hillshire's designee shall take place at Hillshire's principal place
of business.**

Plaintiff seeks to conduct the deposition of Hillshire's designee in Philadelphia,
Pennsylvania, while Defendants contend that the appropriate place for the deposition is Chicago,
Illinois—Hillshire's principal place of business. "[T]he general rule is that corporations and
defendants that are employees of a corporate defendant ought to be deposed at the corporation's
principal place of business." Bro-Tech Corp. v. Thermax, Inc., No. 05-2330, 2006 WL 3337496,
at *2 (E.D. Pa. Nov. 16, 2006) (citing Triple Crown Am., Inc. v. Biosynth AG, No. 96-7476,

2

1998 WL 227886, at *3 (E.D. Pa. Apr. 30, 1998); Socodis-Bocchi Trading, Inc. v. M/V

Humboldt Rex, No. 91-1474, 1992 WL 142030, at *3 (E.D. Pa. June 16, 1992); 8A Charles Alan

Wright & Arthur R. Miller, Federal Practice and Procedure § 2112, at 81-82 (2d ed. 1994)). This

is because "[a] defendant neither chooses the cause of action nor the place of its bringing."

Sampathachar v. Fed. Kemper Life Assurance Co., No. Civ.A. 03-5905, 2004 WL 2743589, at

*2 (E.D. Pa. Nov. 24, 2004) (citing Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir. 1979)).

    Plaintiff suggests that the Court should conduct a multiple-factor balancing test to

determine where Hillshire's designee should be deposed, but that is not correct. There is a

presumption that a defendant corporation's designee should be deposed at the corporation's

home that must be overcome to require the designee to appear elsewhere, and the factors to

which Plaintiff cites simply illuminate whether that presumption has been overcome in a

particular case. See Matarazzi v. Econ. Forms Corp., No. 87-5373, 1988 WL 83721, at *1 (E.D.

Pa. Aug. 10, 1988) (citing Mitchell v. Am. Tobacco Co., 33 F.R.D. 262 (M.D. Pa. 1963))

(observing that there is an "ordinary presumption that depositions should be taken at a

corporation's principal place of business"); Moretti v. Herman's Sporting Goods, Inc., No. 88-

0111, 1988 WL 122299, at *1 (E.D. Pa. Nov. 10, 1988) (citing Work v. Bier, 107 F.R.D. 789,

792 n.6 (D.D.C. 1985)) ("Absent exceptional circumstances, the deposition of a defendant

corporation by its agents and others shall ordinarily be taken at its principal place of business.").

    While this general rule "is not inflexible and is subject to modification," Bro-Tech Corp.

v. Thermax, Inc., 2006 WL 3337496, at *2, the reasons Plaintiff offers to conduct the deposition

in Philadelphia fall short of the circumstances that courts in this district have found sufficiently

compelling to order the deposition of a corporate designee to be held in a place away from the

corporation's home. For example, Hillshire's principal place of business is not in location with a

ten-hour time difference, which would impede the Court's ability to mediate any disputes that arise during the deposition, see id., nor are all counsel located in Philadelphia, see Socodis-Bocchi, 1992 WL 142030, at *3, and Plaintiff has not offered to bear the cost of travel, see id.

Plaintiff contends that Tim Smith, Hillshire's proposed designee, "offers no reason why the location of the deposition is inconvenient for him,"[1] but in Mr. Smith's declaration, he stated that

> [i]n general, traveling to Philadelphia for a day or more of preparation and deposition testimony would be extremely inconvenient for me and ultimately damaging to the numerous key initiatives that I am working on across my businesses. At present, I am focused on multiple high priority initiatives including the aforementioned partner opportunity, the launch of our biggest fiscal year innovation initiative, as well as multiple cross-functional leadership meetings which require me either to be in our Chicago office or traveling to Springdale, Arkansas.[2]

Cf. Socodis-Bocchi, 1992 WL 142030, at *3 (requiring a corporate designee to submit to a deposition away from the corporation's principal place of business in part because the corporation "failed to present any evidence of the extent to which the corporate designees' affairs would be disrupted if required to appear in Philadelphia for a deposition").

Many of the reasons Plaintiff offered to justify holding the deposition in Philadelphia cut both ways, such as the observation that travel time from Chicago to Philadelphia is less than three hours (or vice versa), most of the documents that have been produced in the case are stored electronically (which means that Plaintiff would not be burdened by the need to bring those documents to Chicago), and the fact that Defendants have conducted a number of their depositions in this district (which suggests that Plaintiff is not being forced to bear excessive travel expenses to participate in discovery in this matter).

---

[1]   Pl.'s Mem. Opp'n Defs.' Mot. Protective Order 10, ECF No. 111.
[2]   Smith Decl. ¶ 8, ECF No. 100-3.

Plaintiff also suggests that holding the deposition in Philadelphia would facilitate the Court's ability to resolve any disputes that may arise because the Allentown courthouse would be a short drive away. This concern is a serious one in light of the amount of judicial supervision the parties have required, but if the Court's intervention once again proves necessary, the Court is confident that it would be able to do so remotely. Thus, "Plaintiff has presented no persuasive reason to deviate from the general rule" that requires Plaintiff to depose Hillshire's designee at Hillshire's principal place of business. See Triple Crown, 1998 WL 227886, at *3.

**B.     Defendants' motion to limit the scope of the deposition of Hillshire's designee is granted in part and denied in part.**

In addition to disputing the location where the deposition should be held, the parties also dispute the propriety of a number of topics that Plaintiff has proposed. Defendants seek a protective order preventing Plaintiff from inquiring about certain topics and limiting the scope of others. For the following reasons, the Court grants Defendants' motion in part.

**1.     Topics 3, 4, and 6**

Topics 3, 4, and 6 pertain to a facility located in Allentown, Pennsylvania and the marketing, selling, and distribution activities that Hillshire conducts there. Defendants contend that these topics are not relevant to this action because the facility does not belong to Defendants, and they have never used the facility to sell any of their Park's Finest-branded products. Defendants also object to the breadth of the topics, given that they encompass any activities Hillshire has conducted at the facility.

Plaintiff's theories of the relevance of these topics to this action are weak. First, Plaintiff speculates—without any apparent evidentiary support—that the reason Hillshire does not use this facility to sell or distribute Park's Finest products is that Hillshire may be "deliberately suppressing the sale of the accused Park's Finest product in [the Allentown] area to avoid

confusion in this area during the course of this litigation,"[3] and Plaintiff presumably seeks evidence to support that theory. Second, Plaintiff contends that information about the products Hillshire sells or distributes from this facility may lead to evidence that the Hillshire employees involved in the selection of the Park's Finest name were aware of Plaintiff's "Parks" name. Understanding how that is so requires following a chain of inferences. First, Plaintiff represents that it has recently learned through discovery that two senior Hillshire executives were involved in the selection of the Park's Finest name. Because of their senior roles at Hillshire, these individuals presumably would be familiar with the competitors to Hillshire's sausage products, which, according to Plaintiff, would include sausage products sold by Dietz & Watson, Inc. under the Parks name. Topics 3, 4, and 6 thus seek "evidence that Hillshire sells its products in [the Allentown] area in direct competition with Dietz & Watson's sale of Park's sausages."[4] If that is true, an inference could arise that the two Hillshire executives must have known of the Parks name at the time that they were involved in selecting the Park's Finest name, which may be relevant to Plaintiff's trademark infringement claims.[5]

Plaintiff will not be foreclosed from inquiring about these topics, but they will be narrowed to correspond to the reasons Plaintiff has offered for their relevance. Hillshire's designee should be prepared to testify about the purpose of the facility in a general sense to satisfy Plaintiff's desire to learn why the facility is not involved in the sale of Park's Finest-branded products. The designee should also be prepared to testify about the types of products that Hillshire has marketed, sold, or distributed from the facility and the regions in which those activities have been conducted, which addresses Plaintiff's desire to confirm that Hillshire

---

[3]    Pl.'s Mem. Opp'n Defs.' Mot. Protective Order 19.
[4]    Id.
[5]    The relevance of this evidence to Plaintiff's claims of trademark infringement is explored in greater detail in connection with the Court's review of Topics 9 and 12.

competes in the same markets as Dietz & Watson's Parks-branded products.[6] However, the designee need not be prepared to testify in exhaustive detail about the nature of the activities Hillshire conducts at the facility.

**2.     Topics 7 and 8**

Topics 7 and 8 concern the marketing, sale, and distribution of Hillshire products to Pathmark markets, including a specific Pathmark market in Philadelphia. This particular Pathmark location is notable because one of Plaintiff's attorneys stated that he discovered products bearing Defendants' "Ball Park" name displayed for sale adjacent to products bearing Plaintiff's Parks name at this location.[7] Plaintiff states, without elaboration, that these two topics are relevant for the same reasons as Topics 3, 4, and 6, and the Court presumes that Plaintiff is again seeking evidence to show that that Hillshire's products compete in the same markets as Dietz & Watson's Parks-branded products.

Accordingly, these topics will be limited in the same fashion as Topics 3, 4, and 6. Hillshire's designee should be prepared to testify to the types of products Hillshire has sold through Pathmark markets but need not be prepared to testify in exhaustive detail about Hillshire's relationship with that retailer.

**3.     Topics 9 and 12**

Topics 9 and 12 concern Hillshire's knowledge of the identity of competitors to Hillshire's sausage and kielbasa products, including products bearing the "Jimmy Dean" name. While Plaintiff states that these topics are relevant for the same reasons as Topics 3, 4, and 6 (and, therefore, Topics 7 and 8), the relevance of this information in fact depends upon a slightly

---

[6]     It would seem that this information could be obtained from some other source that is more convenient, see Fed. R. Civ. P. 26(b)(2)(C)(i), or more precise than deposition testimony, but neither party has presented information to support that determination.
[7]     A photograph of the display in question was included as an exhibit to Plaintiff's motion for preliminary injunctive relief. See Pl.'s Mem. Supp. Mot. Prelim. Inj. 5, ECF No. 5-1; Child Decl. ¶¶ 1-4, ECF No. 5-6.

different chain of inferences. With respect to the previous topics, Plaintiff seeks to use them to obtain evidence that Hillshire products are sold in markets and channels where Parks-branded products are also sold. From that evidence, Plaintiff seeks to create an inference that the two referenced Hillshire executives must have known of the existence of the Parks name because senior Hillshire executives would presumably know the identities of their competitors. With Topics 9 and 12, however, Plaintiff appears to seek direct evidence that some Hillshire employees—though not necessarily those employees involved in the selection of the Park's Finest name—were aware that Parks-branded products competed with Hillshire's products. If the Parks name was known to some Hillshire employees, that evidence could suggest that the employees who were actually involved in the selection of the Park's Finest name also knew of the Parks name.

Defendants contend that this evidence is not relevant, but relevancy has a broad definition under the Federal Rules. While relevance is not defined under the discovery rules, the term "is, however, defined in Rule 401 of the Federal Rules of Evidence, which states that 'relevant evidence' is 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" King v. Hasbro, Inc., No. 07-4001, 2009 WL 3157319, at *1 (E.D. Pa. Sept. 28, 2009). The evidence Plaintiff seeks is relevant because evidence that some Hillshire employees knew of the Parks name has some tendency to suggest that the employees involved in the selection of the Park's Finest name also knew of the name, which is a fact that may bear on the ultimate question of whether Defendants are liable for trademark infringement.[8] But the fact

---

[8]       Defendants argue that in a prior order, the Court determined that the knowledge of only those employees who were involved in the selection of the Park's Finest name is relevant to Plaintiff's trademark infringement claims. It is true that it matters not that some of a defendant's employees knew of a plaintiff's trademark if the employees who were involved in the selection of a challenged mark did not have that knowledge. See A & H

that these topics seek relevant information does not end the inquiry; only if their likely benefit outweighs the burden they impose on Hillshire are they proper subjects of inquiry. See Fed. R. Civ. P. 26(b)(1).

The evidence Plaintiff seeks does not have substantial probative value. To resolve a claim of trademark infringement, the central question that must be answered is not whether the defendant had knowledge of the plaintiff's mark, or even the defendant's intent in selecting the mark, but whether there is a likelihood of confusion between the two marks. See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210-11 (3d Cir. 2000). The mere fact that a defendant was aware of a plaintiff's mark, which is what Plaintiff seeks to infer from evidence it hopes to obtain during the deposition, is not itself probative of whether the defendant's mark creates confusion in the marketplace. See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:115 (4th ed. database updated December 2015) ("It must be kept in mind that the junior user's mere knowledge or awareness of the senior user's mark is not the same as an intent to confuse customers."). Rather, knowledge of a plaintiff's

---

Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 226 (3d Cir. 2000) (discussing a district court's finding that a defendant did not adopt a challenged mark with malicious intent, which was based in part on the district court's decision to "credit[] the evidence that no one at [defendant] responsible for the expansion of The Miracle Bra to swimwear had ever heard of [plaintiff's] Miraclesuit"). Thus, evidence that employees who were not involved in the selection of a challenged mark knew of the plaintiff's mark is not independently relevant if the court ultimately finds that the employees who were involved had no knowledge of the plaintiff's mark. But at this stage of the proceedings, no finding has been made that the employees involved in the selection of the Park's Finest name lacked awareness of Plaintiff's Parks name. If other employees at Hillshire were aware of the Parks name, that evidence could suggest that the employees involved in the selection of the Park's Finest name may also have known of the Parks name.

This question was not before the Court when the Court ruled on the document request to which Defendants refer. There, when Defendants challenged the propriety of Plaintiff's request for "[a]ll documents concerning the knowledge of Defendants or any of their officers, employees or agents, concerning the Parks trademark registrations," the only reason Plaintiff offered for needing that discovery was to "seek information concerning Defendants' intent in adopting the word Parks in their Park's Finest trademark." It is a plaintiff's burden to explain its need for a discovery request, not a court's to conceive of one, see Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment ("A party requested to provide discovery may have little information about the importance of the discovery in resolving the issues as understood by the requesting party."), and with nothing more than that explanation, the Court limited the scope of the document request to the people whose intent Plaintiff sought to discover: the Hillshire employees involved in the adoption of the Park's Finest name. Here, Plaintiff has offered an explanation for its desire to obtain broader discovery, and for the reasons the Court has discussed, that explanation is sound.

mark is only relevant to the extent that knowledge supports an inference that the defendant chose the challenged mark with the "the deliberate intent to push [the plaintiff] out of the market." See Freedom Card, Inc. v. JPMorgan Chase & Co. 432 F.3d 463, 479 (3d Cir. 2005) (citing A & H Sportswear, 237 F.3d at 232). Even proof of such intent does not conclusively establish liability, because a trademark infringement inquiry "focuses upon the state of mind of the target group of consumers, not upon the state of mind of the junior user." McCarthy, supra, § 23.110 ("In the absence of likelihood of confusion, the alleged infringer's intent cannot transmute a lawful act into an unlawful one."); see A & H Sportswear, 237 F.3d at 225-26 ("[I]t is important to reiterate the purpose of the 'intent' inquiry," because the intent of the defendant in selecting a mark is only relevant "to the extent that it bears on the likelihood of confusion . . . ."). Thus, even if a plaintiff can show that a challenged mark was chosen with the intent to confuse, that is only one factor among many that a court must consider in determining whether there is a likelihood of confusion between the two marks, and it is not even the most important one.[9]

The evidence Plaintiff seeks therefore has only a minor connection to the ultimate issue in this case, and as originally drafted, that limited evidentiary value clearly would have been outweighed by the burden these topics would have imposed on Hillshire. These two topics concern Hillshire's knowledge of its competitors, and Plaintiff defined Hillshire's knowledge to mean the knowledge of "all persons and/or corporations who or which at any time acted on [its] behalf."[10] As Defendants pointed out, these topics "would impose a burden on the Hillshire

---

[9]        "The single most important factor in determining the likelihood of confusion is mark similarity." A & H Sportswear, 237 F.3d at 216 (citing Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 476 (3d Cir. 1994)).

[10]       See Churchill Decl. Ex. 1, at 5, ECF No. 101-1.

corporate designee to speak for over a hundred thousand employees, past and present, plus some unknowable total of persons 'acting on their behalf.'"[11]

However, in response to Defendants' motion for a protective order, Plaintiff offers to limit the scope of these topics to lower the burden on Hillshire. First, Plaintiff is willing to narrow the definition of "Hillshire" to include only Hillshire's (i) marketing managers, sales managers, and sales strategy and planning managers for various Hillshire products, (ii) regional and sales managers for the northeastern and southeastern U.S. Census Bureau districts[12] and salespersons in those districts, (iii) persons involved in sales to the United States military, and (iv) members of Hillshire's legal department.[13] Second, Plaintiff is willing to confine these topics to the preceding five years. Defendants' only response to this proposal is that even with these limitations, the topics would still be "overbroad and oppressive."[14]

The Court has previously cautioned both parties that "[w]hen a party objects to a discovery request on the grounds that the request would impose an undue burden, the party 'must "demonstrate with specificity and factual detail the exact nature and extent of the burden."'" See Parks, LLC v. Tyson Foods, Inc., No. 5:15-cv-00946, 2015 WL 5042918, at *5 n.3 (E.D. Pa. Aug. 26, 2015). Without that information, the Court has no means to assess the extent of the burden.[15] As originally drafted, the burden these topics would have imposed was readily apparent from Defendants' observation of the number of employees to which the topics would have applied, but the burden the topics would impose in their revised form is not. Defendants

---

[11]    Mem. Supp. Defs.' Mot. Protective Order 11, ECF No. 100-1.
[12]    While the U.S. Census Bureau has defined a "Northeast" census region, there does not appear to be a "southeastern" census region or division. See Census Regions and Divisions of the United States, U.S. Census Bureau, http://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf (last visited Dec. 11, 2015).
[13]    Pl.'s Mem. Opp'n Defs.' Mot. Protective Order Ex. B.
[14]    Reply Mem. Supp. Defs.' Mot. Protective Order 3, ECF No. 116.
[15]    See Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment ("A party claiming undue burden or expense ordinarily has far better information—perhaps the only information—with respect to that part of the determination.").

contend that even with Plaintiff's revisions, preparing for these topics would be "oppressive," but they fail to explain the nature of that burden with specificity or support that contention with factual detail. As a result, the Court has no means to assess the extent of the burden the revised topics would impose, and without that information, the Court has no basis to find that their burden outweighs their admittedly limited probative value. Accordingly, Defendants' request for Plaintiff to be precluded from inquiring about these topics is denied.

However, the Court will further limit the scope of these topics in two respects. First, Hillshire's designee need not be prepared to testify about Hillshire's knowledge of all competitors to Hillshire's sausage and kielbasa products and Jimmy Dean-branded products. Plaintiff seeks information about Defendants' "knowledge of Parks and its trademarks,"[16] not Defendants' knowledge of each of Hillshire's competitors.[17] Therefore, these topics shall be limited to Hillshire's knowledge of Parks-branded products sold in competition to Hillshire's sausage or kielbasa products or Jimmy Dean-branded products, rather than Hillshire's knowledge of all "those who sell products in competition" with its products.

Second, the Court will further limit the set of Hillshire employees to whom these topics apply. Plaintiff represents in its opposition memorandum that it is proposing to limit these topics the knowledge of "specific management personnel, the legal department and the three individuals identified by Defendants as having made the ultimate decision to adopt Park's Finest as a trademark."[18] But as the Court has reviewed, Plaintiff worded its proposal to include not only "management personnel" but also all sales persons in the northeastern and southeastern U.S. Census Bureau districts and all persons involved in sales of Hillshire products to the United

---

[16]     See Pl.'s Mem. Opp'n Defs.' Mot. Protective Order 17.
[17]     If Plaintiff does seek to inquire more broadly about Hillshire's knowledge of its competitors, Plaintiff has failed to explain the relevance of that information. See supra note 8.
[18]     See Pl.'s Mem. Opp'n Defs.' Mot. Protective Order 14, 21.

States military, regardless of their seniority.[19] The limitation Plaintiff describes, rather than the one Plaintiff actually proposed, is the more sensible of the two. Accordingly, Hillshire's designee need not be prepared to discuss the knowledge of all of Hillshire's sales persons in the northeastern and southeastern U.S. Census Bureau districts and all persons involved in Hillshire's sales to the United States military of these topics, but only that of regional or sales managers for those areas of Hillshire's business.

To summarize, Plaintiff may inquire about the knowledge of certain Hillshire personnel,[20] over the last five years, of Parks-branded products purportedly sold in competition with Hillshire sausage or kielbasa products or Jimmy Dean-branded products.

**4.    Topic 13**

Topic 13 concerns "[a]ny marketing analysis, such as by but not limited to, Nielsen Marketing Analytics, concerning any Hillshire Product."[21] Plaintiff contends that this topic is relevant "to show the sale of products under the Parks trademark and Defendants' knowledge of that fact by their inclusion in the available market surveys specifically including the Nielsen survey used by Defendants."[22] Defendants contend that this topic should be limited in scope to concern only marketing analyses that pertain to Defendants' Park's Finest-branded products.

This topic is excessively broad in scope, and it is doubtful that any designee of a corporation the size of Hillshire could be adequately prepared to testify to all of the information

---

[19]    Specifically, Plaintiff proposed to limit the scope of Topics 9 and 12 to the knowledge or information of "[t]he marketing managers, sales managers, and sales strategy and planning managers" for various Hillshire products, "[r]egional and sales managers for the NE and SE U.S. census districts and sales persons in those districts," "[p]ersons involved in sales to US military," and "[p]ersons in the legal department of Hillshire." See Pl.'s Mem. Opp'n Defs.' Mot. Protective Order Ex. B; supra text accompanying note 13.

[20]    Namely, Hillshire's marketing managers, sales managers, or sales strategy and planning managers for the Hillshire products Plaintiff enumerated, regional or sales managers for the northeastern and southeastern United States Census Bureau districts and for products sold to the U.S. military, and members of Hillshire's legal department.

[21]    See Churchill Decl. Ex. 1, at 5.

[22]    Pl.'s Mem. Opp'n Defs.' Mot. Protective Order 20-21. Plaintiff does not elaborate as to which Nielsen survey it is referring.

that this topic could encompass.[23] Unlike Plaintiff's willingness to propose limits to the breadth of some of its other topics, Plaintiff only proposes to limit the temporal scope of this topic to a five-year period. That does little to remedy the overly broad and burdensome nature of this topic, and because Plaintiff has not offered any basis for the Court to craft a narrower version, the Court will adopt Defendants' proposal and limit this topic to only those marketing analyses that pertain to Park's Finest-branded products.

5.      **Topics 17-20**

        Topics 17 and 18 concern alleged transactions in shares of the Parks Sausage Company by the Sara Lee Corporation, a Hillshire subsidiary, between 1988 and 1995, while Topic 19 concerns the location of any records in Hillshire's possession concerning the relationship between the two companies, and Topic 20 concerns products that Sara Lee manufactured for the Parks Sausage Company. Plaintiff's only explanation for the relevance of these topics is that these topics are relevant for the same reasons as Topics 3, 4, and 6, and the Court therefore presumes that, like Topics 9 and 12, Plaintiff is seeking to discover whether any of Hillshire's employees were aware of the existence of Plaintiff's Parks name, this time by virtue of the fact that a Hillshire subsidiary owned an investment in the Parks Sausage Company approximately twenty years ago. Defendants argue that these topics have no relevance to this action given that the alleged share transactions occurred nearly twenty years before the selection of the Park's Finest name, and they also allege that Sara Lee never manufactured Parks-branded products for the Parks Sausage Company.

        Given that the only reason Plaintiff articulates for the relevance of these topics is to seek evidence that Hillshire employees were aware of Plaintiff's Parks name at the time the Park's

---

[23]      It is quite likely that Hillshire's employees prepare reports on Hillshire products on a daily basis that could be characterized as "marketing analyses."

Finest name was chosen, Topics 17, 18, and 20 are effectively subsumed by Topics 26 and 42 through 44, which, as will be seen, concern Hillshire's knowledge of the Parks Sausage Company, products made or sold by the Parks Sausage Company, and trademarks and trademark registrations owned by the Parks Sausage Company. Accordingly, Defendants' motion to preclude Plaintiff from inquiring about these topics generally is granted.

With respect to Topic 19, which seeks the location of any records in Hillshire's possession concerning the alleged relationship between the two companies, the only relevance of such documents would be that some of Hillshire's employees may have learned of the existence of the Parks Sausage Company from them, and Plaintiff will be able to inquire directly about Hillshire's knowledge of the Parks Sausage Company through other topics. Plaintiff has not articulated any other connection between the documents, if any exist, and any claims or defenses in this action. The Court therefore grants Defendants' motion to preclude inquiry into this topic.

6.     **Topic 26**

Topic 26 concerns Hillshire's knowledge of the Parks Sausage Company. As with topics 9 and 12, Plaintiff has agreed to limit this topic to the knowledge of a defined set of Hillshire employees over a limited period of time. As with those topics, the Court will further limit the set of Hillshire employees,[24] but Plaintiff otherwise may inquire about this topic for the same reasons that the Court articulated in connection with Topics 9 and 12.

7.     **Topics 27, 30, and 32**

Topics 27, 30, and 32 seek to have Hillshire's designee identify which of its employees is most knowledgeable about certain areas of Hillshire's business. Topic 27 seeks the identity of the Hillshire employee most knowledgeable about the marketing, sale, and distribution of sausage products, Topic 30 seeks the identity of the Hillshire employee most knowledgeable

---

[24]      See supra note 20.

about the marketing, sale, and distribution of Hillshire products in the New England Division of the U.S. Census Bureau's Northeast Region, and Topic 32 seeks the identity of the Hillshire Employee most knowledgeable about the marketing, sale, and distribution of Hillshire Products in the Middle Atlantic Division of the Bureau's Northeast region. Plaintiff contends that these topics "are relevant to developing evidence concerning Defendants' knowledge of products sold under the Park's trademark . . . and are important to assist in understanding the documents produced by Defendants."[25] Defendants objected to the scope of these questions and offered instead to identify the person with the most knowledge of the marketing, sale, and distribution of Park's Finest-branded products.

Plaintiff's explanation is short on details of how possessing the identity of these individuals may lead to the discovery of admissible evidence, but in light of the fact that these topics only call for Hillshire's designee to provide Plaintiff with the names of, at most, three Hillshire employees, the burden on Hillshire to prepare its designee to address these topics is minimal. See Fed. R. Civ. P. 26(b)(1). Accordingly, Hillshire's designee shall be prepared to testify to this information.

**8.    Topic 38**

Topic 38 concerns the marketing, sale, and distribution of Hillshire products in the Middle Atlantic Division of the U.S. Census Bureau's Northeast region. Plaintiff contends that this topic is relevant for the same reason as Topics 3, 4, and 6, which Plaintiff seeks to use to discover evidence that Hillshire has sold products in direct competition with products sold under Plaintiff's Parks name. Presumably, Plaintiff seeks to obtain evidence that Hillshire has sold products in this region to show that Hillshire products have competed in the same markets as Parks-branded products. However, that explanation does not justify the expansive reach of this

---

[25]    See Pl.'s Mem. Opp'n Defs.' Mot. Protective Order 21.

topic, which effectively encompasses the whole of Hillshire's operations across three states.[26] In order to limit the scope of this topic to correspond to Plaintiff's need for this information, Hillshire's designee need be prepared only to testify generally about the types of products that Hillshire has marketed, sold, or distributed in these regions and the channels through which those products are sold.

Plaintiff also contends that this topic is necessary to enable it to learn about certain individuals named in documents Defendants have produced during discovery.[27] Plaintiff, however, does not direct either Hillshire or the Court to those particular discovery materials or specify those individuals. While Plaintiff is free to inquire about these individuals during the deposition, Plaintiff will not be heard to argue that Hillshire's designee was not adequately prepared to discuss them, because Plaintiff has not afforded Hillshire adequate notice of this topic. See Fed. R. Civ. P. 30(b)(6) (providing that a deposition notice directed at an organization "must describe with reasonable particularity the matters for examination").

9.    **Topics 42-44, 48, and 49**

Topics 42-44, 48, and 49 pertain to Hillshire's knowledge of the Parks Sausage Company's products and trademarks. Topics 42-44 concern Hillshire's knowledge of products the Parks Sausage Company has made or sold and trademarks or trademark registrations the Parks Sausage Company has owned, while Topics 48 and 49 concern Hillshire's knowledge that products have been sold under the Parks name and, specifically, that Dietz & Watson has been using that name to sell products. As with Topics 9, 12, and 26, Plaintiff has agreed to limit these topics to the knowledge of a defined set of Hillshire employees and to limited time periods, and while the Court will again further limit the scope of these topics to a narrower set of Hillshire

---

[26]    See Census Regions and Divisions of the United States, U.S. Census Bureau, http://www2.census.gov/geo/pdfs/maps-of-reference/us_regdiv.pdf (last visited Dec. 11, 2015).
[27]    See Pl.'s Mem. Opp'n Defs.' Mot. Protective Order 21.

employees,[28] Plaintiff otherwise may inquire about them for the same reasons as Topics 9, 12, and 26.

**10.     Topics 46 and 47**

Topics 46 and 47 concern the steps Hillshire took to determine whether the name "Parks" was in use as a trademark before selecting the Park's Finest name and the steps Hillshire took to determine whether any entities that were identified in a trademark search report were engaged in selling products under the trademarks identified by the search. Plaintiff contends that this information is relevant because "[t]he Third Circuit has made clear that in adopting a trademark after obtaining a search report, the investigation should be made to determine whether there were 'other companies marketing similar goods under trademarks including the name.'"[29]

For this proposition, Plaintiff cites to Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 480 (3d Cir. 1994), in which the court stated that in cases of trademark infringement that are based on a theory of reverse confusion,[30] a proper subject of inquiry is whether the defendant "was careless in not conducting a thorough name search for American uses of the name." See Fisons, 30 F.3d at 480 (quoting Interpace Corp. v. Lapp, Inc., 721 F.3d 460, 463 (3d Cir. 1983)). But in the years following Fisons, the Third Circuit has twice explicitly disavowed this aspect of the decision. See Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 480 (3d Cir. 2005) (stating, in a reverse confusion case, that the court was "unimpressed" with evidence that the defendant was careless in selecting its mark because "we have not yet adopted that standard for such an analysis"); A & H Sportswear, Inc. v. Victoria's

---

[28]     See supra note 20.

[29]     See Pl.'s Mem. Opp'n Defs.' Mot. Protective Order 22.

[30]     "While the essence of a direct confusion claim is that a junior user of a mark is said to free-ride on the 'reputation and good will of the senior user by adopting a similar or identical mark,' reverse confusion occurs when 'the junior user saturates the market with a similar trademark and overwhelms the senior user.'" A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 228 (3d Cir. 2000) (citation omitted) (citing Fisons, 30 F.3d at 475).

Secret Stores, Inc., 237 F.3d 198, 232-33 (3d Cir. 2000) ("Although we recognize that our opinion in Fisons perhaps implied that mere carelessness, as opposed to deliberate intent to confuse, would weigh in a plaintiff's favor in a reverse confusion case, we are reluctant to adopt such an interpretation, as it would be manifestly out of step with our prior holdings regarding the relevance of 'intent' in trademark infringement cases."); see also Kinbook, LLC v. Microsoft Corp., 866 F. Supp. 2d 453, 469-70 (E.D. Pa. 2012) ("[T]he Third Circuit Court of Appeals has not adopted a 'carelessness' standard for such cases. To the contrary, the Court of Appeals considered and declined to adopt such a test . . . ." (citing Freedom Card, 432 F.3d at 480; A & H Sportswear, 237 F.3d at 232-33)). The Third Circuit has distanced itself from this aspect of Fisons for good reason: the ultimate question that must be resolved when a court is confronted with a claim of trademark infringement is whether there is a likelihood of confusion between two marks, and evidence of a defendant's "mere carelessness . . . does not shed any light on this inquiry." See A & H Sportswear, 237 F.3d at 233.

Therefore, Hillshire's designee need be prepared to testify only about whether the trademark search that Hillshire conducted informed Hillshire of the existence of Plaintiff's Parks name, if so, the steps Hillshire took to examine Plaintiff's or Plaintiff's licensees' use of the Parks name and the information Hillshire learned about Plaintiff, Plaintiff's licensees, or the Parks name from those inquiries.

**11.    Topics 55-59**

Topics 55-59 concern Hillshire's sales of products to the African-American community. Specifically, Topics 55 and 58 concern Hillshire's development of brands of food products for the African-American community and its strategy for selling food products to the African-American community, respectively, while Topics 56 and 57 concern any marketing surveys or

focus groups Hillshire conducted of the African-American community.[31] Similar to Topics 27, 30, and 32, Topic 59 seeks to have Hillshire's designee identify the Hillshire employee who is most knowledgeable concerning the marketing, sale, and distribution of Hillshire products to the African-American community.

Plaintiff contends that these topics are relevant because evidence has been produced that customers of Dietz & Watson's Parks-branded products are "40 to 60 percent African American."[32] From that evidence, Plaintiff speculates that Hillshire may have adopted the Park's Finest name with the intent to displace the sale of Parks-branded products to the African-American community. Defendants respond that these topics are overbroad because they are not limited to Hillshire's evaluation of the African-American market in connection with the marketing and selling of Park's Finest-branded products. The Court agrees. Plaintiff points to no evidence to suggest that its theory is anything more than speculation, and even if Plaintiff's justification for inquiring about these topics is sound, Hillshire's efforts to market and sell products to the African-American community are relevant to this action only in the context of Hillshire's plans to market and sell Park's Finest-branded products and whether those plans reveal any intent to introduce confusion with the Parks name among that demographic. If any broader inquiry is relevant, Plaintiff does not explain how that is so.[33] Accordingly, with respect to Topics 55-58, Hillshire's designee need be prepared to testify about these topics only in the context of Hillshire's development of the Park's Finest products. However, with respect to Topic 59, for the same reasons that the Court explained in connection with Topics 27, 30, and 32, Hillshire's designee should be prepared to identify the Hillshire employee who is most

---

[31]     Plaintiff agreed to limit the scope of these three topics to the previous five years. See Pl.'s Mem. Opp'n Defs.' Mot. Protective Order Ex. B.

[32]     See Pl.'s Mem. Opp'n Defs.' Mot. Protective Order 22.

[33]     See supra note 8.

knowledgeable concerning the marketing, sale, and distribution of Hillshire products to the African-American community.

## III.  Defendants' motion to compel is granted in part.

## A.  Defendants' requests for admission

Defendants ask the Court to compel Plaintiff to answer certain requests for admission that Plaintiff declined to answer and amend its answers to certain others. For the following reasons, Defendants' Motion is granted.

### 1.  Plaintiff shall serve Defendants with answers to Request for Admission Numbers 18 to 44.

Requests for Admission Numbers 18 to 44 pertain to the circumstances surrounding the expiration of the federal registrations for certain of Plaintiff's trademarks.[34] Defendants contend that the circumstances under which the federal registrations lapsed may be relevant to the question of whether Plaintiff has abandoned any of these marks, while Plaintiff argues that the cancellation of a federal trademark registration is not relevant to a trademark owner's common law trademark rights.[35]

Plaintiff is correct that "[a]llowing a federal registration to expire does not by itself prove abandonment of the mark." See 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 20.57 (4th ed. database updated December 2015) (emphasis added). But the fact that allowing a federal registration to lapse "does not, per se, constitute an abandonment of a party's common law rights in and to said mark," id. n.5 (quoting Jean Patou, Inc. v. Aristocrat Prods. Corp., 202 U.S.P.Q. 130 (T.T.A.B. 1979), does not mean that a trademark owner's failure to renew a trademark registration lacks any relevance to the question of abandonment. See Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc., 576 F. Supp. 2d 868, 880 (N.D. Ill. 2008)

---

[34]    See Dabney Decl. Ex. 1, at 5-9, ECF No. 86-3.
[35]    Pl.'s Resp. Opp'n Defs.' Mot. Compel 1, ECF No. 89.

("[A]lthough allowing a mark to expire may be taken into account as evidence of abandonment, such expiration does not in itself establish abandonment." (citation omitted)); see also Crash Dummy Movie, LLC v. Mattel, Inc., 601 F.3d 1387, 1391 (Fed. Cir. 2010) ("Although [defendant] later allowed its trademark registrations to lapse, cancellation of a trademark registration does not necessarily translate into abandonment of common law trademark rights." (emphasis added)). But more importantly, Defendants are not simply seeking to confirm that the trademark registrations lapsed. Rather, Defendants are seeking to probe the circumstances under which Plaintiff permitted them to lapse, and those circumstances—apart from the mere fact that the registrations expired—may be probative of whether Plaintiff abandoned any of these marks. See, e.g., Who Dat Yat Chat, LLC v. Who Dat, Inc., Nos. 10-1333 et al., 2012 WL 1118602, at *11 (E.D. La. Apr. 3, 2012) (observing that abandoning a federal trademark registration may be evidence of whether the owner intended to abandon the mark, unless the owner's failure to maintain a federal registration was merely the result of inadvertence); L.A. Triumph, Inc. v. Ciccone, No. CV 10-06195, 2011 WL 5562810, at *5 (C.D. Cal. Aug. 31, 2011) (denying summary judgment to the defendant on the basis of abandonment where the plaintiff "dispute[d] that it intentionally allowed its registration to lapse, and instead [argued that it] simply forgot to renew its application").

As the Court has observed, relevancy has a broad definition under the Federal Rules, and Defendants have articulated a sufficient connection between these discovery requests and the issues in this case to establish their relevancy. Accordingly, Plaintiff shall serve Defendants with answers to these requests for admission. See Fed. R. Civ. P. 36(a)(6).

**2.      Plaintiff shall serve Defendants with amended answers to Request for Admission Numbers 45 to 77, 99 to 170, and 240 to 290.**

Requests for Admission Numbers 45 to 77, 99 to 170, and 240 to 290 seek to have Plaintiff admit that neither it nor its two licensees has marketed Parks-branded products through various internet platforms, such as Twitter and Facebook. For example, Request Number 45 asks Plaintiff to "[a]dmit that you have never marketed your Parks Products on Twitter."[36] Plaintiff answered each of these requests with a qualified denial that, as Defendants point out, appears to be contradictory. For example, Plaintiff answered Request Number 45 by stating that "Parks, LLC . . . do[es] not market directly on Twitter but marketing advertising by Parks, LLC, as defined by Defendants, of Parks products has appeared and does appear on Twitter."[37]

Plaintiff's explanation for this cryptic response is that while Parks-branded products are "not being advertised directly by Plaintiff" on these platforms, references to the Parks Sausage Company and its products can be found on them.[38] For example, Plaintiff refers to a May 5, 2015 tweet by a Twitter user with the username "@TheHstryMakers," which states "'More Parks sausages, Mom . . . please.' Did you know that Parks Sausage was a black owned business founded in 1951?"[39] Plaintiff suggests that this tweet shows that "Plaintiff's products are being advertised on Twitter," which is why it was unable to answer Defendants' requests with an unqualified denial.

The problem with this reasoning is twofold. First, Defendants did not ask Plaintiff to admit that "Parks Products have never been marketed" on these platforms. Defendants asked

---

[36]      Dabney Decl. Ex. 1, at 9.
[37]      Dabney Decl. Ex. 2, at 3, ECF No. 86-4.
[38]      See Pl.'s Resp. Opp'n Defs.' Mot. Compel 5-6.
[39]      See The HistoryMakers (@TheHstryMakers), Twitter, (May 5, 2015, 10:22 AM), http://twitter.com/thehstrymakers/status/595639758669389824.

Plaintiff to admit that "you[40] have never marketed your Parks Products" on them. Second, a tweet that highlights the history of the Parks Sausage Company, authored by a "[n]on-profit research and educational institution" working to "creat[e] a digital archive of the untold personal stories of well-known and unsung African Americans," could hardly be described as the act of marketing Parks-branded products on Twitter.[41] Plaintiff shall serve Defendants with amended answers that properly respond to Defendants' requests. See State Farm Mut. Auto Ins. Co. v. Cordua, No. 07-518, 2010 WL 1223588, at *2 (E.D. Pa. Mar. 29, 2010) (observing that evasive or ambiguous answers to requests for admission will not do, and admonishing that courts should not "allow the responding party to make hair-splitting distinctions that frustrate the purpose of the [r]equest" (quoting United States v. Lorenzo, No. 89-6933, 1990 WL 83388, at *1 (E.D. Pa. June 14, 1990))).

**3.      Plaintiff shall serve Defendants with amended answers to Request for Admission Numbers 405, 406, 409, 410, 415, 416, 421, 422, 427, 428, 433, 434, 439, 440, 445, 446, 451, 452, 457, 458, 463, 464, 469, 470, 475, 476, 481, 482, 487, 488, 493, 494, 499, 500, 505, 506, 511, 512, 517, 518, 523, 524, 529, 530, 535, 536, 541, 542, 547, 548, 553, 554, 559, 560, 565, 566, 571, 572, 577, 578, 583, 584, and 639 to 659.**

Through this series of requests, Defendants seek to have Plaintiff admit that Parks-branded products have not been sold in various regions of the country. For example, Request for Admission Number 409 asks Plaintiff to "[a]dmit that your Parks Products have never been sold in Alaska."[42] Plaintiff declined to answer these requests, alleging that it "does not know the limits or extent of the area of distribution of the Parks Products which are resold" after their initial sale by Dietz & Watson or Super Bakery.[43] Defendants contend that Plaintiff did not make a reasonable inquiry before responding to these requests, because Plaintiff "must have some

[40]     Or, depending upon the particular request for admission, Dietz & Watson or Super Bakery.
[41]     The HistoryMakers (@TheHstryMakers), Twitter, https://twitter.com/TheHstryMakers (last visited Dec. 15, 2015).
[42]     Dabney Decl. Ex. 1, at 41.
[43]     Dabney Decl. Ex. 2, at 5.

24

ability to learn about the geographic location of sales of Parks Products."[44] Plaintiff responds that it has provided Defendants with detailed information concerning Dietz & Watson's and Super Bakery's sales of Parks-branded products and has no further information available to it.

As Plaintiff acknowledges, Rule 36 requires a party to make a reasonable inquiry before responding that it lacks sufficient knowledge or information to answer a request, and a reasonable inquiry "extends beyond what the respondent already knows to include what is 'readily obtainable.'"[45] While Plaintiff's point is well taken that it may be unable to conclusively determine that Parks-branded products have never been sold in a particular region, the Court agrees with Defendants that Plaintiff has not demonstrated that it conducted a reasonable inquiry before refusing to answer these requests. According to Plaintiff, the only information available to it concerns Super Bakery's and Dietz & Watson's sales of Parks-branded products, which Defendants have already obtained during discovery. Beyond that information, Plaintiff contends that it "has no way of determining the geographic limits of the resale of those products by their customers."[46] This contention, however, suggests that Plaintiff did not attempt to inquire with Dietz & Watson or Super Bakery to learn whether they may have knowledge of the locations where their customers resell their products. It would be surprising if these two companies have no knowledge of where their own products are resold, and Plaintiff cannot be said to have made a reasonable inquiry without first posing that question to its two licensees. Plaintiff may not be able to determine with certainty that Parks-branded products have never been sold in certain regions of the country, but Plaintiff's licensees may be able to confirm that they have been sold in others.

---

[44]     See Mem. Supp. Defs.' Mot. Compel 7, ECF No. 86-1.
[45]     See Pl.'s Resp. Opp'n Defs.' Mot. Compel 7; Fed. R. Civ. P. 36(a)(4).
[46]     See Pl.'s Resp. Opp'n Defs.' Mot. Compel 7.

Accordingly, Plaintiff shall inquire with Dietz & Watson and Super Bakery about their knowledge of whether their Parks-branded products have been sold in any of the regions named in Defendants' requests and serve Defendants with amended answers that either answer the requests or detail the inquiry that Plaintiff made before concluding that it was unable to answer.

## B.      Defendants' interrogatories

Defendants ask the Court to compel Plaintiff to respond to certain interrogatories. For the following reasons, Defendants' Motion is granted.

### 1.      Plaintiff shall serve Defendants with amended answers to Interrogatory Numbers 9 to 11.

Interrogatory Numbers 9 and 10 seek the stock keeping unit code and universal product code for Parks-branded products that are referenced in certain documents that Defendants obtained during discovery, while Interrogatory Number 11 seeks additional details about sales records that Plaintiff disclosed to Defendants. Plaintiff answered these interrogatories by referring Defendants to documents that Dietz & Watson and Super Bakery produced in response to subpoenas that Defendants served on them. Defendants contend that the information contained in those documents does not fully respond to these interrogatories.

Plaintiff appears to concede that point. For example, Interrogatory Number 11 seeks, among other things, "the precise geographic locations" of certain sales of Parks-branded products, which Plaintiff responded to by referring to documents produced by Super Bakery that "provide . . . in some instances the customer's geographic location."[47] While Plaintiff cannot be compelled to produce information that does not exist, see See Am. Fed'n of State Cty. & Mun. Emps. v. Ortho-McNeil-Janssen Pharm., Inc., No. 08-cv-5904, 2010 WL 5186088, at *4 (E.D. Pa. Dec. 21, 2010), it is not clear from Plaintiff's responses whether it does not have any

---

[47]      See Pl.'s Resp. Opp'n Defs.' Mot. Compel 9 (emphasis added).

additional information or whether Plaintiff simply believed that directing Defendants to these

Dietz & Watson and Super Bakery documents would be sufficient. Therefore, Plaintiff shall

serve amended answers to these interrogatories that either fully respond to them or represent that

Plaintiff does not have sufficient information available to it to adequately respond.[48]

**2.      Plaintiff shall serve Defendants with an answer to Interrogatory Number 16.**

Interrogatory Number 16 seeks to have Plaintiff "[i]dentify each and every reason why

[it] did not renew [its] federal trademark registrations" for certain marks and "describe all

communications concerning the decision not to renew any of those registrations."[49] Plaintiff

contends that this interrogatory is not relevant for the same reasons that it opposed Defendants'

Requests for Admission Numbers 18 to 44. For the same reasons that Plaintiff must respond to

those requests, Plaintiff shall answer this interrogatory.

**C.      Defendants' requests for production**

Defendants ask the Court to compel Plaintiff to respond to certain requests for

production. For the following reasons, Defendants' Motion is granted in part.

**1.      Plaintiff shall respond to Defendants' Request for Production Number 117.**

Request for Production Number 117 seeks "[a]ll documents on which [Plaintiff] relied in

responding to Defendants' First Requests for Admission, including all documents which support

any request in Defendants' First Requests for Admission which you deny."[50] Plaintiff objects to

---

[48]       Plaintiff's responses to these interrogatories are also deficient for a second reason. While a party has the option, under certain circumstances, to answer an interrogatory by referring the requesting party to business records, those records must be the party's own records, not the records of someone else. See Fed. R. Civ. P. 33(d) (allowing a party to respond to an interrogatory by referring the requesting party to business records "[i]f the answer . . . may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records" (emphasis added)); id. advisory committee's note to 1970 amendment (explaining that the addition of this option to Rule 33 was intended to relieve the responding party of "engag[ing] in burdensome or expensive research into his own business records in order to give an answer"); 8B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2178 (3d ed. 2010) ("Ordinarily it is . . . required that the information be obtainable from the records of the responding party, not those of somebody else. Whatever the duty of a responding party to consult the records of others to provide a proper answer to an interrogatory, Rule 33(d) does not provide an option for designating those instead of obtaining responsive information." (footnote omitted)).
[49]       Dabney Decl. Ex. 3, at 7, ECF No. 86-5.

this request on two grounds. First, Plaintiff contends that, categorically, "courts have consistently rejected such document requests."[51] Second, Plaintiff contends that this request is insufficiently specific to satisfy Federal Rule of Civil Procedure 34(b)(1)(A), which requires a party making a request for production to "describe with reasonable particularity each item or category of items" sought.

Taking Plaintiff's objections in order, Plaintiff is not correct that courts consistently reject this type of document request. To the contrary, a cursory review of the case law reveals that this type of "standard inquiry," see <u>Xchange Telecom Corp. v. Sprint Spectrum L.P.</u>, No. 14-CV-54, 2015 WL 773752, at *8 (N.D.N.Y. Feb. 24, 2015), has been permitted with some regularity.[52] While that does not mean that this type of request may never warrant an objection, <u>see</u> Fed. R. Civ. P. 26(b)(1)-(2), there is no categorical bar to making such a request.

Nor is Plaintiff correct that this request lacks sufficient specificity. A request for production satisfies Rule 34's specificity requirement if "a reasonable [person] would know what documents or things are called for," <u>W.L. Gore & Assocs., Inc. v. Tetratec Corp.</u>, No. 89-3995, 1989 WL 144178, at *3 (E.D. Pa. Nov. 28, 1989), and there should be no reason that a party could not identify the documents upon which it relied to respond to an opposing party's requests for admission. See <u>Bridger-Riley</u>, 2015 WL 4496055, at *3 (observing that a party's agreement to produce all documents sought by a request for production "to the extent that such documents

---

50    Dabney Decl. Ex. 5, at 4, ECF No. 86-7.
51    Pl.'s Resp. Opp'n Defs.' Mot. Compel 10.
52    <u>See, e.g.</u>, <u>United States v. Bridger-Riley</u>, No. 14-CV-654, 2015 WL 4496055, at *3 (N.D. Okla. July 23, 2015) (compelling a party to respond to a request for "documents reviewed or relied upon to respond to interrogatories or requests for admission"); <u>Xchange Telecom</u>, 2015 WL 773752, at *8 (approving a request for "any document you referred to or reviewed in responding to any of [the] interrogatories or requests for admission"); <u>Md. Cas. Co. v. Shreejee Ni Pedhi's, Inc.</u>, No. 3:12-cv-121, 2013 WL 3353319, at *2-3 (M.D. Fla. July 2, 2013) (finding a series of requests for production seeking "all documents supporting" the denials of various requests for admission to be "relevant and discoverable"); <u>Stanecki v. Turning Point Capital, Inc.</u>, No. 12-cv-2812, 2013 WL 1966917, at *5 (D. Colo. May 13, 2013) (overruling objections to a request for "all documents identified or described in [defendant's] responses to requests for admission"); <u>Phillips v. Clark Cty. Sch. Dist.</u>, No. 2:10-cv-02068, 2012 WL 135705, at *16 (D. Nev. Jan. 18, 2012) (compelling the defendant  to respond to a request for "all documents which relate to Defendant's denials, in whole or in part, of any of Plaintiff's requests for Admissions").

exist, are known by Defendant to exist, and are in Defendant's possession, custody, or control" was "nonsensical" given that the request sought all "documents reviewed or relied upon to respond to interrogatories or requests for admission").

Plaintiff cites to a series of cases to support this contention, but each of these courts was faced with a discovery request that was both broader and less clearly defined than the request at issue here. Plaintiff first cites to <u>Susko v. City of Weirton</u>, which rejected a request for "all documents and other tangible things which support[ed]" a party's denials to a series of requests for admission. <u>See</u> No. 5-09-CV-1, 2010 WL 1881933, at *13-14 (N.D. W. Va. May 7, 2010). Here, however, Defendants do not seek all documents that could conceivably support Plaintiff's answers to the requests for admission; Defendants seek only those documents upon which Plaintiff actually relied in answering the requests. <u>See</u> <u>Smith v. Cafe Asia</u>, 256 F.R.D. 247, 255 (D.D.C. 2009) (distinguishing between a request for a party to "identify all documents which relate to [an] interrogatory" and a request to "identify all documents on which it <u>relied</u> in support of the answer to that interrogatory").

Plaintiff also cites to <u>Preferred Carolinas Realty, Inc. v. Am. Home Realty Network, Inc.</u>, but this court drew the same distinction as the court in <u>Cafe Asia</u> to reject a request for all information "that support[ed] the answers that [Plaintiff] gave in its interrogatories." <u>See</u> No. 1:13CV181, 2014 WL 1320133, at *4 (M.D.N.C. Mar. 28, 2014). The court in <u>Incorp Servs., Inc. v. Nev. Corp. Servs., Inc.</u>, to which Plaintiff also cites, rejected a similar request to that in <u>Preferred Carolinas</u>, finding a request for "all documents supporting any of Defendant's Responses to any of [plaintiff's] Interrogatories" too vague to satisfy Rule 34. <u>See</u> No. 2:09-CV-01300, 2010 WL 2450607, at *8 (D. Nev. June 17, 2010). Plaintiff's citation to <u>Lindell v. Synthes USA</u> comes the closest to supporting Plaintiff's contention, but the court rejected a

discovery request for all documents that a party "referred to, relied upon, or consulted" in responding to a set of interrogatories, which is both broader and more ambiguous than Defendants' request. <u>See</u> No. 1:11-cv-02053, 2013 WL 3146806, at *9 (E.D. Cal. June 18, 2013). Even if the request in <u>Lindell</u> could be considered functionally similar to the request at issue here, this Court would not agree that Defendants' request fails to describe with reasonable particularity the documents that Defendants seek, at least in the absence of any contention on Plaintiff's part that it cannot understand and respond to the request.[53] Accordingly, Plaintiff shall respond to this request for production.

### 2. Plaintiff shall respond in part to Defendants' Request for Production Number 176.

Request for Production Number 176 seeks "[a]ll documents that [Plaintiff] sent or received from Dietz & Watson concerning Dietz & Watson's purchase of [Plaintiff's] Baltimore, Maryland plant in or around 1999."[54] Plaintiff contends that this information has no relevance to this action, while Defendants argue that the documents may contain "information relating to the production, packaging, advertising, and sale of the Parks Products" or may reveal that Dietz & Watson acquired not only the plant in Baltimore but also ownership of certain Parks trademarks, which could affect Plaintiff's standing in this action.[55]

While the latter contention appears to amount to little more than speculation, Defendants will not be entirely foreclosed from seeking these documents. This request shall, however, be limited in scope, because the request covers far more than the specific information that Defendants seek. Therefore, Plaintiff shall produce any documents concerning Dietz & Watson's

---

[53]    While Plaintiff argues that this request is insufficiently specific to comply with Rule 34(b)(1)(A), not once does Plaintiff contend that it is unable to discern which documents Defendants seek. <u>See</u> Wright & Miller, <u>supra</u> note 48, § 2211 ("Even a generalized description should be sufficient when . . . the party from whom discovery is sought will have no difficulty in understanding what is wanted.").

[54]    Dabney Decl. Ex. 5, at 14.

[55]    Mem. Supp. Defs.' Mot. Compel 12.

purchase of the Baltimore, Maryland plant that relate either to Dietz & Watson's production, packaging, advertising, or sale of Parks-branded products or to ownership rights in Parks trademarks.

**3.      Plaintiff shall respond in part to Defendants' Request for Production Number 177.**

Request for Production Number 177 seeks "[a]ll documents sent to or received from the city government for Baltimore, Maryland from July 1, 1998 until present concerning the agreement to restructure the debt [Plaintiff] owed in connection with the business of Parks, LLC and the payouts of that debt, including all documents that you sent to the city government of Baltimore, Maryland or any agencies thereof purporting to show the profits earned by Parks, LLC at any point in time from 1999 until present."[56]

The relevance of this request is far from obvious. According to Defendants, the City of Baltimore extended a loan to Plaintiff when it acquired the assets of the Parks Sausage Company, and the structure of the loan permits Plaintiff to repay the balance in periodic payments at the rate of 7.5% of Plaintiff's net income. Defendants therefore believe that Plaintiff may have provided the City of Baltimore with documentation of its profitability, and they contend that the extent of Plaintiff's profitability is relevant to the question of whether there is secondary meaning in any of Plaintiff's trademarks.

A company's profits, however, are not directly relevant to the question of whether secondary meaning exists in the company's trademarks. "Secondary meaning exists when the mark is 'interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services.'" Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000) (quoting Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3d Cir. 1978)). There exist a

---

[56]      Dabney Decl. Ex. 5, at 14.

number of indicia of whether a mark has attained secondary meaning, including the volume of

sales of products bearing the mark. See id. Sales figures are relevant because they reveal the

extent to which customers have been exposed to a mark, which may support—or contradict—a

claim that a mark has attained secondary meaning. See 2 J. Thomas McCarthy, McCarthy on

Trademarks and Unfair Competition, § 15.49 (4th ed. database updated December 2015). The

magnitude of a company's profits, by contrast, does not have that same relationship to market

exposure. While substantial profits may suggest substantial exposure, minimal profitability does

not necessarily suggest the opposite.[57]

The limited correlation between profitability and secondary meaning reduces, but does

not completely eliminate, the probative value of this information. Thus, Plaintiff's contention

that this document request "ha[s] no bearing on any issue in this lawsuit" is not correct. But as

with Request for Production Number 176, this request, which seeks all documents sent to or

received from the City of Baltimore concerning the restructuring of Plaintiff's loan from the

City, appears to cover substantially more information than Defendants actually seek.

Accordingly, Plaintiff shall respond to this request but need produce only responsive documents

that contain information about Plaintiff's profitability.

## 4.    Plaintiff shall respond in part to Defendants' Request for Production Numbers 178 and 179.

Request for Production Number 178 seeks all documents concerning Plaintiff's federal

and state tax returns for 2001 until present, including the tax returns themselves and the

schedules thereto, while Request for Production Number 179 seeks certain federal and state tax

returns of Plaintiff's owners, of Super Bakery, and of Super Bakery's owners.

---

[57]       No one would dispute that secondary meaning exists in "Amazon.com," for example, despite the fact that the company has notoriously struggled to generate profits. See David Streitfeld, Amazon Posts an Unexpected Profit, and Its Shares Soar, N.Y. Times (Oct. 22, 2015), http://www.nytimes.com/2015/10/23/technology/amazon-q3-earnings.html.

Because public policy disfavors the disclosure of tax returns, they are not discoverable unless they are relevant and the information sought from them cannot be obtained through other means. See First Fid., N.A. v. Nissenbaum, No. 89-2248, 1991 WL 46456, at *2 (E.D. Pa. Mar. 28, 1991) (Van Antwerpen, J.). "The party seeking discovery of the tax returns bears the burden of establishing relevance," while "the party resisting disclosure bears the burden of furnishing alternative information sources." Id. (citing Kravitz v. Jewelry Basics, Inc., No. 89-2657, 1990 WL 44899, at *2 (E.D. Pa. Apr. 12, 1990)).

Defendants articulate two primary reasons that this information is relevant. First, as with Request for Production Number 176, Defendants speculate that Plaintiff may have transferred ownership of some of its Parks trademarks, and if Super Bakery's tax returns reveal that Super Bakery has deducted amortization expenses associated with any of those marks, that information would be inconsistent with Plaintiff's claim of ownership. Second, Defendants seek to discover the revenues Plaintiff has earned from licensing its marks, both because that information is relevant to whether Plaintiff has rights in the marks and because Defendants speculate that "Plaintiff [has] failed to report royalty income from sales of [Parks-branded products] to federal and state agencies," which they contend, if true, would support their unclean hands defense. Plaintiff disputes the relevance of the tax returns and argues that Defendants are able to obtain the information they seek from other sources, including the discovery that Plaintiff has already provided.

With respect to Plaintiff's tax returns, information about Plaintiff's revenues is relevant to Plaintiff's claims of trademark infringement, and Plaintiff fails to respond to Defendants' contention that it has otherwise failed to produce any financial or accounting statements that would provide Defendants with an alternative source for this information. Because Plaintiff's tax

33

returns are relevant and Plaintiff has not carried its burden of showing that Defendants can obtain the information they seek from them through other means, Plaintiff shall produce its tax returns and the schedules thereto in accordance with Defendants' request.

A different conclusion is warranted for the remainder of these requests. With respect to Defendants' request for the tax returns of the owners of Plaintiff and Super Bakery, Defendants fail to explain what additional information these returns would contain that could not be found on the tax returns of the entities themselves. As for Super Bakery's tax returns, the Court agrees with Plaintiff that the information Defendants seek could be obtained through other means. Defendants could learn whether Super Bakery has taken any deductions for amortization expense associated with a Parks trademark through deposition testimony or an interrogatory; there is no need for Super Bakery to produce every federal and state tax return it has filed over the last fourteen years to answer that question. Defendants also fail to justify the relevance of their request for all documents concerning Plaintiff's tax returns and all documents reviewed in connection with preparation of those returns—a request that appears on its face to be substantially overbroad.

## IV.    Conclusion

For the foregoing reasons, each of Defendants' motions is granted in part. An appropriate order follows.

34

**V.      Order**

In accordance with this Memorandum Opinion and Order, this 23rd day of December, 2015, **IT IS ORDERED** as follows:

1.      Defendants' Motion for Protective Order Regarding Plaintiff's Notice of Rule 30(b)(6) to Defendant Hillshire Brands Company, ECF No. 100, is **GRANTED IN PART AND DENIED IN PART** as follows:

(a)      Plaintiff's deposition of a designee of Hillshire shall be conducted in Chicago, Illinois;

(b)      Defendants' motion to preclude Plaintiff from inquiring about Topics 3, 4, and 6 is **DENIED**. However, these topics shall be limited to the general purpose of the Allentown, Pennsylvania facility, the types of products Hillshire has marketed, sold, or distributed from the facility, and the regions of the country in which those activities have been conducted;

(c)      Defendants' motion to preclude Plaintiff from inquiring about Topics 7 and 8 is **DENIED**. However, these topics shall be limited to the types of products Hillshire has sold through Pathmark markets;

(d)      Defendants' motion to preclude Plaintiff from inquiring about Topics 9 and 12 is **DENIED**. However, these topics shall be limited to the knowledge of certain Hillshire personnel[58] of Parks-branded products that have purportedly been sold in competition with Hillshire sausage or kielbasa products or Jimmy Dean-branded products;

(e)      Defendants' motion to limit the scope of Topic 13 is **GRANTED**. This topic shall be limited to marketing analyses that concern Parks Finest-branded products;

---

[58]      See supra note 20.

(f)     Defendants' motion to preclude Plaintiff from inquiring about Topics 17 to 20 is **GRANTED**;

(g)     Defendants' motion to limit the scope of Topic 26 is **GRANTED IN PART**. This topic shall be limited to the knowledge of certain Hillshire employees;[59]

(h)     Defendants' motion to limit the scope of Topics 27, 30, and 32 is **DENIED**;

(i)     Defendants' motion to limit the scope of Topic 38 is **GRANTED IN PART**. This topic shall be limited to the types of products Hillshire has marketed, sold, or distributed in the regions specified in these topics and the channels through which those products have been sold;

(j)     Defendants' motion to limit the scope of Topics 42 to 44, 48, and 49 is **GRANTED IN PART**. These topics shall be limited to the knowledge of certain Hillshire employees;[60]

(k)     Defendants' motion to limit the scope of Topics 46 and 47 is **GRANTED IN PART**. These topics shall be limited to whether Hillshire's trademark search informed Hillshire of the existence of Plaintiff's Parks name, if so, the steps Hillshire took to examine Plaintiff's or Plaintiff's licensee's use of the Parks name, and the information Hillshire learned about Plaintiff, Plaintiff's licensees, or the Parks name from those inquiries;

(l)     Defendants' motion to limit the scope of Topics 55-58 is **GRANTED**. These topics shall be limited to the context of the development of the Park's Finest-branded products;

(m)     Defendants' motion to limit the scope of Topic 59 is **DENIED**; and

---

[59]     See supra note 20.
[60]     See supra note 20.

(n)     Defendants' request for an award of expenses is **DENIED**.

2.     Defendants' Motion to Compel Plaintiff's Responses to Certain Discovery Requests, ECF No. 86, is **GRANTED IN PART AND DENIED IN PART** as follows:

(a)     Defendants' motion to compel Plaintiff to respond to Request for Admission Numbers 18 to 44 is **GRANTED**;

(b)     Defendants' motion to compel Plaintiff to serve amended answers to Request for Admission Numbers 45 to 77, 99 to 170, and 240 to 290 is **GRANTED**;

(c)     Defendants' motion to compel Plaintiff to serve amended answers to Request for Admission Numbers 405, 406, 409, 410, 415, 416, 421, 422, 427, 428, 433, 434, 439, 440, 445, 446, 451, 452, 457, 458, 463, 464, 469, 470, 475, 476, 481, 482, 487, 488, 493, 494, 499, 500, 505, 506, 511, 512, 517, 518, 523, 524, 529, 530, 535, 536, 541, 542, 547, 548, 553, 554, 559, 560, 565, 566, 571, 572, 577, 578, 583, 584, and 639 to 659 is **GRANTED**;

(d)     Defendants' motion to compel Plaintiff to serve amended responses to Interrogatory Numbers 9 to 11 is **GRANTED**;

(e)     Defendants' motion to compel Plaintiff to respond to Interrogatory Number 16 is **GRANTED**;

(f)     Defendants' motion to compel Plaintiff to respond to Request for Production Number 117 is **GRANTED**;

(g)     Defendants' motion to compel Plaintiff to respond to Request for Production Number 176 is **GRANTED IN PART**. This Request for Production shall be limited to only those documents that relate either to Dietz & Watson, Inc.'s packaging, advertising, or sale of Parks-branded products or to ownership rights in Parks trademarks;

(h)      Defendants' motion to compel Plaintiff to respond to Request for Production Number 177 is **GRANTED IN PART**. This Request for Production shall be limited to only those documents that contain information about the level of Plaintiff's profitability;

(i)      Defendants' motion to compel Plaintiff to respond to Request for Production Numbers 178 to 179 is **GRANTED IN PART**. Plaintiff shall produce only its federal and state tax returns and any schedules thereto;

(j)      Plaintiff shall serve Defendants with the information and materials set forth in items (a)-(h) no later than **Monday, January 11, 2016**; and

(k)      Defendants' request for an award of expenses is **DENIED**.


BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge