UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

———————————————————————

PARKS, LLC,                                          :
                                                     :
                    Plaintiff,                       :
             v.                                      :            No. 5:15-cv-00946
                                                     :
TYSON FOODS, INC.;                                   :
HILLSHIRE BRANDS COMPANY,                            :
                                                     :
                    Defendants.                      :

———————————————————————

**<u>MEMORANDUM OPINION</u>**

**Defendants' Motion for Summary Judgment, ECF No. 124 – Granted**

**Joseph F. Leeson, Jr.**                                            **May 10, 2016**
**United States District Judge**

## I.      Introduction

This case involves a trademark and false advertising dispute.

The Plaintiff, Parks, LLC, claims to be the owner of the trademark "Parks" that is used to sell sausages and other food products. Defendants Tyson Foods, Inc. and Hillshire Brands Company are owners of the "Ball Park" trademark that is used to sell a popular brand of frankfurters.

In 2014, Defendants launched a new line of "super-premium" frankfurters under the name "Park's Finest." Parks claims that by doing so, Defendants have infringed upon its "Parks" trademark and engaged in false advertising and other unlawful conduct.

In February 2015, Parks filed a complaint charging Defendants with engaging in false advertising, trademark infringement, and trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125, as well as violating Pennsylvania law prohibiting unfair trade practices, trademark dilution, and unfair competition. Parks moved for a preliminary injunction on the

1

basis of its false advertising claim, seeking to have Defendants enjoined from using the name "Park's Finest" on any of Defendants' products. After a hearing, the Court denied the motion because Parks failed to demonstrate that it was likely to succeed on its false advertising claim. See Parks, LLC v. Tyson Foods, No. 5:15-cv-00946, 2015 WL 4545408 (E.D. Pa. July 28, 2015). The parties then commenced discovery, and the Court was called upon to resolve a number of disputes, including a dispute over Defendants' written discovery requests, see Parks, LLC v. Tyson Foods, 2015 WL 5042918 (E.D. Pa. Aug. 26, 2015), Parks's written discovery requests, see Parks, LLC v. Tyson Foods, 2015 WL 9316060 (E.D. Pa. Dec. 23, 2015), and the scope of a deposition, see id.

Discovery has concluded, and Defendants have moved for summary judgment. Parks has conceded that judgment is warranted in Defendants' favor on its claims of trademark dilution and its claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law. See Pl.'s Mem. Opp'n 1, ECF No. 138. That leaves Parks's claims of false advertising and trademark infringement in violation of the Lanham Act and unfair competition under Pennsylvania law. The Court has determined that no reasonable factfinder[1] could find in Parks's favor from the evidence the parties have presented. Therefore, Defendants' Motion for Summary Judgment is granted.

## II.    Legal standard – Motion for summary judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[1]    The parties disagree over whether Parks would be entitled to a jury trial on these claims.

party," id. When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**III.    Judgment is warranted in Defendants' favor on Parks' claim of false advertising.**

**A.    Parks's allegations do not relate to the "nature, characteristics, qualities, or geographic origin" of Defendants' Park's Finest product.**

Parks's false advertising claim was the basis for its request for preliminary injunctive relief. In the course of explaining why Parks was not likely to succeed on the merits of this claim, the Court laid out the scope of the Lanham Act's prohibition on false advertising:

> [15 U.S.C. § 1125(a)(1)(B)] prohibits using "in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" either "on or in connection with any goods or services, or any container for goods," which "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B); see Groupe SEB USA, Inc. v. Euro-Pro Operating LLC, 774 F.3d 192, 198 (3d Cir. 2014).

Parks, 2015 WL 4545408, at *7. At the time, the Court suggested that Parks may not have a viable claim for false advertising because the allegedly false representation that Defendants are making—calling their product "Park's Finest"—does not relate to the "nature, characteristics, qualities, or geographic origin" of the product. See id. at *7 n.15. The Court now holds that for this reason, Parks's allegations do not state a claim for a violation of § 1125(a)(1)(B).

Section 1125(a) prohibits "two major and distinct types" of conduct. 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:9, Westlaw (database updated Mar. 2016). Section 1125(a)(1)(A) prohibits misrepresentations that are "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of [a] person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). Section 1125(a)(1)(B), by contrast, prohibits advertising and promotional activities that "misrepresent[] the nature, characteristics, qualities, or geographic origin of [a person's] goods, services, or commercial activities." Id. § 1125(a)(1)(B). "Section 1125(a) thus creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1384 (2014) (citing Waits v. Frito–Lay, Inc., 978 F.2d 1093, 1108 (9th Cir. 1992)). The two provisions have "separate . . . substantive rules and applicability," see McCarthy, supra, § 27:9, which means that to properly analyze a claim under this section of the Lanham Act, the claim must be correctly classified. Section 1125(a)(1)(A) acts as a "vehicle for assertion of a claim of infringement of an unregistered mark," McCarthy, supra, § 27:14, and claims under this provision are generally analyzed under the "law governing infringement of registered trademarks." Island Insteel Sys., Inc. v. Waters, 296 F.3d 200, 206 n.1 (3d Cir. 2002). False advertising claims under § 1125(a)(1)(B) are analyzed under a different framework that is designed to assess whether an advertisement about a product has a tendency to deceive prospective purchasers about the nature or characteristics of the product. See Groupe SEB, 774 F.3d at 198 (quoting Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc., 653 F.3d 241, 248 (3d Cir. 2011)) (setting forth the test that applies to a claim of false advertising).

According to Parks, Defendants' use of the name "Park's Finest" constitutes false advertising because "Park's Finest unambiguously refer[s] to Parks," <u>see</u> Pl.'s Mem. Opp'n 4, which "misrepresent[s] Tyson's products as products of Parks," <u>see</u> Am. Compl. ¶ 51, ECF No. 4. This is a claim of false association, not false advertising. Parks is not contending that Defendants have misrepresented the nature, characteristics, or qualities of their new line of frankfurters; its claim is that the name "Park's Finest" is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, . . . association . . . [or] origin" of the product. "Absent a false statement about geographic origin, a misrepresentation is actionable under § 1125(a)(1)(B) only if it misrepresents the 'characteristics of the good itself'—such as its properties or capabilities." <u>Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.</u>, 796 F.3d 576, 590 (6th Cir. 2015) (quoting <u>Sybersound Records, Inc. v. UAV Corp.</u>, 517 F.3d 1137, 1144 (9th Cir. 2008)); <u>see</u> <u>Forschner Grp., Inc. v. Arrow Trading Co. Inc.</u>, 30 F.3d 348, 357 (2d Cir. 1994) (rejecting a claim that use of the phrase "Swiss Army knife" to describe "an inexpensive and shoddy multifunction pocketknife manufactured in China" constituted false advertising because the representation did not relate to either the geographic origin or the quality of the product). As the Court observed in connection with Parks's request for preliminary injunctive relief, Defendants' use of the name "Park's Finest" could deceive consumers only if it led them to believe that the product was associated with Parks. That could happen only if the word "Parks" "identif[ies] and distinguish[es]" Parks's products "from those manufactured and sold by others"—in other words, only if the word "Parks" constitutes a protectable trademark. <u>See</u> 15 U.S.C. § 1127 (defining "trademark"). Because Parks's claim rises or falls based on whether it is able to establish that "Parks" functions as a trademark in the minds of consumers, the proper analytical framework in which to assess this claim is the law of trademarks.

**B.      A reasonable trier of fact could not conclude that Defendants' use of the name "Park's Finest" constitutes false advertising.**

Even if the false advertising framework applied, a reasonable trier of fact could not find

in Parks's favor. To establish liability, a plaintiff must show

> 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

Groupe SEB, 774 F.3d at 198 (alteration in original) (quoting Pernod Ricard USA, LLC v.

Bacardi U.S.A., Inc., 653 F.3d 241, 248 (3d Cir. 2011)). A false statement can take one of two

forms: either the statement is literally false, which means that it unambiguously conveys a false

message to the intended audience, or the statement is "literally true or ambiguous, but has the

tendency to deceive consumers." Id. (quoting Novartis Consumer Health, Inc. v. Johnson &

Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002)).

**1.      Defendants have not made a literally false statement.**

Determining whether a statement is literally false is essentially a matter of construction,

which calls upon the court to examine whether the statement "on its face, conflicts with reality."

See Schering Corp. v. Pfizer Inc., 189 F.3d 218, 229 (2d Cir. 1999) (Sotomayor, J.); Novartis,

290 F.3d at 587. "[A] court may determine, based on its own review of the advertisement,

whether a literally true or literally false message is conveyed, using its 'own common sense and

logic in interpreting the message of the advertisement.'" McCarthy, supra, § 27:56 (quoting

Hertz Corp. v. Avis, Inc., 867 F. Supp. 208, 212 (S.D.N.Y. 1994)). The important limiting

principle is that "[o]nly an unambiguous message can be literally false," Novartis, 290 F.3d at

587, which reserves for this category only the "bald-faced, egregious, undeniable, over the top"

6

falsities, <u>Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.</u>, 586 F.3d 500, 513

(7th Cir. 2009).

Defendants' use of the name "Park's Finest" is not one of those statements. As the Court

explained in denying Parks's request for preliminary injunctive relief, the "Park's Finest" mark

that appears on Defendants' packaging does not unambiguously refer to Parks, and no reasonable

factfinder could conclude otherwise.

> The new frankfurters appear in a package that features the name "Park's Finest"
> prominently displayed in a capitalized, sans-serif typeface, with the word "Park's"
> located on a separate line directly above the word "Finest." The two words are set
> in a justified alignment, and together they form a large, rectangular-shaped word
> mark. Superimposed on the center of, and partially obscuring, the "Park's Finest"
> text is Defendants' "Ball Park" trademark—the mark that appears on Defendants'
> Ball Park-branded frankfurters. The new Park's Finest name and the Ball Park
> brand are also used together in the radio and television advertisements Defendants
> created, which describe the product as "Park's Finest from Ball Park."

<u>Parks</u>, 2015 WL 4545408, at *2 (citations omitted). Even a consumer who is familiar with the

"Parks" brand would not inevitably come away with the impression that the "Park's" in "Park's

Finest" was a reference to Parks rather than to Defendants' "Ball Park" brand, given that the

"Ball Park" name is directly integrated into both the Park's Finest wordmark and the script of the

advertisements. Because the Park's Finest name is, at the least, susceptible to "several plausible

meanings," <u>see</u> <u>Groupe SEB</u> (quoting <u>Clorox Co. P.R. v. Proctor & Gamble Commercial Co.</u>,

228 F.3d 24, 35 (1st Cir. 2000)), the Court found that Defendants' advertisements were not

literally false. <u>Parks</u>, 2015 WL 4545408, at *10.

Parks contends that this conclusion needs to be revisited because Defendants failed to

produce any evidence to support the testimony given by one of its officers at the preliminary

injunction hearing that the name "Park's Finest" was intended to be seen as shorthand for their

"Ball Park" brand, or any customer surveys to show that consumers understand that connection.

In Parks's view, the Court's conclusion that Defendants had not made a literally false statement depended upon that testimony, and Defendants' failure to produce other evidence to substantiate that testimony calls the Court's conclusion into question.

This argument misapprehends the nature of the inquiry into whether a statement is literally false. A statement is literally false only if the statement, on its face, unambiguously conveys a false message. The Court's conclusion that the use of the name "Park's Finest" was not literally false was based simply on the Court's examination of that message in the context it was presented. See Parks, 2015 WL 4545408, at *9 ("On the product's packaging, Hillshire integrated its Ball Park trademark into the Park's Finest word mark, and in the television commercials, Hillshire chose to verbally juxtapose the two names by using the phrase, 'Park's Finest from Ball Park.' . . . In that context, the name 'Park's Finest' and the phrase 'Park's Finest from Ball Park' plausibly convey to consumers that the Park's Finest frankfurters 'are the highest-end product line under the Ball Park brand.'"). "A determination of literal falsity rests on an analysis of the message in context," Groupe SEB, 228 F.3d at 198 (quoting Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc., 19 F.3d 125, 129 (3d Cir. 1994)), not on the message the speaker intended to convey or on survey evidence of what consumers may believe the message to mean.[2] That "Park's Finest" can be understood as a

---

[2]       The same is true with regard to Parks's contention that evidence produced during discovery revealed that the Park's Finest product was born out of Defendants' "intention to produce a product which would be seen as a sausage but would be called a hot dog." Pl.'s Mem. Opp'n 7. This contention relates to Parks's argument that consumers would not understand "Park's Finest" to be a reference to the Ball Park brand because the "Park's Finest" product is actually a sausage, not a frankfurter, and the Ball Park brand is associated with frankfurters, not sausages. The Court examined this contention at length in connection with Parks's request for preliminary injunctive relief, and pointed out that "[e]ven if a consumer mistakenly believed that the Park's Finest product was a sausage"—or even if the product was actually a sausage—"a consumer could still understand that the 'Park's Finest' name, in the context Hillshire has created, was intended to be a reference to Defendants' Ball Park brand." See Parks, 2015 WL 4545408, at *9 & n.8. A consumer who encounters the Park's Finest product would not be privy to how Defendants intended for the product to be seen; the consumer would simply be presented with a package that contains the "Park's Finest" name, the "Ball Park" logo superimposed on it, and the statement that the package contains "'Uncured Beef Frankfurters' in a font size that is significantly larger than much of the other text that appears on the

reference to the "Ball Park" brand is a matter of common sense and linguistics, see Parks, 2015 WL 4545408, at *10 n.9 (observing that the word "park" is a commonly understood abbreviation for a ballpark), not whether there is a sufficient quantum of evidence documenting the fact that Defendants intended for consumers to understand that reference.[3]

## 2.    Defendants' use of "Park's Finest" is not likely to deceive a substantial portion of the intended audience.

If a statement is not literally false, it may nonetheless constitute false advertising if the statement can be shown to have a tendency to deceive a substantial portion of the intended audience. See Pernod Ricard, 653 F.3d at 248; Novartis, 290 F.3d at 591, 594. Whether a statement has a tendency to deceive "depends upon the message that is conveyed to consumers," which means "the success of the claim usually turns on the persuasiveness of a consumer survey." Rhone-Poulenc Rorer, 19 F.3d at 129-30. At the preliminary injunction hearing, Defendants were the only ones to present any survey evidence. Their survey found that only one person from a field of two hundred mistakenly believed that Defendants' Park's Finest product originated with Parks—a rate of confusion of less than one percent. See Parks, 2015 WL 4545408, at *13-15.

In their opposition to the present motion for summary judgment, Parks has produced a survey, which it relies upon to support both its false advertising claim and its trademark infringement claim. The trouble with asking this survey to pull double-duty is that, as Defendants

---

package." Id. at *15 n.24. No reasonable factfinder could conclude that the "Park's Finest" name, in that context, could not be understood as a reference to the "Ball Park" brand.

[3]    Regardless, Defendants have produced documentary evidence that the "Park's Finest" name was chosen precisely because it functioned as a reference to their Ball Park brand. Defendants produced a report from a marketing firm that conducted a series of focus groups early in the development of the Park's Finest product. Among the names that the firm tested, "Park's Finest" was one of two names that "merit[ed] consideration" because "[t]he word 'Park' evoked feelings of the baseball park experience that is strongly associated with hot dogs," and the name "linked strongly to the Ball Park brand name." Smith Decl. Ex. 1, at 9, ECF No. 127-1. Another study conducted approximately two months later also found "Park's Finest" to be one of the top two performing names because it "show[ed] unique strength on Fit with [the] Ball Park brand." Smith Decl. Ex. 2, at 6, ECF No. 127-2.

point out, the survey was designed to assess a claim of trademark infringement, not false advertising. The Court of Appeals for the Third Circuit has suggested that, in the false advertising context, "a well-designed consumer survey first asks 'communication' questions to see what messages the viewer got and to 'filter' or separate those viewers who received certain messages from those who did not," and then "asks those who received a particular message . . . 'comprehension' questions to determine what the viewers thought the message meant." See Rhone-Poulenc Rorer, 19 F.3d at 134. This survey, however, presented each participant with an array of five product images, including (in the test group) pictures of a Parks breakfast sausage package, a Park's Finest package, and three other unrelated sausage and hot dog products, before asking whether the participant believed that two or more of those products were "from the same company or are affiliated or connected." See Lang Decl. Resp. Swann Critique Ex. 2, at 43-47, ECF No. 138 (containing a copy of the survey form); id. at 49-53 (reproducing the product array that was presented to the survey participants). If the participant answered in the affirmative, the survey asked the participant to identify those products and explain why he or she believed that they were affiliated or connected. Id. at 43-47.

What the survey did not do is ask the participants what message they received after examining the Park's Finest product or assess what they thought the message meant. A review of the responses provided by those survey participants who believed that the Parks product depicted in the image was affiliated with or connected to the Park's Finest product depicted in the image reveals that nearly seventy percent of them believed that they were related because they both had the word "Park" in their name, while another twenty percent pointed to the fact that they both had a same or similar name. Id. at 27. That sheds no light on what message a consumer receives when they encounter the Park's Finest packaging or, more importantly, whether the consumer

10

would receive the false message that the product originated with, or was affiliated with, Parks. A survey participant who did not receive any message of origin from the image of the Park's Finest product may nonetheless have responded that the product was related to the image of the Parks product simply because the participant noticed that that the word "Park" appeared in both images. A properly designed false advertising survey would have "filtered" out any participant who did not receive a message from the Park's Finest packaging that had to do with the product's origin. See Novartis, 290 F.3d at 591 (quoting Johnson & Johnson-Merck Consumer Pharm. Co. v. Smithkline Beecham Corp., 960 F.2d 294, 300 (2d Cir. 1992)). Inversely, a survey participant who correctly understood from the packaging that the Park's Finest product was affiliated with Defendants' Ball Park brand may nonetheless have answered that the Parks product was connected to the Park's Finest product, again, simply because the participant noted that the two products had the word "Park" in common. But without assessing what message that participant received from the Park's Finest packaging, whether the packaging actually communicated a false message cannot be ascertained. See id. (recognizing that the evidentiary value of a false advertising survey depends upon whether the "questions are directed to the real issues"). Instead of assessing the message that the Park's Finest packaging communicates, this survey assessed whether consumers who encounter the two products simultaneously would be confused about their relationship to each other. While that may be an appropriate method to assess the likelihood of confusion in connection with a trademark infringement claim, it is not the appropriate methodology to assess the veracity of a message that an advertisement conveys to its target audience.

Another, and perhaps more fundamental, flaw in the survey's methodology is that it effectively assumes that the "Parks" name possesses secondary meaning among the audience for

11

Defendants' Park's Finest product.[4] As the Court has explained, the "Park's Finest" name is capable of conveying a false message only if a consumer who encounters the Park's Finest packaging would be deceived into believing that the product was affiliated with Parks. See Parks, 2015 WL 4545408, at *12-13. A consumer who is not familiar with the "Parks" name could not be deceived by the "Park's Finest" name, even if that consumer failed to comprehend that the product is part of the Ball Park family. See id. at *12 ("The mere fact that a consumer may fail to understand the association between the Park's Finest name and the Ball Park brand does not mean that Defendants' statements are false or misleading. For a consumer who receives from Defendants' packaging or advertisements only the message that the product is called "Park's Finest"—neither believing the product to relate to [Parks] nor understanding Defendants' play on the "Ball Park" name—the name would contain little to no meaning at all, other than the meaning the name derives from its association with the product." (footnote omitted)). By presenting each survey participant with an image of both the Park's Finest product and the Parks product, a participant could opine that he or she believed that the products were affiliated or connected even if that participant had never before heard of the "Parks" name. Outside of the survey environment, there would be no risk that this person would receive a false message from the Park's Finest packaging. That Parks's false advertising claim turns on whether the "Parks" name has secondary meaning in the marketplace reinforces the conclusion that this claim is properly characterized as one of trademark infringement, not false advertising.

Finally, the survey was not directed at the appropriate universe of consumers. To participate in the survey, a participant was required to live in one of approximately two hundred ZIP codes in the country that, according to Parks, correspond to the locations of stores that sell

---

[4]    As will be seen, this observation also explains why this survey does not offer evidentiary support for Parks's contention that the "Parks" name had secondary meaning when Defendants launched their Park's Finest product.

"Parks"-branded products. <u>See</u> Lang Decl. Resp. Swann Critique Ex. 2, at 8-9. Limiting a survey universe to a particular geographic area may be appropriate in a dispute over trademark rights in a limited territorial market, but to prevail on a claim of false advertising, "the plaintiff 'must persuade the court that the persons "to whom the advertisement is addressed" would find that the message received left a false impression about the product.'" <u>U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.</u>, 898 F.2d 914, 922 (3d Cir. 1990) (quoting <u>Toro Co. v. Textron, Inc.</u>, 499 F.Supp. 241, 251 (D. Del. 1980)). Limiting the survey universe to areas where "Parks"-branded products are allegedly sold was, in effect, an attempt to survey consumers of Parks's products, which may not be representative of whether a substantial portion of the intended audience for Defendants' Park's Finest product would be deceived.

Because these flaws render Parks's survey unsuitable for supporting a claim of false advertising, what is left is largely the same evidence that was presented at the preliminary injunction hearing: the survey that Defendants conducted, which shows evidence of little confusion among the target audience, and a few isolated instances of purported confusion in the marketplace cited by Parks,[5] which is not sufficient to permit a reasonable trier of fact to infer

---

[5]       In support of its request for preliminary injunctive relief, Parks cited to reports by Dietz & Watson, Inc., a company that licenses the use of the "Parks" name for use on certain food products, that three consumers who contacted Dietz & Watson after the launch of Defendants' Park's Finest product appeared to be confused about the relationship of the Park's Finest product to Dietz & Watson's "Parks"-branded products. This evidence was not sufficient to show that Parks was likely to succeed on its false advertising claim, because "[t]he reaction of three consumers . . . cannot be extrapolated to reach the conclusion that Defendants' statements would tend to deceive a 'substantial number' of consumers." <u>Parks</u>, 2015 WL 4545408, at *13. The same is true now, where Parks needs to show not merely that it is likely to succeed on this claim, but that a reasonable trier of fact could find in its favor based on this record.

         Parks also points to deposition testimony of Lydell Mitchell, one of the two co-owners of Parks, where he recounted that he has been personally approached by individuals who mistakenly believed that Defendants' Park's Finest product was a product of Parks. <u>See</u> Child Decl. Ex. 5, at 72:4-24, ECF No. 138 [hereinafter "Lydell Dep."]. When pressed to identify these individuals, he testified that it was "not . . . a whole bunch of people" but rather "just a couple here or there" among his personal friends, such as his "golfing buddy" of thirty years. <u>Id.</u> 73:10-13, 76:14-79:5. These anecdotal instances of confusion are not sufficient to show that any of Defendants' statements have a tendency to deceive, both because of their small number and because the friends of one of the owners of Parks, especially a friend for thirty years, may have a level of "intimate contact" with the Parks brand that ordinary consumers do not, which casts doubt on whether their views are representative of the average consumer. <u>See Parks</u>,

that a substantial portion of the target audience would be likely to be deceived. Defendants' survey is not without some flaws of its own, as the Court observed when Defendants presented it at the preliminary injunction hearing, see Parks, 2015 WL 4545408, at *15 n.24, but the survey methodology generally followed the approach described by Rhone-Poulenc Rorer to assess the message the consumers are likely to receive from the Park's Finest packaging and whether that message has a tendency to deceive them. Parks's survey expert prepared a report that further critiqued the methodology employed in Defendants' survey, but the majority of that criticism is directed at whether the survey utilized an appropriate methodology to test for consumer confusion in the context of a claim of trademark infringement, rather than whether the survey was appropriate to test a claim of false advertising.[6]

Regardless, the precise evidentiary weight to which Defendants' survey is entitled is not of critical importance in light of Parks's failure to produce sufficient evidence from which a reasonable trier of fact could find in its favor. Accordingly, even if Parks's claim can properly be characterized as one for false advertising under 15 U.S.C. § 1125(a)(1)(B), Defendants are entitled to summary judgment.

## III.   Judgment is warranted in Defendants' favor on Parks's claim of trademark infringement.

### A.   Parks must show that the "Parks" name possesses secondary meaning.

While Parks at one time held federal trademark registrations for "Parks" and other variants of the name, those registrations expired between 2003 and 2011. Pl.'s Resp. Opp'n

---

2015 WL 4545408, at *14 (quoting Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 59 F.3d 902, 910 (9th Cir. 1995)).

[6]      See, e.g., Lang Decl. Resp. Swann Critique Ex. 2, at 3-4 (opining that there are two generally accepted survey formats that are used to measure the likelihood of confusion between two trademarks, and that Defendants' survey chose the wrong format); id. at 4-5 (contending that the phrasing of one of the survey questions did not conform with standards for one type of trademark survey format); id. at 6-8 (contending that the survey universe did not match the territorial area where Parks contends that it possesses trademark rights in its "Parks" name); id. at 8-9 (contending that the survey universe failed to include customers of Parks).

Defs.' Statement of Undisputed Material Facts ¶ 20, ECF No. 138 [hereinafter "Pl.'s Resp. Defs.' Facts"]. To prevail on a claim of trademark infringement, the mark must be valid and legally protectable, and if a mark is not federally registered, "validity depends upon proof of secondary meaning, unless the unregistered . . . mark is inherently distinctive." Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 437-38 (3d Cir. 2000) (quoting Ford Motor Co. v. Summit Motor Prods., 930 F.2d 277, 292 (3d Cir. 1991)).

The name "Parks" originated with Henry G. Parks, who founded the Parks Sausage Company—Parks's predecessor—in the 1950s. See Am. Compl. ¶ 15; Pl.'s Resp. Defs.' Facts ¶ 1. A mark that consists of a surname is generally not viewed as inherently distinctive, which means that it "only achieves protection if the mark is shown to have secondary meaning." See Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3d Cir. 1978); McCarthy, supra, § 13:2 n.2 (collecting cases across the circuits). Whether a particular mark is properly characterized as a surname depends upon whether the "primary significance of the mark to the purchasing public is that of a surname." Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999) (citing In re Hutchinson Tech., Inc., 852 F.2d 552, 554 (Fed. Cir. 1988)). Parks is commonly recognized as a surname—indeed, it is the surname of a notable civil rights figure in American history (Rosa Parks)—and Parks has not produced any evidence to suggest otherwise. The word "Parks" also does not have "well known meanings as a word in the language," see id. (quoting In re Rivera Watch Corp., 1955 WL 6450, at *4 (U.S. Patent & Trademark Office Jul. 8, 1955)), other than as the plural form of "park," which would make little sense standing alone. In short, Parks has failed to show that there is a triable issue of fact that consumers would not primarily view its use of the name "Parks" as a surname.[7]

---

[7]     Parks suggests that this conclusion is in tension with Defendants' argument that the word "Park's" in their "Park's Finest" name is a shorthand reference to "Ball Park." It is not. The reason that the word "Park's" can be

Parks must therefore show that "Parks" had secondary meaning in the marketplace when Defendants commenced the sale of their Park's Finest product. Parks does not contend that the "Parks" name has attained secondary meaning nationwide but rather only in the "Eastern United States."[8]

**B.    A reasonable trier of fact could not conclude that the "Parks" name has secondary meaning in the Eastern United States.**

"Secondary meaning exists when the mark 'is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services.'" <u>Commerce Nat'l</u>, 214 F.3d at 438 (quoting <u>Scott Paper</u>, 589 F.2d at 1228). There are a number of factors that illuminate whether secondary meaning has been established:

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion.

<u>Id.</u> (citing <u>Ford Motor</u>, 930 F.2d at 292).

**1.    The "Parks" name has been only minimally advertised.**

The extent to which a mark has been featured in advertising can be probative evidence of secondary meaning because secondary meaning is generally "established through extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark." <u>See id.</u> Accordingly, "[a] plaintiff could

---

understood as a reference to Defendants' "Ball Park" brand is that the Ball Park trademark appears alongside the "Park's Finest" name, both on the packaging of the product and in advertisements. As the Court previously pointed out, if a consumer fails to take note of the Ball Park trademark on the Park's Finest packaging, that consumer would likely fail to understand that the name was intended to be a reference to the Ball Park brand. <u>See Parks</u>, 2015 WL 4545408, at *11. Critical to understanding the message Defendants intend to communicate is the context in which they have presented that message.

[8]    <u>See</u> Pl.'s Mem. Opp'n 12. Parks does not define "Eastern United States" in its brief, but it appears to view the area as encompassing all states "east of the Mississippi River," north to Maine and south to Florida. <u>See</u> Pl.'s Statement of Material Facts ¶¶ 7, 17, ECF No. 138 [hereinafter "Pl.'s Facts"].

create a reasonable inference . . . that a term had gained secondary meaning by showing that it had appeared for a long period of time in a prevalent advertising campaign." E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 200 (3d Cir. 2008). Parks, however, has not done so. Since approximately 2001, Parks has not sold any products directly, but rather licenses the "Parks" name to two entities, Dietz & Watson and Super Bakery, Inc., to sell products under its name. See Pl.'s Resp. Defs.' Facts ¶ 8. During that time, the only advertising that Dietz & Watson has conducted for the Parks-branded products that it sells is to obtain placements in printed grocery store "circular ads," where the products appear alongside other products offered for sale at the store, perform in-store demonstrations at approximately one store per week, and to attend approximately six "food shows" on an annual basis. See id. ¶¶ 21-22. From 2007 to 2013, Dietz & Watson spent approximately only $14,000 per year on these circular advertisements and product demonstrations. See id. ¶ 23. With respect to Super Bakery, the company appears to sell Parks-branded products only to, or at least predominantly to, the United States military.[9] Super Bakery's marketing efforts consist solely of personal visits by its marketing manager to "institutions and military facilities" and his participation in "dozens of food shows" that are held "around the country," which happen "sporadically." See Child Decl. Ex. 10, ¶¶ 7-8, ECF No. 138; Child Decl. Ex. 1, at 118:18-119:9, ECF No. 138. Parks, however, does not cite to evidence of the extent to which those facilities or food shows are located in the Eastern United States. This evidence suggests only a minimal level of advertising, insufficient to permit an inference of secondary meaning by a rational trier of fact.

---

[9]     See Pl.'s Facts ¶ 26 (stating that the level of Super Bakery's sales of "Parks"-branded products from 2003 to 2013 "depend[ed] on the needs of the military"); Pl.'s Mem. Opp'n 13 (contending that Defendants failed to account for "the sale of Parks products by Super Bakery in the military market").

**2.      The size of the company and the extent of sales and customers are not probative of secondary meaning.**

Information about a company's size, the number of sales made under the mark, and the number of customers can also be probative evidence of secondary meaning, the inference being that "[t]he larger a company and the greater its sales, the greater the number of people who have been exposed to this symbol used as a trademark." McCarthy, supra, § 15:49. Charles Wright, who was deposed on behalf of Dietz & Watson, characterized the part of Dietz & Watson's business that sells "Parks"-branded products as "a very small company." See Child Decl. Ex. 3, at 177:22-24. Dietz & Watson's sales of products bearing the "Parks" name have averaged approximately $5.5 million per year from 2008 to 2013, with nearly all of those sales coming from the Eastern United States region.[10] See Pl.'s Resp. Defs.' Facts ¶ 77. Parks contends that Super Bakery's sales averaged approximately $3.1 million per year, but Parks has not presented any evidence of where those sales occurred, other than to say that they were to "the military market." See Pl.'s Mem. Opp'n 13; Pl.'s Facts ¶ 26.

For a trier of fact to infer the existence of secondary meaning from sales, the "[r]aw sales figures need to be put into context." McCarthy, supra, § 15:49. This makes sense, because the inference that is being drawn from sales figures is, "the greater [the] sales, the greater the number of people who have been exposed" to the mark. See id. If sales bearing the mark account for only a small portion of the relevant market, that is not probative evidence that a substantial number of consumers in that market have come to associate the mark with a particular source of products. Defendants have presented evidence that since 2011, "Parks"-branded breakfast sausages accounted for no more than 1.3% of the breakfast sausage market in the "Northeast" region of

---

[10]      See Pl.'s Resp. Defs.' Facts ¶¶ 30, 32 (setting forth the states where "Parks"-branded products have not been sold since 2008, which includes nearly all of the states west of the Mississippi River); Pl.'s Facts ¶ 17 ("Dietz & Watson's primary market for its Parks products has been in the states east of the Mississippi River.").

the United States (comprising Pennsylvania, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, New Hampshire, Vermont, and Maine). See Pl.'s Resp. Defs.' Facts ¶ 43. The "Mid-South" (comprising Maryland, West Virginia, Virginia, Kentucky, Tennessee, and North Carolina) was the only other region with a measurable market share for those products, where they accounted for approximately 0.01% of that market in 2011 and 2012 (with no measurable market share thereafter). Id. With respect to "Parks"-branded dinner sausage, it accounted for less than 1% of the market in the Northeast region and less than 0.5% of the market in the Mid-South, with no measurable market share in any other region. Id. ¶ 44.[11] A rational factfinder could not infer from these sales figures or the size of the company that the "Parks" mark possesses secondary meaning in the Eastern United States.[12]

---

[11]     Parks contends that this market share evidence is "inadmissible hearsay" and "irrelevant" and that "no such documents were produced by Defendants in discovery." For the reasons already explained, evidence that puts sales figures into context, such as evidence about the market share those sales represent, is relevant to the ability of the factfinder to infer secondary meaning from those figures. With respect to the contention that this evidence constitutes inadmissible hearsay, the question at the summary judgment stage is not whether the evidence offered is admissible in the form it is presented but whether that evidence "cannot be presented in a form that would be admissible at trial." See Fed. R. Civ. P. 56(c)(2); Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993) (recognizing that hearsay "can be considered on a motion for summary judgment [if] it is capable of being admissible at trial"). Defendants' source for this evidence is a declaration of Tyson's senior brand manager, who stated that she obtained these figures from "IRI", a paid service that makes market share data available that she relies upon in her role at Tyson. See Elliott Decl. ¶¶ 24-26, ECF No. 126. Parks does not explain the basis of its hearsay objection or attempt to show that this evidence could not be presented in an admissible form at trial. The IRI report that Tyson's senior brand manager relied upon may, for example, fall within the hearsay exception for "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations." See Fed. R. Evid. 803(17). Finally, Parks does not explain its contention that "no such documents were produced by Defendants during discovery." To the extent that it is contending that Defendants should be precluded from relying upon this evidence because they failed to disclose it in response to a valid discovery request, Parks does not point to any particular discovery request or offer any other support for that contention.

[12]     The sales of "Parks"-branded products are not spread evenly among the states east of the Mississippi River. Rather, in some of those states, no products were sold at all, see Pl.'s Resp. Defs.' Facts ¶¶ 30, 32, while others accounted for an outsized portion of the total sales in the region, see id. ¶¶ 41-42 (indicating that sales in New Jersey averaged approximately $1.7 million from 2011 to 2013 and sales in Pennsylvania averaged approximately $1.9 million over the same time period). It is possible that sales in certain of these states, such as Pennsylvania and New Jersey, could be large enough, relative to the market in those states, to be probative of secondary meaning in those markets. However, Parks did not produce any evidence of the share of those markets that those sales represent. Quite to the contrary: Parks produced evidence that much of the sales in those states were to distributors, not individual customers, who may in turn resell the products outside of those states. See Katz Decl. Ex. A; Pl.'s Resp. Defs.' Facts ¶ 48 ("[M]any of Parks' customers are wholesalers, retailers and distributors that have broad footprints."). Thus, even the concentrated sales of "Parks"-branded products to certain states may not be indicative of secondary meaning in those areas. Regardless, Parks's contention is that its mark possesses secondary meaning in the Eastern

**3.      No reasonable factfinder could conclude that Defendants copied the "Parks" name.**

Proof that a junior user copied a senior user's mark can be probative of secondary meaning, and Parks contends that copying occurred here. Parks points to the fact that a trademark search conducted by Defendants' counsel in July 2013, during the development of the Park's Finest product, revealed the existence of Parks's expired registration for its "Parks" name. Because the "Parks" name was known to Defendants (or, at least, their counsel) approximately six months prior to the date of the first sale of a product bearing the "Park's Finest" name, Parks contends that a trier of fact could infer that Defendants copied the "Parks" name. But as Parks itself recognizes, copying can generally "be refuted by showing independent creation." See Pl.'s Mem. Opp'n 17. Tim Smith, who was the vice president and general manager for the "Ball Park" brand at the time of the creation of the "Park's Finest" product, stated in a sworn declaration that "[t]he name 'Park's Finest' was suggested in June 2013 as a possible name" for the product—a month prior to the trademark search conducted by Defendants' counsel. See Smith Decl. ¶ 6, ECF No. 127. Mr. Smith's testimony is corroborated by the fact that a marketing firm engaged by Defendants had tested the name "Park's Finest" in focus groups conducted on June 17, 2013. See Smith Decl. Ex. 1, at 9. Indeed, the trademark search itself is evidence that Defendants had conceived of the "Park's Finest" name prior to the search, because the search was conducted on the name "Park's Finest." See Sluzas Decl. Ex. 3, at 1, ECF No. 138. This evidence would not permit an inference that Defendants chose the "Park's Finest" name with the intent to copy the "Parks" name.

---

United States, and it has made no argument that the name may have secondary meaning in any other identifiable area.

4.    **Parks's survey is not probative of secondary meaning.**

A party seeking to establish secondary meaning is not required to submit a survey to prevail. See E.T. Browne, 538 F.3d at 201. Nonetheless, survey evidence, when it is available, may be "direct and persuasive evidence of secondary meaning." See Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc., 780 F.2d 1324, 1333 n.9 (8th Cir. 1985). Parks contends that the survey it conducted, which detected a "consumer confusion rate of 32.7%", also constitutes evidence of secondary meaning because "proof of one is proof of the other." See Pl.'s Mem. Opp'n 17-18 (quoting Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 465 (3d Cir. 1983)). That, however, is not necessarily the case. See McCarthy, supra, § 15.11 n.1 ("Not every response rate that shows likely confusion establishes secondary meaning and not every survey that fails to show likely confusion establishes an absence of secondary meaning." (quoting Vincent N. Palladino, Secondary Meaning Surveys, in Trademark and Deceptive Advertising Surveys 98 (2012))). When the Lapp court was speaking of proof of confusion, the court was referring to evidence of actual confusion in the marketplace. See Lapp, 721 F.2d at 465 (observing that the plaintiff had "introduced several examples of actual confusion in buyers"). "Proof of actual consumer confusion caused by another's use of the designation is . . . evidence of secondary meaning, since if the designation is not distinctive, use by another will not result in confusion." Restatement (Third) of Unfair Competition § 13 cmt. e (Am. Law. Inst. 1995).

By contrast to evidence of actual confusion in the marketplace, whether a likelihood of confusion detected by a survey is probative of secondary meaning depends upon the format of the survey. For example, in Ideal Toy Corp. v. Plawner Toy Manufacturing Corp., 685 F.2d 78, 82 (3d Cir. 1982), the maker of the Rubik's Cube conducted a survey that revealed that forty percent of the participants mistakenly identified a "knockoff" version of the plaintiff's puzzle as

a Rubik's Cube. The confusion detected by that survey was probative of secondary meaning in the Rubik's Cube's trade dress because the participants were able to identify the source of the authentic product after being presented with nothing more than the defendant's reproduction. But as the Court has already explained, Parks's survey was quite different. This survey presented participants with images of a "Parks"-branded product and the Park's Finest product and proceeded to ask them whether they perceived any connection or affiliation between any of the images.[13] As a result, even if a survey participant had never before heard of the "Parks" name, that participant could still respond that he or she believed that the two products were connected simply based on the participant's review of the product images. As a result, the rate of confusion that the survey generated is not necessarily correlated to secondary meaning.[14]

### 5.     Parks has produced only minimal evidence of actual confusion.

As for evidence of actual confusion, Parks can point to only a handful of alleged instances of confusion, consisting of three unnamed consumers who were purportedly confused by the association between "Parks"-branded products and Defendants' Park's Finest product, and the testimony of one of Parks's two co-owners that a few of his personal acquaintances mistakenly believed that the Park's Finest product originated with Parks.[15] In light of the fact that Defendants have sold "many millions of units" of their Park's Finest product to "[m]illions of consumers," reports of only a few actual instances of confusion cast substantial doubt on Parks's claim of secondary meaning. See Commerce Nat'l, 214 F.3d at 440 (reasoning that the "harmonious coexistence in the same geographic area" of two companies operating in the same

---

[13]     See supra note 4 and accompanying text.
[14]     Defendants contend that the survey's methodology is fatally flawed, which renders the confusion rate detected by the survey unsound. See Defs.' Mot. Exclude Parks, LLC's Expert, ECF No. 144. Because Parks has failed to present evidence from which a rational trier of fact could conclude that secondary meaning exists in the name "Parks" in the Eastern United States, the Court does not need to determine whether the survey would be probative evidence of a likelihood of confusion between the marks.
[15]     See supra note 5.

industry with similar names without a single instance of actual confusion "most certainly cut[]

against [the plaintiff's] claim of secondary meaning").

**6.      The length and exclusivity of Parks's use of its mark supports a finding of
         secondary meaning, but Parks failed to quantify the nature and extent of that use.**

Weighing most in Parks's favor is the length and exclusivity of its use of the "Parks"

name. Parks has licensed the use of the name to Dietz & Watson and Super Bakery for over a

decade, and Defendants do not contend that the name has been used by any other participants in

the market. Parks also stresses the fact that the name has been in use since the 1950s, when

Henry G. Parks founded the Parks Sausage Company. However, as Defendants point out, Parks

has not cited to any evidence to attempt to quantify how widespread the name was known over

those years before the present owners purchased the company out of bankruptcy in the late

1990s, which limits the inferences that can be drawn from the name's long history. Length and

exclusivity of use are relevant only to the extent that the use was in the territorial area where

secondary meaning is claimed, and without any evidence of where the "Parks" name was

known—to the extent the same had attained secondary meaning over that time—no conclusions

can be drawn about whether that history suggests that the name possesses, or at one time did

possess, secondary meaning in the Eastern United States.

Taken together, Parks would ask the trier of fact to find secondary meaning across

twenty-six states from a minimal amount of advertising, a level of sales that does not appear to

indicate significant market penetration, an allegation of copying that appears to be contradicted

by the evidentiary record, a few reported incidents of actual confusion in the marketplace, and

the long history of the "Parks" name, the nature and extent of which Parks has not attempted to

quantify. From this evidence, the trier of fact "would have to make a leap of faith to conclude

that the [name] gained secondary meaning" across the geographic area that Parks has staked out.

See E.T. Browne, 538 F.3d at 199. For that reason, Defendants are entitled to judgment in their favor on Parks's claims of trademark infringement and unfair competition.[16]

## IV.   Conclusion

Parks's allegations of false advertising do not relate to the nature, qualities, characteristics, or geographic origin of Defendants' Park's Finest product, which means that Parks's allegations do not state a valid claim for false advertising. Even if they did, a reasonable trier of fact could not find that Defendants' use of the "Park's Finest" name on the packaging for their product or their advertisements has a tendency to deceive a substantial portion of their intended audience.

Nor could a reasonable trier of fact find that Parks has proven that its "Parks" name possesses secondary meaning across the area it has defined, without which Parks cannot prevail on a claim of trademark infringement. Accordingly, Defendants are entitled to judgment in their favor. A separate order follows.

BY THE COURT:

/s/ Joseph F. Leeson, Jr.
JOSEPH F. LEESON, JR.
United States District Judge

---

[16]    Defendants analyzed Parks's claim of unfair competition together with its claim of trademark infringement, and Parks too did not discuss the unfair competition claim separately from its trademark infringement claim. With no argument from Parks that the basis for these two claims differs in any substantive respect, Defendants are entitled to judgment on both claims.