UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PARKS, LLC, | : | |
| Plaintiff | : | |
| v. | : | No. 5:15-cv-00946 |
| TYSON FOODS, INC. and HILLSHIRE BRANDS COMPANY, | : | |
| Defendants | : | |

# **O P I N I O N**

Defendants' Motion for Attorney's Fees and Costs, ECF No. 184 – Denied

**Joseph F. Leeson, Jr.**                                                                                   **August 17, 2017**
**United States District Judge**

## I.    Introduction

     This case involves a trademark dispute between Parks, LLC, which sells various food products—primarily sausages—under the "Parks" name, and Tyson Foods, Inc. (and its wholly-owned subsidiary Hillshire Brands Company), maker of the popular "Ball Park" brand of hot dogs. Parks brought this suit after Tyson launched a new line of "super-premium" hot dogs under the name "Park's Finest." In a previous opinion, the Court entered summary judgment in Tyson's favor, 186 F. Supp. 3d 405, 412 (E.D. Pa. 2016), *aff'd*, 863 F.3d 220 (3d Cir. 2017), which Tyson followed with a request for attorney's fees and related nontaxable expenses. *See* Fed. R. Civ. P. 54(d)(2). In its view, this is an "exceptional" case that warrants fee shifting under the Lanham Act. *See* 15 U.S.C. § 1117(a). In the Court's view, it is not.

## II.    Standard of Review – Award of Attorney's Fees under the Lanham Act

     Under the Lanham Act, a "court in exceptional cases may award reasonable attorney fees to the prevailing party." § 1117(a). "[A]n 'exceptional' case is . . . one that stands out from others," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014), in the sense that "(a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner,'" *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314-15 (3d Cir. 2014) (quoting *Octane Fitness*, 134 S. Ct. at 1756).

     There is "no precise rule or formula" to make this determination, *Octane Fitness*, 134 S. Ct. at 1756, so "[w]hether litigation positions or litigation tactics are 'exceptional' enough to merit attorneys' fees must be determined by district courts 'in the case-by-case exercise of their

discretion, considering the totality of the circumstances,'" *Fair Wind*, 764 F.3d at 815 (quoting *Octane Fitness*, 134 S. Ct. at 1756). Some considerations that may help to illuminate this inquiry include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness*, 134 S. Ct. at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

### III. This case was not "exceptional" within the meaning of § 1117(a).

### A. The Manner in which the Case was Litigated

It is true that this case was unusual in the degree to which discovery had to be managed by the Court. By the time discovery had closed, the Court had issued no fewer than fifteen discovery-related opinions and orders that together spanned approximately 100 pages—longer than the Court's preliminary injunction and summary judgment opinions combined. But unlike some of the most rancorous discovery periods that the Court has overseen, neither side resorted to the sort of "wasteful procedural maneuvers" or "dilatory tactics" that are the hallmark of a case that has been litigated in an unreasonable manner. *See* John G. Roberts, Jr., *2015 Year-End Report on the Federal Judiciary* 11 (Dec. 31, 2015), https://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf. As the Court observed when it denied Tyson's motion for discovery sanctions, the source of these numerous, intractable discovery disputes instead seemed largely attributable to "the parties' failures to effectively communicate their respective positions and concerns" to each other, as though "the two sides [were] largely speaking two different languages" as they responded to each other's discovery requests and objections. Order 1 n.1, ECF No. 180 [hereinafter Sanctions Order].[1] Both sides seemed to believe earnestly in the correctness of their positions, but their respective understandings of what each discovery request sought and what each side needed to do to discharge its obligations were poles apart.

That suggests, at its core, a failure by the two sides to work collaboratively at discovery, and it cannot be emphasized enough that "lawyers—though representing adverse parties—have an affirmative duty to work together . . . to achieve prompt and efficient resolutions of disputes." Roberts, *supra*, at 6. But it does not suggest that one side—in the case of the instant motion, Parks—litigated the case in an unreasonable manner.

In support of its present motion, Tyson revisits a number of the accusations it levied against Parks during discovery. Chief among them is Tyson's contention that Parks responded to its document requests with a 30,000-page "document dump" filled with "largely irrelevant" materials that Parks did not review prior to production—a charge it repeated often throughout the case. Mem. Supp. Mot. 6, 8, ECF No. 184-1. But as the Court explained when it ruled on one of

---

[1] By citing to the order denying Tyson's motion for sanctions, the Court is not suggesting that a request for attorney's fees is governed by the same standard as a motion for discovery sanctions—it is not, *see Octane Fitness*, 134 S. Ct. at 1756 (emphasizing that "sanctionable conduct is not the appropriate benchmark")—but some of the observations made at that time help to explain why Parks did not engage in the sort of unreasonable conduct that warrants a fee award.

the motions to compel that Tyson filed during discovery, if a party elects—as Parks did here—to respond to a document request by producing documents "as they are kept in the usual course of business," *see* Fed. R. Civ. P. 34(b)(2)(E)(i), it "is not required to sift through the documents to separate the responsive documents from the non-responsive." *Parks, LLC v. Tyson Foods, Inc.*, 2015 WL 5042918, at *2 (E.D. Pa. Aug. 26, 2015). The Court left the door open for Tyson to renew its motion to compel if it were able to show that the documents had not actually been produced as they were kept in the usual course of business, *see id.* at *3 (pointing out that Tyson was "not foreclosed from seeking relief . . . in the event that [Parks's] production proves to have been inadequate under Rule 34"), but Tyson never did. Tyson did revisit the topic in the motion it filed for discovery sanctions, but only to argue that Parks should not have been permitted to rely on the usual-course-of-business option in light of the fact that those 30,000 documents had been in storage, not in active use. But that alone does not prevent a party from relying on the usual-course-of-business option as long as "the way in which the documents are kept has not changed from how they were kept in the usual course of business," *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 363 (N.D. Ill. 2005), and Parks produced a declaration from one of its co-owners that the documents were stored "in the same manner and order in which they were kept during the operation of the business," Mitchell Decl. ¶ 8, ECF No. 83-1.[2]

      Tyson also renews its complaint that nowhere among that initial 30,000-document production were there any documents that had been created in the past fourteen years. That too was addressed during discovery, when the Court pointed out that this accusation "means little without any reference to any specific document requests" that Tyson believes Parks did not adequately answer. *Parks*, 2015 WL 5042918, at *7 n.4. As the Court explained at the time, a number of Tyson's document requests sought documents that would be expected to be at least fourteen years old, such as its request for "[d]ocuments sufficient to identify every person who was or is an officer or director of Parks, LLC"—an entity that was formed in 1996 and appears to have changed little since that time—or Tyson's request for "[a]ll documents concerning [Parks's] knowledge that the Parks Marks and assets were [once] possibly for sale by H.G. Parks"—a reference to events that occurred twenty years before this case was filed. *Id.* Parks also points out that since 2001, the Parks company has functioned as little more than a two-person holding company for the Parks mark, neither producing nor selling any Parks-branded products itself. As a result, the documents in its possession that were responsive to Tyson's demands for information about the specific products sold under the Parks name, the volume of sales, and the

---

[2]    Tyson disputed that assertion based on the fact that the documents were produced in "approximately 14 boxes and . . . randomly stuffed onto two file carts," Mem. Supp. Mot. Sanctions 3, ECF No. 76-1, but Parks conceded that its filing system was not particularly sophisticated. *See* Mitchell Decl. ¶¶ 7-8 ("During the operation of the business, the Accounts Receivable were kept in drawers in files by customer name. The Accounts Payable were kept in drawers in files by vendor or supplier name. . . . [When] Parks, LLC terminated its business operations, . . . I placed the business records in banker boxes in the same manner and order in which they had been kept during the operation of the business."). In light of the limited "size and sophistication" of the Parks company, the Court has no reason to doubt that explanation. *See* Sanctions Order 1 n.1.

distribution channels "were quite limited and dated." Pl.'s Opp'n 8, ECF No. 190. As the Court noted when it denied Tyson's motion for discovery sanctions, much of Tyson's frustration with Parks's discovery responses seemed "to be attributable to the fact that [Parks] simply did not possess the information that [Tyson was] seeking," which was likely a reflection of the limited "size and sophistication" of the Parks company in the form that it presently exists. Sanctions Order at 1 n.1.

To be sure, Parks's discovery responses were not perfect. As Tyson observes, the Court had to order Parks to amend its responses to Tyson's interrogatories because Parks had initially responded to some of them with only a statement that it would produce "responsive, non-privileged documents . . . pursuant to a reasonable search" at some unspecified time in the future. 2015 WL 5042918, at *4. The second attempt Parks made to answer those interrogatories also fell short of the mark, when it tried to answer them through a combination of written responses and reliance on Rule 33(d) (which allows a party to forgo a written response if it instead directs the opposing party to records where the information can be found) without actually "specifying the records" that were responsive to Tyson's requests. Fed. R. Civ. P. 33(d)(1). Parks tried to explain away that deficiency by suggesting that Tyson already knew where to find the records, because Parks had described where they could be found in one of its previous briefs. While that may have been so, that does not comply with the letter of the rule. Parks was also slow to respond to Tyson's document requests. Its initial production was a week late, and some documents were produced considerably after that. Parks concedes that "[i]n some respects, [it] found the discovery overwhelming," Pl.'s Opp'n 6, and to some extent, the Court is sympathetic to that view,[3] but the discovery rules require litigants to be proactive, and the prudent course of action would have been to either seek an extension of time or apply for a protective order.

Even with these shortcomings in mind, this is not, in the Court's view, "the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Octane Fitness*, 134 S. Ct. at 1756-57. A review of the discovery-related opinions the Court issued reveals that it was ultimately a mixed bag for both sides. Tyson won some of its discovery challenges, but many others were turned away to some degree or another for being unfounded or for overreaching. *See* 2015 WL 5042918, at *2-8; 2015 WL 9316060, at *10-17. "[T]he fact that [Tyson] was on the losing side of some of those discovery disputes cuts against its argument that [Parks] was unreasonable." *See Parallel Networks Licensing, LLC v. Int'l Bus. Machs. Corp.*, No. 13-2072, 2017 WL 3232422, at *2 (D. Del. July 31, 2017) (Jordan, J.).

This being a totality-of-the-circumstances inquiry, a word about Tyson's own discovery conduct is appropriate. *See id.* (recognizing that "[t]he conduct of the parties is a relevant factor

---

[3] By way of example, Tyson served Parks with 739 requests for admission. Considering the fact that some districts limit litigants to 25 unless they can articulate a good reason to serve more, *see, e.g.*, S.D. Cal. Local R. Civ. P. 36.1(a), it may not have been out of line for Parks to question whether the burdens that Tyson was imposing through its discovery requests were proportional to their likely value. *See* Fed. R. Civ. P. 26(b)(1).

4

under *Octane*'s totality-of-the-circumstances inquiry" (quoting *Gaymar Indus. v. Cincinnati Sub-Zero Prods.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015))). Tyson's motions were replete with allegations of egregious discovery misconduct—often in bold, underlined text—but tended to be comparably short on substance, which served only to compound the burdens of sifting through the numerous disputes that Tyson raised to find those that had merit. In its first motion to compel, filed after Parks's initial document production, Tyson accused Parks of engaging in "blatant, unjustified" conduct that was nothing short of an "unmitigated flaunting of its [discovery] obligation[s]" and sought to have Parks compelled to respond to all 115 of its document production requests, without objection, all because of Tyson's view that the documents Parks had produced "were merely a document dump of largely irrelevant, non-responsive files . . . not subject to any advance review" that did not contain any documents created within the last fourteen years. Mem. Supp. Mot. Compel 5-6, ECF No. 51. As already mentioned, the former objection lacked merit and the latter objection meant little without reference to any particular discovery request, and Tyson neglected to cite to any specific document requests that it believed that Parks had failed to properly answer. Instead, Tyson simply informed the Court that it had attached a copy of Parks's responses to all 115 requests for production for the Court to review and took the position that "the entirety of [its] 115 Requests for Production [were] at issue," apparently leaving it to the Court to review each request and determine whether that was so. *Id.* at 4. This long-on-rhetoric, short-on-substance approach was responsible for that motion being largely denied, *see* 2015 WL 5042918, at *6-8, and it was on display in a number of Tyson's discovery-related letters and briefs.

That rhetoric reached its peak in the sanctions motion Tyson filed late in discovery. In it, Tyson accused Parks and its counsel of a "disgraceful," "unrepentant pattern of intentional, wrongful, [and] unethical discovery conduct" that "ma[de] a mockery of the federal court litigation process," Mem. Supp. Sanctions 2, 13, insinuated—with no apparent basis—that Parks's counsel may have deliberately "remove[d] critical relevant documents" before turning over a set of files for Tyson's review, *id.* at 3, and accused Parks and its counsel of having carried out a "premeditated plan to hide evidence, give manifestly incomplete, non-responsive answers to interrogatories, and force [Tyson] to go through [a] lengthy discovery resolution process, again and again so as to run out the discovery clock and destroy [Tyson's] ability to identify and retain experts, and then to embark on a jury trial by ambush," *id.* at 4 n.3. In the end, those bombastic accusations cut against its argument that fee shifting is warranted because of the way its opponent litigated the case.

B. **The Strength of Parks's Claims**

Parks asserted three claims under the Lanham Act: false advertising, false association, and trademark dilution. Tyson contends they were all "frivolous." That was not the case.

Parks's primary claims were its claims of false advertising and false association. The theory behind the false advertising claim was that Tyson's use of the name "Park's Finest" was

5

false, or at least misleading, because it conveyed to consumers that Tyson was selling Parks's finest product. During the early stages of the case, the Court detected a possible problem with this claim: it seemed to be simply a duplicate of Parks's false association claim, not a true claim of false advertising. Under the Lanham Act, a claim of false advertising must be based on a misleading statement made about the "nature, characteristics, qualities, or geographic origin" of a product. 15 U.S.C. § 1125(a)(1)(B). Parks's claim, by contrast, appeared to be based on an allegation that the name Tyson chose was "likely to cause confusion . . . [about] the affiliation, connection, or association" of the product, which is a claim of false association. § 1125(a)(1)(A). At summary judgment, the Court made that conclusion explicit and held that the false advertising claim failed because it was simply a claim for false association cloaked in the language of false advertising. *See* 186 F. Supp. 3d at 414 ("The Court now holds that . . . Parks's allegations do not state a claim for a violation of § 1125(a)(1)(B)."). On appeal, the Third Circuit agreed. 863 F.3d at 226 ("As the District Court recognized, Parks's false advertising claim fails because it is essentially a false association claim in disguise.").

While the claim ultimately failed, there are two reasons why Parks's decision to bring what turned out to be a repackaged version of its false association claim does not support a fee award. The first is that at the time Parks brought the claim, there was little case law—particularly in this circuit—addressing the dividing line between claims of false advertising and claims of false association. The Court had to draw from its own construction of § 1125(a) and analogies to out-of-circuit caselaw to demonstrate why the false advertising claim was not viable. *See* 2015 WL 4545408, at *13 n.15; 186 F. Supp. 3d at 413-15. When the Third Circuit took the case up on appeal, it highlighted the fact that this case afforded it the "opportunity to clarify"—in a precedential opinion, no less—"the distinction between claims brought under § 1125(a)(1)(A) and § 1125(a)(1)(B)." 863 F.3d at 226. Particularly with respect to Parks's contention that the name "Park's Finest" could mislead consumers about the product's "origin" (and therefore amount to false advertising), the Third Circuit pointed out that while it had in the past suggested in dicta that such a claim would not be viable, it had "never [reached that conclusion] in a holding." *Id.* at *5. Given the state of the governing law at the time this case was filed, *see Octane Fitness*, 134 S. Ct. at 1756, Parks's decision to attempt a claim under the banner of false advertising was not "unreasonable." *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*, 771 F.2d 521, 526 (D.C. Cir. 1985) (R.B. Ginsburg, J., joined by Scalia, J.).[4]

The fact that the false advertising claim turned out to be a duplicate of the false association claim leads to the second reason why fee shifting is not warranted for the false advertising claim. Because the false advertising claim "effectively collaps[ed] into an inquiry into whether . . . a substantial number of consumers would associate the Park's Finest name with [the] 'Parks' name,'" 2015 WL 4545408, at *13—the same question that needed to be answered

---

[4] It is notable as well that it was not Tyson but the Court that identified this threshold problem with Parks's false advertising claim. While Tyson argued throughout the case that the claim failed on the merits, Tyson did "not question[] the propriety of [Parks] proceeding on a theory of false advertising." 2015 WL 4545408, at *13 n.15.

6

in order to resolve Parks's false association claim—the reasonableness of Parks's decision to bring that claim is, in effect, linked to the merits of its false association claim. As will be seen, that claim was not so "exceptionally meritless" as to warrant fee shifting. *See Octane Fitness*, 134 S. Ct. at 1757. The Court turns to that topic now.

In its briefing in support of this motion, Tyson contends that the false association claim—the true heart of this case—was "meritless," "frivolous," and "100% specious." Mem. Supp. Mot. 12, 14, 16. But during oral argument before the Third Circuit, Tyson's counsel offered a quite different—and less hyperbolic—assessment: "this case [was] basically about a failure of proof." Oral Argument at 16:33, 863 F.3d 220 (No. 16-2768), http://www2.ca3. uscourts.gov/oralargument/audio/16-2768ParksLLCv.TysonFoods.mp3.

There was no genuine dispute in this case that the Parks name had "once enjoyed widespread recognition" as a result of an ad campaign that was at one time "ubiquitous and long-running." 863 F.3d at 223, 232. That differentiates this case from the mine-run of frivolous trademark infringement suits brought by plaintiffs who seek to prevent others from infringing on marks that do not and have never had the sort of recognition in the marketplace that would entitle them to protection. There was also little question that Tyson's "Park's Finest" name bore a close similarity to the "Parks" name, and that the two products, Tyson's hot dogs and Parks's sausages, are closely related.[5] Many of the pieces then seemed to be in place for a potentially meritorious false association suit. All that remained was whether Parks would be able to demonstrate that a name that was once entitled to protection was still sufficiently active in the marketplace (and the minds of consumers) to allow Parks to continue to protect it.

Parks ultimately failed in that endeavor. But that may have been due in large part to the company's failure to produce a proper survey to gauge the current level of awareness of its name. Survey evidence is not essential to proving that a mark has secondary meaning, but "[a]n expert survey of purchasers can provide the most persuasive evidence of secondary meaning." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989). Particularly in a case like this one where there was no genuine dispute that the mark had once attained secondary meaning, survey evidence showing that the name still enjoyed recognition among a critical mass of consumers might have gone a long way toward carrying Parks's burden. Parks did conduct a survey during discovery, but it was not properly designed to measure secondary meaning (it focused on likelihood of confusion, the second of the two steps of a false association inquiry), so it ended up being of no help. With no survey evidence, Parks was left to rely upon circumstantial indicia of secondary meaning, such as volume of sales and extent of advertising, none of which favored Parks in the form that the company currently exists. Tyson, for its part, did not attempt a

---

[5] Because Parks failed to make a sufficient showing of secondary meaning to survive summary judgment, the Court did not reach the second step of assessing whether there was a likelihood of confusion between the marks and is not passing judgment on that question now. But for the present purpose of assessing the strength of Parks's claims, suffice it to say that Tyson would likely not believe that it would be able to call a new line of hot dogs "Johnsonville's Finest" without creating a risk of confusion in the marketplace.

survey of its own to measure secondary meaning, so it is ultimately not possible to know, from the record of this case, whether or not the Parks name might still have some measurable level of secondary meaning in some of the geographic territory where Parks believes that its name still resonates. It was, as Tyson's counsel put it, "a failure of proof."

Seen in that light, and against the historical backdrop of the Parks name, this is not a case where the disparity in strength between the two sides was so unusually great that a fee award is in order. Even now, Tyson perhaps does not appreciate how close it may have come to a different result in this case. When the case went up on appeal, two of the three members of the panel candidly acknowledged that they were quite familiar with the Parks name and its once-ubiquitous advertisements.[6] A properly-designed survey (and perhaps a bit more modesty in the geographic area Parks sought to protect, *see* 863 F.3d at 236 n.24) might have changed the course of this case.

Tyson also makes much of the fact that Parks moved for a preliminary injunction at the outset of the case without specifying any geographic limitation on the relief it sought, only to concede at summary judgment that its mark had, at best, secondary meaning in only the eastern half of the United States. The problem with that argument is that Parks based its request for a preliminary injunction solely on its claim for false advertising, not its claim for false association, *see* 2015 WL 4545408, at *2, and ordinarily, false advertising claims do not turn on whether the plaintiff who challenges the false statement has a protectable trademark or where that trademark is protectable. False advertising and false association are "two distinct bases of liability," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1384 (2014); the purpose of a false advertising claim is not to stop a party from infringing upon a protectable trademark, but to stop a competitor from engaging in the "the kind of unfair competition that consists of lying about goods or services." *Serbin v. Ziebart Int'l Corp.*, 11 F.3d 1163, 1168 (3d Cir. 1993) (quoting Charles Bunn, *The National Law of Unfair Competition*, 62 Harv. L. Rev. 987 (1949)); *id.* at 1173 ("[S]imple claims of false representations in advertising are actionable under section 43(a) when brought by competitors of the wrongdoer, even though they do not involve misuse of a trademark." (quoting *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1108-09 (9th Cir. 1992))). Of course, it turned out that Parks did not have a viable false advertising claim because its allegations properly sounded in false association, not false advertising, which meant that its ability to obtain any relief in this case both depended on, and was limited to, its ability to prove secondary meaning. But it was not until after the preliminary injunction hearing that the Court pointed that out, *see id.* at *13 & n.15, and Parks responded to that decision by conceding at summary judgment that it could not obtain relief for any of its claims anywhere other than the

---

[6] *See* Oral Argument, *supra*, at 1:13 ("[F]or years in the late 1970s and 1980s, I fed my kids Parks Sausages, and I loved the television commercial, 'Can I have some more Parks Sausages, Mom, Please?' And my kids would say the same thing to me when I was feeding them breakfast . . . . So that is indelibly etched in my memory when I think of Parks.") (Roth, J.); *id.* at 16:14 ("This was, as Judge Roth pointed out at the outset, a very, very well-known mark in the '60s and 70's. I hate to admit, I remember those ads really well too.") (Smith, C.J.).

area where it believed it could establish secondary meaning: the eastern United States. With that context in mind, Parks's omission of an express geographic limitation in its preliminary injunction motion does not significantly tip this case toward the "exceptional" category.

That still leaves Parks's claim for trademark dilution, which it voluntarily withdrew at summary judgment. That claim, it is true, had little chance of success from the start, given that dilution claims are reserved for those marks that are "widely recognized by the general consuming public of the United States," 15 U.S.C. § 1125(a)(2)—marks that are, in other words, a "household name." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012); *see It's a 10, Inc. v. Beauty Elite Grp.*, No. 13-60154, 2013 WL 6834804, at *8 (S.D. Fla. Dec. 23, 2013) (suggesting that dilution claims are limited to marks "the likes of such giants of branding as Exxon, Kodak, and Coca-Cola"). Even at the peak of Parks's fame, it is unlikely that the brand would have qualified.

But an award of attorney's fees does not turn on how *great* the disparity was between the parties' litigating positions; it turns on whether the disparity between their positions was *unusual*—whether the present case "stands out from others." *Octane Fitness*, 134 S. Ct. at 1756 (holding that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position"); *Fair Wind*, 764 F.3d at 815 (explaining that a case is exceptional when "there is an unusual discrepancy in the merits of the positions taken by the parties").

While dilution claims are intended to be rare, reserved for only truly famous marks, it is nonetheless quite common for them to be tacked on to claims for trademark infringement or false association. *See* H.R. Rep. No. 109-23 (2005), *reprinted in* 2006 U.S.C.C.A.N. 1091, 2005 WL 638693, at *25 (statement of Rep. Berman) (expressing the "hope that [with the 2006 amendments to the Lanham Act] the dilution remedy will be used in the rare circumstance and not as the alternative pleading"). But because they offer relief only to holders of a "select class of marks" that are "truly prominent and renowned," *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 908 (9th Cir. 2002) (quoting *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999)), and because that category is "strict[ly] polic[ed]," *id.*, the vast majority of attempted dilution claims not only fail, but had very little chance of ever succeeding.

That is not to say that because non-meritorious dilution claims are common, attorney's fees could never be awarded for filing one. But in light of the fact that the Parks name, at least at one time, "enjoyed widespread recognition", 863 F.3d at 223—something that many marks never attain—the company's attempt to characterize its mark as "famous" is not so different from numerous other plaintiffs that have tried the same thing, despite having hardly any chance of being considered alongside that pantheon of truly famous marks. Notable recent examples include a grocery store with a single location in Rehoboth Beach, Delaware, *Lingo v. Lingo*, 785 F. Supp. 2d 443, 455 (D. Del. 2011), a wholesale granite retailer, *Boston Granite Exch., Inc. v. Greater Boston Granite, LLC*, No. 1:11-CV-11898, 2012 WL 3776449, at *6 (D. Mass. Aug. 29, 2012), a Russian circus performer and his troupe of clowns and trick-performing cats, *Kuklachev*

*v. Gelfman*, 600 F. Supp. 2d 437, 452 (E.D.N.Y. 2009), a manufacturer of rifle sights, *Leapers, Inc. v. SMTC, LLC*, No. 14-CV-12290, 2014 WL 4964376, at *1 (E.D. Mich. Oct. 3, 2014), and a brand of grease pumps used in commercial trucks, *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 500 (6th Cir. 2013). None of those would seem to have ever enjoyed the sort of widespread recognition that the Parks name once appeared to have.

Thus, while Parks's dilution claim had little chance of success, when considered against the landscape of dilution claims that routinely find their way into Lanham Act cases, it was not so "uncommon" or "exceptionally meritless" that it "stands out from [the] others." *Octane Fitness*, 134 S. Ct. at 1756-57. It was not, in the language of the Lanham Act, "exceptional." § 1117(a).

## C. Parks's Motivation

While not dispositive, it is worthwhile to consider Parks's motivation in bringing these claims. *Octane Fitness*, 134 S. Ct. at 1756-57 & n.6 (quoting *Fogerty*, 510 U.S. at 534 n.19) (recognizing that while a fee award may be warranted even in the absence of bad faith, the motivation of the parties is a relevant consideration). By the end of this case, the Court had grown quite familiar with the two sides, and the overriding impression the Court received from Parks was that it genuinely viewed Tyson's use of the name "Park's Finest" as an existential threat—a potential final blow to the once-prominent company, inflicted by a competitor that, by revenue, is approximately four thousand times its size. The decision to bring this suit was also a reflection of the undeniable pride that its two current owners have in the company and its name—a company that not only was once well-known, but that made history as the first African-American-owned company to be publicly traded on the New York Stock Exchange. There is no question in the Court's mind that these claims were brought in good faith, and that is relevant to whether fee shifting is warranted.

## IV. Conclusion

Neither the way that Parks litigated this case nor the disparity in strength between the parties' positions was "'exceptional' enough to merit attorneys' fees." *Fair Wind*, 764 F.3d at 815. Accordingly, Tyson's request for an award of attorney's fees and related nontaxable expenses is denied.